# IN THE UNITED STATES DISTRICT COURT FOR THE

## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| TONY BOWLES | ) |
| also known as "TB" and "Eric Hill" | ) |
| | ) |
| JOHNNIE HILL | ) |
| also known as "J," "Bush," and "Snoop" | ) |
| | ) |
| STEVEN BATES | ) |
| also known as "Worm" | ) |
| | ) |
| NARATIO BOWLES | ) |
| also known as "Rato" and "Roto" | ) |
| | ) |
| AARON DANGERFIELD | ) |
| also known as "Ernie" and "Danger" | ) |
| | ) |
| MARVIN DIXON | ) |
| also known as "Chief" and "Sonny" | ) |
| | ) |
| KEITH HENDERSON | ) |
| | ) |
| KIMANITA JOHNSON | ) |
| also known as "Pinky" | ) |
| | ) |
| CHRISTOPHER JONES | ) |
| | ) |
| ELLSWORTH JUGGINS | ) |
| also known as "Ells" and "L" | ) |
| | ) |
| JAMES MCQUEEN | ) |
| also known as "Pops" | ) |
| | ) |
| DONNA PORTER | ) |
| also known as "D" | ) |

**UNDER SEAL**

Case No. 1:13-mj-00611

OCT 1 5 2013

CLERK U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

JONATHAN SANDERS                           )
also known as "J"                          )
                                           )
PAUL STARNER                               )
                                           )
THOMAS THURMAN                             )
also known as "T"                          )
                                           )
DARREL WILLIAMS                            )
also known as "Rell," "Real," and "Drell"  )
                                           )
DONALD YOUNGBLOOD                          )
also known as "Blood"                      )
                                           )
        Defendants.                        )
                                           )

UNITED STATES OF AMERICA                   )
                                           )
        v.                                 )
                                           )
MARCIANO REZA, JR.                         )
also known as "J"                          )
                                           )
BRENNAN CHRISTIAN                          )
also known as "Twin" and "Trey"            )
                                           )
LAZARO JAIMES                              )
also known as "Laz" and "Lazo"             )
                                           )
FRANCISCO REZA                             )
also known as "Frankie" and "Pancho"       )
                                           )
VENANCIO REZA                              )
also known as "Venancio Resa" and "Vinny"  )
                                           )
        Defendants.                        )
                                           )

**UNDER SEAL**

Case No. 1:13-mj-00612

FILED OCT 1 5 2013 CLERK ... ALEXANDRIA ...

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR
## CRIMINAL COMPLAINTS AND ARREST WARRANTS

I, Kenneth M. Smith, Special Agent of the Federal Bureau of Investigation (FBI), Washington (D.C.) Field Office, Northern Virginia Resident Agency, being duly sworn, depose and state the following:

## INTRODUCTION

1.     This affidavit is submitted in support of an application for a criminal complaint and arrest warrants for the following defendants in case number 1:13-mj-00611: TONY Bowles (also known as "TB" and "Eric Hill"); Johnnie HILL (also known as "J," "Bush," and "Snoop"); Steven BATES (also known as "Worm"); NARATIO Bowles (also known as "Rato" and "Roto"); Aaron DANGERFIELD (also known as "Ernie" and "Danger"); Marvin DIXON (also known as "Chief" and "Sonny"); Keith HENDERSON; Kimanita JOHNSON (also known as "Pinky"); Christopher JONES; Ellsworth JUGGINS (also known as "Ells" and "L"); James MCQUEEN (also known as "Pops"); Donna PORTER (also known as "D"); Jonathan SANDERS (also known as "J"); Paul STARNER; Thomas THURMAN (also known as "T"); DARREL Williams (also known as "Rell," "Real," and "Drell"); and Donald YOUNGBLOOD (also known as "Blood"). Your affiant submits that the evidence described in this affidavit establishes probable cause to believe that between in and around 2012 and the present date, within the Eastern District of Virginia and elsewhere, these defendants did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute 500 grams or more of a substance containing a detectable amount of cocaine, a Schedule II controlled substance, and twenty-eight grams or more of a mixture and substance containing a detectable amount of

cocaine base (commonly known and hereafter referred to as "crack"), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

2.      This affidavit is further submitted in support of an application for a criminal complaint and arrest warrants for the following defendants in case number 1:13-mj-00612: MARCIANO Reza, Jr. (also known as "J"); Brennan CHRISTIAN (also known as "Twin" and "Trey"); Lázaro JAIMES (also known as "Laz" and "Lazo"); FRANCISCO Reza (also known as "Frankie" and "Pancho"); and VENANCIO Reza (also known as "Venancio Resa" and "Vinny"). Your affiant submits that the evidence described in this affidavit establishes probable cause to believe that between in and around 2012 and the present date, within the Eastern District of Virginia and elsewhere, these defendants did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

3.      Each defendant will be referred to individually by the portion of their name that is in all capitalized letters in the paragraphs above.

4.      All information in this affidavit is personally known to me, has been related to me by other law enforcement officers and/or confidential sources, or has been related to me by records and documents gathered during this investigation, as noted. This affidavit contains information necessary to support probable cause for this application. It is not intended to include each and every fact and matter observed by me or known to the government. The inferences and conclusions I draw from the evidence included in this affidavit are what I believe based on my training, experience, and knowledge of the investigation.

## AGENT BACKGROUND

5.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

6.      I have been a Special Agent with the FBI since March 2008. Since February 2009, I have been assigned to a squad that investigates Criminal Enterprises and Violent Gangs out of the Washington Field Office (WFO), Northern Virginia Resident Agency. Prior to joining the FBI, I was employed as a Corrections Officer in Utah for six years.

7.      I have attended classes and courses conducted by the FBI and other government agencies regarding the conduct of various criminal activities by persons and/or groups who illegally import, distribute, and sell illegal narcotics. As a Special Agent with the FBI, I have conducted physical surveillance, analyzed phone records, and participated in the application and execution of search warrants and arrest warrants for numerous defendants, including drug traffickers. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. I have also spoken to confidential sources, suspects, defendants, witnesses, and other experienced investigators concerning the methods and practices of drug traffickers, as well as the inner-workings of major drug trafficking organizations. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology utilized by the traffickers and abusers of controlled substances.

8.      I have also become knowledgeable with the enforcement of state and federal laws pertaining to narcotics and dangerous drugs. Based on this experience, I have become well-

versed in the methodology utilized in narcotics trafficking operations, the unique trafficking patterns employed by narcotics organizations, and their patterns of drug abuse. I have also interviewed convicted drug dealers who decided to cooperate with government officials. During these interviews, the drug dealers have explained their schemes to use and launder drug proceeds and their methods of operation. I have also spoken with other FBI, Drug Enforcement Administration (DEA), and Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) agents, and police officers who have advised me when relating the substance of their similar experiences and the results of their own investigations and interviews. Based upon this experience, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking.

9.     During the course of my participation in investigations of narcotics trafficking organizations, I have testified in trial and grand jury proceedings. I have written reports, analyzed records and documents, served as the affiant on numerous Title III wiretaps, and served as an administrative agent on over twenty Title III wiretaps where I was not the affiant. Through my employment with the FBI, I have gained knowledge in the use of various investigative techniques including the utilization of wiretaps, physical surveillance, undercover agents, confidential informants and cooperating witnesses, the controlled purchases of illegal narcotics, electronic surveillance, consensually monitored recordings, investigative interviews, financial investigations, the service of administrative and grand jury subpoenas, and the execution of search and arrest warrants.

## INVESTIGATION BACKGROUND

10.     In May 2012, the FBI partnered with the Prince William County Police Department (PWCPD) in the latter's ongoing investigation of TONY, who was reported by

multiple sources to be a substantial cocaine and crack dealer. The FBI and PWCPD learned that the ATF, the Sheriff's Office for Fairfax County, and the Manassas Park Police Department were also investigating TONY and his associates, which led to all the involved agencies combining their efforts to uncover the full scope of TONY's criminal activity.

11.    The investigation revealed that TONY has a large network of people with and through whom he distributes cocaine and crack, to include defendants NARATIO, DANGERFIELD, HENDERSON, JOHNSON, JONES, JUGGINS, MCQUEEN, SANDERS, DARREL, and YOUNGBLOOD. TONY and his associates operate primarily in and around Woodbridge, Triangle, Dumfries, Stafford, and Fredericksburg, Virginia, all within the Eastern District of Virginia.

12.    The investigation further revealed that one of TONY's primary sources of supply is HILL, from whom TONY frequently obtains several-hundred-gram quantities of cocaine. HILL lives within the Eastern District of Virginia and supplies numerous other people with cocaine and crack, to include defendants BATES, DIXON, PORTER, STARNER, and THURMAN. In order to meet his supply needs, HILL obtains multi-kilogram quantities of cocaine.

13.    MARCIANO lives in North Carolina and, along with defendants CHRISTIAN, JAIMES, FRANCISCO, and VENANCIO, obtains multi-kilogram quantities of cocaine that they then distribute, as both cocaine and crack. During the course of investigating HILL, agents determined that he and MARCIANO maintain phone contact because MARCIANO is a backup or alternate source of supply for HILL. Agents also learned that MARCIANO and VENANCIO were targets of a joint investigation by the North Carolina State Bureau of Investigation, the

Sheriff's Departments for Moore and Montgomery Counties in North Carolina, and the Department of Homeland Security, Homeland Security Investigations.

14.     UCC-1[1] is one of the people who supplies MARCIANO with kilogram quantities of cocaine. Agents discovered that one of the methods UCC-1 uses to transport cocaine to MARCIANO is through a New Jersey-based long-haul trucking business run by UCC-11. UCC-11 has several truck drivers, to include UCC-12, and they use legitimate loads of cargo as a cover to smuggle substantial quantities of cocaine and other controlled substances across the country. As described in more detail below, in April 2013, UCC-12 drove one of UCC-11's trucks down the East Coast, through the Eastern District of Virginia and into North Carolina, where he met with MARCIANO and supplied him with fourteen kilograms of cocaine. The cocaine came from UCC-1. In May 2013, as is also discussed below, UCC-12 was driving the same truck of UCC-11's when law enforcement in Texas found inside the truck several kilograms of cocaine and methamphetamine.

15.     Law enforcement has used many methods to investigate the conspiracies. These include interviews of confidential sources[2] and defendants, consensually monitored phone calls, search warrants, analysis of toll records and other telephone records, examination of wire transfers and other financial records, review of pole camera footage, and physical surveillance.

---

[1] There are several uncharged co-conspirators referred to throughout this affidavit by "UCC" and a corresponding number. The numbers assigned these uncharged co-conspirators do not carry any significance, do not represent their respective roles within the conspiracy, and do not necessarily appear sequentially in this affidavit. There are uncharged co-conspirators referenced within this affidavit who are not labeled a UCC. Each UCC is referred to in the masculine gender, regardless of their true gender.

[2] This affidavit discusses several confidential sources, whose information law enforcement has found to be reliable, credible, and often corroborated by other sources or events. Each confidential source is referred to in the masculine gender, regardless of their true gender, and they are labeled by "CS" and a corresponding number. The numbers do not carry any significance and do not necessarily appear sequentially in this affidavit.

Wherever in this affidavit I discuss information resulting from physical surveillance conducted in this investigation, that information, except where otherwise indicated, does not set forth my own personal observations, but rather that which has been provided directly or indirectly to me through other law enforcement officers who made such observations.

16.     Controlled purchases of cocaine and crack were also made from several defendants by confidential sources and undercover officers.[3] Prior to each controlled purchase involving a confidential source, the confidential source and any vehicle they planned to use was searched prior to and following the transaction to ensure that no contraband was present, with negative results each time. After each transaction, all contraband and evidence purchased, as well as any remaining monies, were relinquished by the confidential source to law enforcement. To date, agents have collected through controlled purchases and seizures in excess of five kilograms of cocaine and 280 grams of crack.[4]

17.     Additionally, United States District Judges Leonie M. Brinkema, Anthony J. Trenga, Liam O'Grady, and Gerald Bruce Lee, of the United States District Court for the Eastern District of Virginia, issued between them ten Orders authorizing law enforcement to intercept communications over eleven cellular telephones used by certain defendants. Thousands of

---

[3] Undercover officers are referred to throughout this affidavit by "UC" and a corresponding number. The numbers assigned each undercover officer do not carry any significance and do not necessarily appear sequentially in this affidavit. Each UC is referred to in the masculine gender, regardless of their true gender.

[4] The controlled purchases and seizures referenced within this affidavit were of substances that, based on the investigation and training and experience of law enforcement, are suspected to be controlled substances. Though some field tests were performed, because agents are awaiting the results of analyses conducted of all the substances by forensic chemists with the DEA and other agencies, all references within this affidavit to controlled substances in law enforcement's possession should be read as suspected controlled substances. Additionally, many of the stated quantities of the suspected controlled substances are based on estimates made by law enforcement in and around the time of the respective seizures of those substances and therefore are not final and are subject to revision by the forensic chemists.

intercepted communications have been pertinent to this investigation. Interception of wire communications and, in some instances, electronic communications, over the following telephones occurred over the following time periods:

a.      (804) 263-5904 ("Target Telephone #1"), used by TONY, from December 17, 2012, to February 13, 2013. Authorization was given to intercept wire and electronic communications.

b.      (804) 316-6479 ("Target Telephone #2"), used by TONY, from January 16, 2013, to April 13, 2013. Authorization was given during the initial thirty-day period of interception to intercept wire communications. During the second and third thirty-day periods of interception, authorization was given to.intercept wire and electronic communications.

c.      (215) 983-4866 ("Target Telephone #3"), used by HILL, from February 14, 2013, to May 11, 2013, and then from May 17, 2013, to July 13, 2013. Authorization was given to intercept wire and electronic communications.

d.      A telephone number ending in the last four digits 9731 ("Target Telephone #4"), used by UCC-2, from February 14, 2013, to March 15, 2013. Authorization was given to intercept wire communications.

e.      (910) 975-5311 ("Target Telephone #5"), used by MARCIANO, from April 12, 2013, to May 12, 2013, and then from August 12, 2013, to September 10, 2013. During the initial thirty-day period of interception, authorization was given to intercept wire communications, while during the second period of interception, authorization was given to intercept wire and electronic communications.

f.      (910) 975-7648 ("Target Telephone #6"), used by MARCIANO, from May 17, 2013, to July 25, 2013. Authorization was given to intercept wire and electronic communications.

g.      A telephone number ending in the last four digits 8062 ("Target Telephone #7"), used by UCC-12, from May 20, 2013, to May 31, 2013. Authorization was given to intercept wire communications.

h.      A telephone number ending in the last four digits 0418 ("Target Telephone #8"), used by UCC-11, from June 14, 2013, to August 10, 2013, and then from August 12, 2013, to September 10, 2013. Authorization was given to intercept wire communications.

i.      (646) 527-2099 ("Target Telephone #9"), used by DIXON, from June 14, 2013, to July 13, 2013. Authorization was given to intercept wire communications.

j.      (786) 459-1960 ("Target Telephone #10"), used by CHRISTIAN, from July 26, 2013, to August 24, 2013. Authorization was given to intercept wire and electronic communications.

k.      A telephone number ending in the last four digits 4156 ("Target Telephone #11"), used by UCC-1, from July 26, 2013, to August 19, 2013. Authorization was given to intercept wire communications.

18.     During the course of intercepting communications over these telephones, many of the defendants who used their respective telephone(s) identified themselves by their first and/or last name, and/or were identified as such by a person with whom they were communicating. Furthermore, during their respective periods of interception, Target Telephones #1 and #2 were registered in TONY's name, Target Telephone #7 was registered in UCC-12's name, and Target Telephone #8 was registered in UCC-11's name. Finally, physical surveillance and other

investigative techniques, in conjunction with the intercepted communications, confirmed the identities of the defendants using their respective telephone(s).

19.     Unless otherwise noted, wherever in this affidavit I assert that a statement was made by an individual, such statement is described in substance herein and is not intended to be a verbatim recitation of such statement. Furthermore, any statements excerpted from recorded conversations, including those that are quoted, are subject to further revision for clarification and/or accuracy. Many intercepted communications over Target Telephones #5, #6, #8, and #11 occurred in Spanish and were translated into English by the wiretap monitor.

20.     Not all relevant intercepted communications are described and not all relevant portions of mentioned communications have been described. The summaries of and quotations from intercepted communications that are discussed in this affidavit are based on line sheets and reviews of recordings, and not final or certified transcripts. All dates and times for those intercepted communications discussed in this affidavit are approximate and based on the monitoring equipment at the time the respective communications were intercepted. Any other times referenced in this affidavit, relating to surveillance, for instance, are approximations.

21.     Discussions of particular intercepted communications include a reference to the Target Telephone on which the communications was intercepted, indicated by "TT" followed by the number of the telephone, as well as the unique session number assigned to the communication by the monitoring equipment. For instance, the first intercepted communication over Target Telephone #1 would be referenced as "TT1 #1." With quotations of communications, brackets are used for the following purposes: The use of "[UI]" indicates that the word or words used were unintelligible and thus could not be translated, and the use of "[OV]" indicates that the parties to a call were talking over one another and thus some words

could not be heard. A phonetic spelling of a word that is not known, does not have a common spelling, and/or could not be translated is indicated with "[PH]." Brackets are also used to protect the identifying information of persons not named as defendants, as well as to provide certain contextual information, *e.g.*, to explain which defendant is being referenced when a nickname is used by another co-conspirator to refer to that defendant.

## PROBABLE CAUSE

22.     This portion of the affidavit is divided into three sections, respectively dealing with the distribution networks of TONY, HILL, and MARCIANO.

## I.    TONY

### A.    Background

23.     TONY was convicted in December 1999 in the United States District Court for the Eastern District of Virginia of conspiracy to distribute fifty grams or more of crack, for which crime he was ultimately sentenced to serve a 121-month prison term. He was released from custody in and around 2009 and is on supervised release through August 2014.

24.     The investigation has established that TONY continues to sell cocaine and crack for profit. With respect to crack, he often creates it himself by cooking cocaine down and adding a diluting agent. The majority of his business comes from supplying wholesale quantities to co-conspirators who are themselves street-level dealers and/or who supply other street-level dealers. Based on my training, experience, and knowledge of the investigation, and as discussed in more detail below, I believe that among the people TONY supplies with cocaine and/or crack for further redistribution are the following: NARATIO, DANGERFIELD, HENDERSON, JOHNSON, JONES, JUGGINS, MCQUEEN, SANDERS, WILLIAMS, and YOUNGBLOOD.

25.     TONY's wholesale distributions typically involve quantities ranging between 1/8th of an ounce (equivalent to approximately 3.5 grams and most commonly known as an "eight ball") to multiple ounces (one ounce is equivalent to approximately twenty-eight grams). The prices he charges can vary, but it appears from the investigation that he most often sells 1/8th of an ounce of cocaine or crack for between approximately $125 and $150, while an ounce of either drug goes for between approximately $1,200 and $1,350. Sometimes TONY loans drugs out and accepts payment at a later date after his associate has sold the drugs himself or herself, a practice commonly known as "fronting," while other times he requires that the full price of the drugs be paid at the time he supplies the associate.

26.     In an effort to avoid detection by law enforcement, TONY and his associates often use coded language to discuss their drug trafficking. Based on my training, experience, and knowledge of the investigation, your affiant has identified what I believe to be the meaning of the following code words that they most often use: "white girl," "girl," "soft," and "powder" refer to cocaine; "hard," and "hard time" refers to crack; "what's-its-name," "what's-his-name," and "what's-her-name," and variations thereof refer to cocaine and crack; "jank," "jink," "joint," and "junk" refer to a quantity of drugs; "fire" refers to a high-quality quantity of drugs; "whip up a waffle" and variations thereof refer to cooking crack; "skate," "eight-ball," "ball," and "shoot pool," refer to an eighth-ounce quantity of drugs; "quack" and "quarter" refer to a quarter-ounce quantity of drugs; "half" and "halftime" refer to a half-ounce quantity of drugs; "onion" refers to a one-ounce quantity of drugs; "yard" refers to $100; "stack" refers to $1,000; and "Roscoe" refers to a firearm.

27.     Investigators identified at least one bank account that TONY has maintained for the past several years. A review of that account shows that over the course of a typical month he

makes several large cash deposits at different branches totaling several thousand dollars. For instance, between on or about January 12, 2013, and on or about July 13, 2013, he deposited approximately $18,000 in cash. Your affiant believes these cash deposits are drug proceeds.

28. TONY maintains a primary residence in Richmond, Virginia, that he shares with his wife and other family members. During the investigation, however, agents determined that he appears to spend the majority of his time in Northern Virginia, and when he does so he most often sleeps at the home of his girlfriend. Currently his girlfriend lives in a home in the 4000 block of Cressida Place, in Woodbridge, Virginia, which will be referred to hereafter as CRESSIDA PLACE. She moved there in and around the spring of this year, prior to which she resided at a home in the 3000 block of Allerton Court, in Dumfries, Virginia, which will be referred to hereafter as ALLERTON COURT. TONY has cooked crack at both of his girlfriend's residences, and has conducted other drug-related activities at or in the vicinity of those residences.

29. Within TONY's distribution network are several of his family members, to include his two brothers, NARATIO and DARREL. DARREL primarily lives at a home in the 3900 block of Findley Road in Dale City, Virginia, that will be referred to hereafter as FINDLEY ROAD. TONY appears to rely heavily on DARREL, who stashes some of TONY's drugs at, and distributes them from, his (DARREL's) home. TONY and DARREL have cooked crack there, and TONY himself also makes sales from in and around the home. DARREL shares the home at FINDLEY ROAD with his and TONY's sister, who occasionally helps both men with their drug trafficking.

30. In addition to FINDLEY ROAD, there are two homes from which TONY and his associates conduct a substantial amount of cocaine and crack sales. The first is located in the

18000 block of Corby Street in Triangle, Virginia, and will be referred to hereafter as CORBY STREET. TONY has also cooked crack at that home. The second is located in 17000 block of Mine Road in Dumfries, Virginia, and will be referred to hereafter as MINE ROAD. The owner of CORBY STREET, UCC-3, and the owner of MINE ROAD, UCC-4, knowingly allow TONY and his associates to use their homes in furtherance of their drug trafficking. UCC-3 was incarcerated during a period of the investigation. During that time, your affiant believes that YOUNGBLOOD and UCC-5 primarily oversaw the sales of cocaine and crack at CORBY STREET.

### B.     Controlled purchases of crack from Tony

31.     In the autumn of 2011, CS-1 was arrested for felony offenses on separate occasions in Stafford and Prince William Counties. He agreed to cooperate with law enforcement in the hope of receiving favorable treatment with respect to his pending charges.

32.     In and around March 2012, CS-1 told investigators that UCC-6 introduced him to TONY, who he learned was a large-scale crack dealer in Dumfries who could easily sell CS-1 one ounce or more of crack at a time.

33.     UCC-6 was intercepted several times ordering crack from TONY. For instance, on December 31, 2012, UCC-6 called TONY and said, "I'm all dress up, got my gown on. I'm coming to see you. I got $100 so far. I'm not waiting on anyone else. Fuck it. . . . So can I get a deal with that tonight?" TONY said, "Just call when you get close, man." (TT1 #2,268). Later that day, TONY spoke with DARREL, who said he was with UCC-6. DARREL explained, "She's right here. She got yard. Says she wants one five." TONY replied, "No, do what she's got." (TT1 #2,282). I believe DARREL was saying that UCC-6 had $100 but was asking for $150 worth of crack, which deal TONY would not allow DARREL to make. Approximately half

an hour later, UCC-6 sent a text message to TONY that said, "Thanks 4 fake bubble gum." (TT1 #2,292). TONY called UCC-6, and she told him, "You can't do nothing with this shit your brother [DARREL] gave me." TONY responded, "You don't need to do nothing with it but put it in your thing. You don't have to cook it." (TT1 #2,294). I believe UCC-6 was complaining about the quality of the crack and TONY was defending it, saying UCC-6 could put it directly in a smoking implement without having to do anything else to it. TONY continued to defend the quality of his crack in two follow-up text messages to UCC-6. The first read, "You the only one in the whole city to say so," (TT1 #2,301) while the second said, "Yea and its pure no cut on it real oily." (TT1 #2,319).

34.     Between April 2012 and November 2012, CS-1 made six controlled purchases of crack from TONY, the sum weight of which purchases totaled approximately 168 grams. CS-1 arranged each purchase from TONY by speaking with him on Target Telephone #1. Certain details of those controlled purchases are discussed below.

35.     The first controlled purchase was on or about April 24, 2012. CS-1 purchased half an ounce of crack from TONY for $600. Prior to the deal, law enforcement observed TONY leaving FINDLEY ROAD to meet up with CS-1. TONY returned to FINDLEY ROAD after the deal.

36.     CS-1 conducted the second controlled purchases on or about May 8, 2012. TONY told CS-1 to meet him at CORBY STREET. When CS-1 arrived, TONY exited CORBY STREET and supplied CS-1 with approximately one ounce of crack for $1,200. TONY went back inside CORBY STREET after the deal.

37.     On or about July 10, 2012, CS-1 made the third controlled purchase, which was of approximately half an ounce of crack from TONY for $600. The deal took place outside of

CORBY STREET. Earlier that day CS-1 had been unable to reach TONY, so he called UCC-6 and asked her to find out where TONY was and if he was willing to sell crack to CS-1 that day. CS-1 later spoke with UCC-6, who informed him that TONY was at CORBY STREET and was expecting CS-1 to arrive shortly to make the purchase. UCC-6 was present with TONY when CS-1 arrived. CS-1 asked to purchase one ounce of crack from TONY, but he said he only had half an ounce with him. TONY said he had more at an apartment behind the Bottom Dollar Store, which apartment investigators know to be ALLERTON COURT, and invited CS-1 to go there with him to get it. CS-1 declined.

38.    The fourth controlled purchase took place on or about July 27, 2012. TONY initially told CS-1 to meet him at FINDLEY ROAD for the deal, but later told CS-1 to instead meet him at CORBY STREET. When CS-1 arrived, TONY was sitting inside a vehicle outside of CORBY STREET. CS-1 got in the vehicle and purchased approximately one ounce of crack from TONY for $1,200. CS-1 observed TONY to be in possession of additional crack, which, by CS-1's estimate, weighed approximately three ounces. CS-1 also observed a black semiautomatic handgun in the center console of the vehicle.

39.    On or about August 30, 2012, CS-1 met TONY at a storage unit in Dumfries and purchased approximately one ounce of crack from him for $1,200. CS-1 observed TONY to be in possession of additional crack, which, by CS-1's estimate, weighed approximately two ounces. During the sale, DARREL and an unidentified man were with TONY.

40.    On or about September 13, 2012, CS-1 attempted unsuccessfully to purchase two ounces of crack from TONY. TONY told CS-1 to meet him at MINE ROAD to conduct the sale, but when CS-1 arrived at that location someone inside told him that TONY and DARREL had left approximately twenty minutes prior. CS-1 called TONY several times, but was unable to

18

reach him. TONY explained the next day that he had forgotten his phone and thus did not get CS-1's calls.

41.     CS-1 purchased approximately one ounce of crack from TONY on or about September 19, 2012, for $1,200. The two had arranged to do a deal for one-and-a-half ounces, but TONY told CS-1 when they met that he would only sell an ounce at that time but could get CS-1 more later that night or the next day. At TONY's direction, CS-1 initially met TONY outside of CORBY STREET, at which time TONY told CS-1 to follow him to an apartment complex at a different location, specifically in the 3600 block of Quantico Terrace Drive, Triangle, Virginia. The deal took place inside an apartment in that complex, which apartment public source information indicates was, at that time, occupied by JOHNSON, who is discussed in more detail below.

42.     On or about November 16, 2012, CS-1 met TONY at ALLERTON COURT and purchased approximately one ounce of crack from him for $1,200.

### C.     Tony's distribution network

43.     What follows are subsections devoted to each of the charged defendants who are part of TONY's distribution network, except for DARREL, who is discussed throughout many of the subsections below. While the wiretaps were up on TONY's two phones, the phone number DARREL used to communicate with him was registered in DARREL's name, and TONY and his associates often refer to DARREL by two of his known nicknames, "Rell" and "Real," and sometimes simply as Darrel. Furthermore, agents have identified DARREL through surveillance done in conjunction with intercepting calls between him and TONY. For instance, and as discussed below, agents observed DARREL on January 31, 2013, exit FINDLEY ROAD with

MCQUEEN a short while after TONY had called DARREL to tell him MCQUEEN was coming to FINDLEY ROAD to pick up crack. (TT2 #2,504).

### i. Dangerfield

44.     During the interception of Target Telephones #1 and #2, DANGERFIELD was one of the people with whom TONY had the most contact. DANGERFIELD obtains both cocaine and crack from TONY, which he then sells to his own customers. DANGERFIELD also sometimes delivers drugs for TONY to TONY's customers. Examples of their intercepted communications follow:

45.     DANGERFIELD explained to TONY on January 28, 2013, that, "I hit your brother up, got one of them joints from him." TONY said, "Oh, alright." DANGERFIELD continued, "Yeah, these people up there talking about they got some money. I'm gonna see what they got. Yeah, I ain't got but one joint. They probably get all that. I told Rell [DARREL's nickname] we got any more I'll hit him up again." TONY replied, "Yeah." (TT2 #2,134). I believe DANGERFIELD was saying that he obtained an ounce quantity of cocaine or crack from DARREL that he intended to sell to a group of customers, and that if they purchased the entire ounce he would go back to DARREL to get more.

46.     On January 30, 2013, DANGERFIELD arranged to purchase from TONY a half ounce quantity of what I believe to be crack for $600. During their first conversation about the deal, TONY asked DANGERFIELD, "What you talking about, man, trying to do?" DANGERFIELD replied, "Oh, give me, uh, give me a quarter right now." He added, "If you got that good shit, goddamn it, I was gonna take a half." TONY responded, "It's the same way." DANGERFIELD said, "You know how you did the first one for me? If it's like that, I go ahead and take the whole half." TONY confirmed, "That's what it is. That's what it is." They then

discussed price, with TONY saying, "I got six," and DANGERFIELD agreeing. (TT2 #2,458). The two talked again later to coordinate when and where to meet. At one point, TONY told DANGERFIELD he would meet him in "like ten minutes." DANGERFIELD replied, "Alright, 'cause I've got somebody waiting on it," which I believe was a reference to DANGERFIELD's intention to redistribute the crack to his own customer. (TT2 # 2,486).

47.     The next day, January 31, 2013, DANGERFIELD ordered an additional quantity of cocaine or crack from TONY, and I believe TONY directed DANGERFIELD to pick it up from DARREL at FINDLEY ROAD. During their first conversation about the deal, TONY said he was in Richmond and would not be coming back up to Northern Virginia for a few days. DANGERFIELD said that was a good idea "because these police up here are running wild. They were out all last night, this morning." Later, TONY said, "Alright, look, my brother [UI] he went to get some brakes put on his truck, but, shit, he probably be done in probably a hour or two, something like that." DANGERFIELD replied, "Alright. . . . He got the same joint you gave me?" TONY said, "Yeah, yeah." (TT2 #2,510).

48.     Later that same day, a woman called TONY and asked if he could deliver "four" to her, which I believe to be a reference to a quantity of cocaine or crack. TONY explained that he did not have a way to get to her, and then said, "Lemme, lemme see my partner. I might get him to slide over there. . . . I'll call you right back." (TT2 #2,584). TONY then called DANGERFIELD to ask where he was, and DANGERFIELD said, "I just left your brother's house." TONY asked, "You in Dale City now?" (where FINDLEY ROAD is located), and DANGERFIELD said he was in Dumfries. TONY explained, "Somebody wanted something over there by Minnieville, right there by the house. I thought you were out that way." (TT2

#2,585). I believe TONY thought DANGERFIELD was still in the vicinity of FINDLEY ROAD and could deliver a quantity of cocaine or crack to the woman who asked for "four."

49.     On February 8, 2013, DANGERFIELD told TONY, "Hey, look, I got a nigger want a half, right." TONY said, "Yeah," and DANGERFIELD continued, "Hook it up and I'll be up there in a half hour, an hour." The two agreed to meet, for what I believe to be a deal for a half ounce of cocaine or crack that DANGERFIELD intended to sell to his own customer. (TT2 #3,645). Less than two hours later, DANGERFIELD told TONY, "My man want another quarter," by which I believe he meant a quarter ounce of cocaine or crack. TONY agreed to supply DANGERFIELD, who then said, "Ok, I'll bring you the money and come pick it up. And I'll probably need one of them just for myself." (TT2 #3,675). In a follow up call, DANGERFIELD confirmed that TONY was still at his sister's house, which I believe to be a reference to FINDLEY ROAD. (TT2 #3,744).

50.     TONY called DANGERFIELD on February 24, 2013, at 12:22 p.m. During their conversation, DANGERFIELD asked, "[L]ook, you know the joint I sold [name redacted]?" TONY replied, "Yeah," and DANGERFIELD continued, "Uh, I wanna say, he said it was too much inositol. That shit was no good man. He, he got mad. I told him see you when you get back, man. I still got that other one. I didn't even sell to what's his name because he said was messed up." TONY responded, "Ah, man, I don't know what to do." DANGERFIELD went on, "I think what's his name made it up, though, Darrel. Huh?" TONY answered, "Oh shit [UI], it's still made the same way." DANGERFIELD said, "Oh, well. I got the other one out and I'm gonna let you look at it when you get back." (TT2 #5,757). I believe in this call DANGERFIELD was relaying a complaint one of his customers had about crack DANGERFIELD had obtained from TONY through DARREL, specifically that it was cut with too much inositol, a known

cutting agent. I further believe that DANGERFIELD surmised that DARREL made the crack, but TONY explained it should have been the same quality as if TONY himself had cooked it.

51.     On March 1, 2013, DANGERFIELD told TONY, "I need another one, man." TONY replied, "Oh, shit, well listen man: I made some fire, man, it's going to be [OV]," and DANGERFIELD cut in and said, "I need that." I believe DANGERFIELD was asking for a quantity of crack and that TONY explained that he had cooked a high quality batch of the drug, which he called "fire." (TT2 #6,597).

52.     DANGERFIELD ordered one ounce of cocaine from TONY on April 3, 2013, that he intended to sell to another person. He identified himself to TONY, saying, "This Danger," and then explained, "Hey, um, on that soft, man need a whole baseball. Hit that for me." TONY asked, "Ah, uh, where you at now?" DANGERFIELD responded, "I'm in Fredericksburg. My, my nigger in Fredericksburg want it." DANGERFIELD confirmed the price, saying, "Alright, that's fourteen," by which I believe he meant $1,400. TONY said, "Alright." (TT2 #11,677).

53.     On Saturday, April 13, 2013, DANGERFIELD asked TONY, "So you ain't gonna do nothing till Monday then, huh?" TONY answered, "Yeah, yeah. A thousand motherfuckers have been calling me, too." DANGERFIELD replied, "Yeah, shit, dude called me. . . . He said that junk I gave him, man, that shit wasn't no good. That's what he told me. Yeah, he's madder than a motherfucker." I believe that DANGERFIELD was explaining that one of his cocaine or crack customers was upset with the quality of the product DANGERFIELD supplied him with. I further believe that TONY confirmed he would not be supplying DANGERFIELD or anyone else with cocaine and crack until the upcoming Monday.

54.     There were several ways investigators identified DANGERFIELD, including:

a.      On February 7, 2013, DANGERFIELD told TONY that he had been "jumped" by the "DEA" the night prior at a McDonald's in Dale City. He explained that he had been meeting with a white man to whom he had given "one," which I believe to be a reference to a quantity of cocaine or crack, after which the officers approached, asked to search DANGERFIELD's vehicle, and administered a breath test because he had been drinking earlier. DANGERFIELD explained that he denied any wrongdoing and did not give the officers consent to search his vehicle. TONY admonished DANGERFIELD, telling him that he had to be more careful because law enforcement often watch fast food restaurants and convenience stores for signs of drug dealing. (TT2 #3,410). TONY later called DARREL to relay the story, during which he referred to DANGERFIELD as "Danger." DANGERFIELD frequently identified himself as "Danger" when he left phone messages for TONY, e.g., on January 30, 2013, when said, "T, give me a call. This is Danger." (TT2 #2,401). Agents learned that members of the PWCPD Street Crimes Unit did stop and have contact with DANGERFIELD on February 6, 2013.

b.      On February 21, 2013, officers were conducting surveillance of ALLERTON COURT, during which time DANGERFIELD told TONY that he would be coming over. (TT2 #5,146). In a subsequent call, DANGERFIELD told TONY that he was outside and TONY said he was inside the apartment. (TT2 #5,155). At that time, officers observed DANGERFIELD at ALLERTON COURT driving a pickup truck registered to a person with the last name Dangerfield. DANGERFIELD got out of the pickup truck and went inside ALLERTON COURT.

### ii.    Youngblood

55.    On December 24, 2012, YOUNGBLOOD voluntarily came forward to law enforcement to offer information about drug trafficking and cooperate proactively. He did not have any pending charges at the time. Rather he said he had been a user of crack and was frustrated with people who, in his words, had been forcing him to deal drugs.

56.    In interviews with law enforcement, YOUNGBLOOD named three people who worked together to sell significant amounts of crack in Prince William County: "Trato" or "Taratio", "J," and UCC-7. The physical descriptions he provided of "Trato" and "J," as well as other identifying information, were consistent, respectively, with NARATIO and SANDERS. YOUNGBLOOD identified TONY as the person who supplied NARATIO, SANDERS, and UCC-7. The latter three, according to YOUNGBLOOD, had several sub-distributors through whom they sold the crack, in exchange for which they provided the sub-distributors with small quantities of crack that the sub-distributors could either use themselves or sell for their own profit. He provided the nickname of "Pop" as belonging to one of the sub-distributors and described "Pop" as living at a residence at the end of Windsor Lane, Triangle, Virginia. MCQUEEN's nickname is "Pops" and he lives at the end of Windsor Lane.

57.    YOUNGBLOOD said that the group was selling crack at various residences where the owners/tenants were paid in crack cocaine in exchange for allowing their residences to be used. He specifically identified CORBY STREET as one of the primary residences from which crack is sold, and said the same about a residence at the end of Mine Road, which agents know to be a reference to MINE ROAD. He also described traveling with "Pop" on one occasion to a residence off of Dale Boulevard where "Pop" obtained a half-ounce quantity of crack from a young black male with dreads and freckles. The physical description of this male is consistent

with DARREL and the general vicinity of where YOUNGBLOOD said the deal took place is consistent with DARREL's residence at FINDLEY ROAD.

58.     YOUNGBLOOD said he had observed NARATIO and SANDERS each in possession of approximately a half kilogram quantity of crack, and had also seen both men in possession of firearms. YOUNGBLOOD said that during the summer of 2012 he purchased crack from SANDERS on a daily basis, the quantities typically ranging between one gram to 3.5 grams and the most, on one occasion, being seven grams. Given YOUNGBLOOD's relationship with SANDERS, law enforcement used YOUNGBLOOD to introduce UC-1 to SANDERS in January 2013 so that UC-1 could make controlled purchases of crack. The controlled purchases are described below in the section dealing with SANDERS.

59.     Law enforcement admonished YOUNGBLOOD during his cooperation to avoid contact with TONY and to focus his efforts on SANDERS. However, beginning on February 10, 2013, and continuing thereafter for a period of time, YOUNGBLOOD was intercepted using phone number (843) 584-2007 to speak with TONY on Target Telephone #1 in order to order crack to deal to other people. That is the phone number YOUNGBLOOD had told investigators was his personal number and it is what they used to communicate with him during his cooperation. YOUNGBLOOD also used phone number (703) 409-4538 on a few occasions to speak with TONY on Target Telephone #2. On February 9, 2013, YOUNGBLOOD called TONY from that number and self-identified himself as "Youngblood." He then told TONY he needed an "eight," which I know to be a 3.5 gram quantity of crack. (TT2 #3,877). TONY spoke with DANGERFIELD later that day and asked him to deliver the crack to YOUNGBLOOD: "I want you to bring the jink from what's a name, ah, down there to Youngblood. He want a jink too." (TT2 #3,912). TONY spoke with YOUNGBLOOD a short while later, and

YOUNGBLOOD said, "Ya man is here." TONY explained, "I sent him here," by which I believe he was referring to DANGERFIELD. YOUNGBLOOD asked, "Alright, what's the scale on that?" TONY explained, "Like, three seven right there. . . . I beefed it up for you, know what I'm saying." (TT2 #3,915). I believe YOUNGBLOOD was asking how much the crack weighed and TONY told him he had added a bit more to it to increase the weight to 3.7 grams as opposed to 3.5 grams.

60.     Upon learning that YOUNGBLOOD was obtaining crack from TONY, agents stopped working with him. In order to preserve the investigation, they did not tell him about the wiretap on TONY's phones or that he had been intercepted. What follow are additional examples of intercepted communications between YOUNGBLOOD and TONY, as well as intercepted communications TONY had with other co-conspirators about YOUNGBLOOD. Based on the intercepted communications and the investigation as a whole, I believe that YOUNGBLOOD was residing at and/or frequenting CORBY STREET while UCC-3, the owner of CORBY STREET, was incarcerated, and that YOUNGBLOOD was for a period of time overseeing cocaine and crack sales at the residence. During the course of the investigation, agents did not find any evidence to support YOUNGBLOOD's claim that he was being forced to sell drugs.

61.     On February 10, 2013, at 9:31 p.m., YOUNGBLOOD called TONY and said, "Bring me a skate." TONY said, "Alright," and then told YOUNGBLOOD he would meet him in "ten minutes." (TT1 #8,338).

62.     On February 11, 2013, YOUNGBLOOD obtained 3.5-gram quantities of crack from TONY on at least three separate occasions.

a.     In the morning, YOUNGBLOOD called TONY and said, "Man, need to see you bad and hog needs slaw." TONY asked, "What you talking about?" YOUNGBLOOD

responded, "Uh, skate." TONY told him, "Alright, be out there in a minute." (TT1 # 8,372). Less than an hour later, TONY called YOUNGBLOOD and said, "Outside man. Come on." (TT1 #8,378).

          b.      Later that afternoon, YOUNGBLOOD called TONY and told him, "Yo, I need another skate baby." TONY responded, "Shit, I'm on my way to yah." The two then concluded the call agreeing to see each other shortly. (TT1 #8,388).

          c.      That evening, the two spoke again. YOUNGBLOOD explained to TONY that, "[W]hen I hit you [slang for a phone call], shit man, I had like ten people waiting on me." TONY asked, "Who all over there now?" YOUNGBLOOD said, "Um, ain't nothing but beggars there now." TONY said he would be there in "ten minutes." (TT1 #8,502). A couple minutes later, YOUNGBLOOD called TONY and asked for another "skate." TONY said, "Alright," and estimated he would arrive in seven minutes. (TT1 #8,503). About twenty-five minutes later, TONY told YOUNGBLOOD he was "walking in the door." (TT1 #8,531). Cell-site information on TONY's phone showed he had traveled to the general vicinity of CORBY STREET.

     63.      On February 20, 2013, at 12:24 p.m., TONY called DARREL and said that, "Youngblood think he's running something [UI]. . . . Youngblood, he say, 'Man, I got this shit right now.' [UI] Well, Youngblood [UI]. This day his last day man. . . . He ain't running shit right. I'm gonna shut the party down on him." (TT2 #4.997). I believe TONY was referring to YOUNGBLOOD overseeing the sale of cocaine and crack at CORBY STREET and that TONY believed YOUNGBLOOD was doing a poor job.

     64.      This belief is supported by a conversation TONY had with NARATIO on February 21, 2013, at 9:34 p.m., in which TONY discussed YOUNGBLOOD's efforts at CORBY STREET and the fact that it wasn't being run as "a tight ship." TONY explained that

there were a lot of people coming to CORBY STREET, that they were smoking in the home, and that the police were watching. TONY warned NARATIO to get his truck away from the home, which I believe was a reference to a truck belonging to NARATIO being parked there. TONY joked that YOUNGBLOOD was going to "catch a hundred years," by which I believe he meant police were going to arrest YOUNGBLOOD for selling cocaine and crack to so many people. (TT2 #5,292).

65.    By February 23, 2013, TONY and YOUNGBLOOD appeared to have settled their differences because, at 3:51 p.m., TONY spoke with DANGERFIELD and told him to deliver a quantity of crack to YOUNGBLOOD: "Hey, uh, go on [UI] Youngblood. I think he want two of 'em." DANGERFIELD then made a request of his own, telling TONY, "[M]ake me an eight ball of powder straight. Don't put that shit in there, it's for me." (TT2 #5,624).

66.    But then on February 27, 2013, TONY explained to DANGERFIELD, "Yeah, I ain't even fooling with no what's her name, old Youngblood and all those motherfuckers no more. . . . They cut clean off." (TT2 #6,029). The next day he conveyed the same message to SANDERS, saying, "Youngblood going to be catching a flight out tomorrow. I'm be going to get some new door locks and just lock the doors up and shit and get some keys and shit." (TT2 #6,179). I believe TONY was referring to kicking YOUNGBLOOD out of CORBY STREET.

67.    On March 7, 2013, a call between DANGERFIELD and TONY indicated that YOUNGBLOOD was working for another crack distributor in the area. DANGERFIELD said, "Hey look, uh, what, what, what's my man down the way? . . . Down, the bottom. What's his motherfucking name? Youngblood?" TONY responded "Who? Youngblood, Youngblood, yeah." DANGERFIELD then said, "Youngblood, yeah. He hustling for New York, right. . . . Yeah he had, uh, uh, he said he going to get ten ounces, right. . . . . I took my girl down to buy a

little something, shit, you know what I'm saying? Nigga had about six or seven thousand dollars on him." As the previous exchange occurred, TONY interjected several short responses. DANGERFIELD then added, "Yeah, it might be a lot of ones. He tried to talk shit. I said, 'Look, man. Aye, I got, I work for my people, my people only. Fuck you.' You know, he just don't know niggas wanna run that New York nigga out of town anyway." (TT2 #7,610).

68.     On or about June 3, 2013, PWCPD officers responded to room at an EconoLodge located in Dumfries for a drug-related call. YOUNGBLOOD was the registered occupant of the room and answered the door. He gave officers consent to search the room, where they saw in plain view a digital scale and several plastic baggies containing cocaine. A search warrant was obtained for the room at that point, and during the execution of the warrant officers found a loaded 9mm handgun hidden under the bed and approximately $1,063 in U.S. currency that was located on YOUNGBLOOD's person.

### iii.     Sanders

69.     As YOUNGBLOOD described, SANDERS currently is one of TONY's most substantial sub-distributors and carries firearms in connection with his drug trafficking. SANDERS has had several run-ins with law enforcement over the course of the investigation, certain of which are discussed below. Law enforcement also made six controlled purchases of crack from SANDERS between January and September 2013. These purchases, as well as certain intercepted communications with and about SANDERS, are also discussed below. The phone number that SANDERS used to communicate with UC-1 in relation to the controlled purchases is also a number he used to communicate with TONY. On January 17, 2013, SANDERS called TONY and said, "This J. This my number." (TT2 #228). SANDERS's first name is Jonathan.

70.     Officers with the Stafford County Sheriff's Office arrested SANDERS on or about January 5, 2013, for domestic assault. A search of SANDERS incident to his arrest revealed that he had in his possession approximately fifteen grams of crack, fifteen grams of marijuana, and over $2,000 in U.S. currency.

71.     On or about January 10, 2013, YOUNGBLOOD, who was accompanied by UC-1, made a controlled purchase of approximately 7.1 grams of crack from SANDERS in Prince William County. YOUNGBLOOD paid SANDERS $450 and reported that SANDERS had his two young children with him during the deal.

72.     On or about January 21, 2013, PWCPD officers conducted a traffic stop on a Range Rover. SANDERS was driving and was the sole occupant. He was arrested for having a suspended license. Officers found behind the center console a .45-caliber Colt handgun. After taking SANDERS to a nearby station to be processed, the arresting officer searched the rear of the police vehicle in which SANDERS had been transported. The officer found a digital scale and two plastic bags containing what appeared to be cocaine. But the officer had not searched the police vehicle prior to beginning his shift that day or before SANDERS was transported in the vehicle, so charges were not pursued against SANDERS for the drugs.

73.     On January 21, 2013, at 9:56 a.m., TONY received a call from an associate who said he saw SANDERS get pulled over and arrested after leaving a Sunoco gas station. TONY told the associate that SANDERS did not have a license and is "always dirty" and "always has a Roscoe on him." (TT2 #938). I know from my training and experience, and knowledge of the investigation, that "dirty" is a slang term for carrying contraband like drugs or a gun, and that "Roscoe" is a code word that TONY and his associates use to refer to a gun.

74.    On January 22, 2013, SANDERS called TONY at 11:22 a.m. and told him about the arrest. SANDERS said the gun in the vehicle was his and that he knew he was driving on a suspended license. SANDERS said he had been at MINE ROAD and left to get gas when he saw that police were following him. He explained that he traveled in the direction of CORBY STREET, rather than towards his own home, because he did not want to lead officer to where he lived. (TT2 #1,108).

75.    On January 23, 2013, TONY received a call from NARATIO at 7:20 p.m. TONY told NARATIO about SANDERS being arrested and the fact that SANDERS had a "Roscoe" on him. TONY explained that the police gave SANDERS the firearm back because "the jank wasn't stolen, and it wasn't concealed, and it wasn't stolen," and NARATIO cut in and added, "And he ain't no convicted felon." TONY responded, "And he ain't no convicted felon, yet." TONY went on to say that SANDERS told him, "[H]e had the what's it name. He said if people would have taken his shoes off he had the what's it name in his socks, and they never took his socks off." (TT2 #1,357). I believe TONY was explaining that SANDERS had the cocaine in his socks, but the police did not search him there. I further believe that this explains why the arresting officer found the cocaine and digital scale in the back of the police vehicle SANDERS was transported in: SANDERS, while being taken to the station, got those items out of his socks and left them in the vehicle in the hope that they could not be tied to him. This conclusion is supported by the fact that while the events surrounding SANDERS's arrest were occurring, investigators received a telephone call from YOUNGBLOOD. He informed agents that he had observed that SANDERS had drugs on him at the time of his arrest and had hidden them on himself or somewhere in the prisoner transport area of the police cruiser he was in.

76.     On or about January 24, 2013, YOUNGBLOOD and UC-1 arranged to purchase one ounce of crack from SANDERS. SANDERS directed them to meet him at CORBY STREET for the deal. After they arrived, they observed SANDERS drive up in his Range Rover. SANDERS went into CORBY STREET. YOUNGBLOOD, with the permission of UC-1, followed after him. YOUNGBLOOD met with SANDERS inside the home and provided him $1,500 in exchange for the ounce of crack (but which was later determined to weigh approximately twenty-four grams).

77.     On February 2, 2013, at 1:22 p.m., SANDERS called TONY and asked, "How much you want for rim and tires and shit?" TONY replied, "Uh, probably around thirteen." (TT2 #2,849). I believe SANDERS was asking TONY for one ounce of cocaine or crack, and TONY quoted him a price of $1,300.

78.     On February 5, 2013, at 8:05 p.m., SANDERS called TONY and asked, "You up my way?" TONY replied, "Shit, no. I rolled out." SANDERS said, "Oh, ok. But, um, if I need to, um, see your people, they around, right?" TONY answered, "Ah, yeah, Rell [DARREL's nickname] up at the house." SANDERS explained, "Ok, ok. Um, well, right now, I'm good, but I'm just trying, you know, sitting down and be proactive. So I'm, I'll probably give you a call back and, um, just let you know I need to meet him or something." (TT2 #3,271). I believe SANDERS was ensuring that he could be resupplied with cocaine or crack if necessary, and that he and TONY were discussing SANDERS going to DARREL because TONY had gone back to Richmond.

79.     On or about February 6, 2013, YOUNGBLOOD and UC-1 met SANDERS in the parking lot of a restaurant for a one-ounce crack deal. YOUNGBLOOD and UC-1 got into the vehicle in which SANDERS had driven to the deal. SANDERS's girlfriend, UCC-8, was in the

front passenger seat. During the deal, UCC-8 pulled out a digital scale and put it on the center console. UCC-8 also had a bag containing what appeared to be crack. SANDERS was in possession of a quantity of crack as well, which he placed on the scale. The scale showed that the crack weighed twenty-eight grams. UC-1 paid SANDERS $1,500 for the ounce.

80.   On February 7, 2013, at 5:45 p.m., a cousin of TONY's called him to say he observed in a nearby shopping center "a whole bunch of them boys in black trucks and black uniforms getting ready to go somewhere. . . . I was just letting you know." TONY replied, "I'll call some people and let them know." (TT2 #3,502). I believe the cousin was saying he saw law enforcement officers getting ready to do an operation and that he called to warn TONY. This belief is further supported by the next three calls TONY placed on Target Telephone #2:

a.   The first was to DANGERFIELD, who, as discussed above, had earlier told TONY that he had an encounter with officers the night prior at a McDonald's. TONY told him, "[T]he same boys they seen last night at McDonald's are down in Dumfries. . . . Don't know where they're going, but someone said they're suiting up." DANGERFIELD replied, "Oh, I ain't going down there. I'm going my ass home." (TT2 3,503).

b.   The next call was to SANDERS. TONY relayed the message from his cousin, saying in particular that the cousin had seen "a whole bunch of jokers shooting and booting up by Sunoco. Not sure where they going." SANDERS replied, "I ain't even in that area, but good looking, good look. Appreciate that. . . ." (TT2 #3,504).

c.   The final call was to DARREL. TONY told him that his cousin "called me and he was on his way home. Said he was cruising past the Sunoco and the boys were right there suiting and booting. I don't know where they going, but they headed somewhere." (TT2 #3,506).

81.     On or about February 13, 2013, UC-1 bought 28.5 grams of crack from SANDERS for $1,500. During the deal, which took place in UC-1's vehicle, UC-1 observed that the majority of the time SANDERS kept his right hand on an object concealed under shirt and jacket that was in the front of his waistband. UC-1 recognized this behavior, and the apparent size of the object SANDERS was gripping, as consistent with the handling of a firearm.

82.     On February 15, 2013, law enforcement was conducting surveillance in the area of ALLERTON COURT. At 7:00 p.m., SANDERS and TONY had a brief telephone discussion during which I believe SANDERS indicated he was already out of the ounce he had previously obtained from TONY and was in the need of another: "You good? I mean you good now? Cause I need another one." TONY responded, "Ah, shit, I might got, ah, I know I got a half of one with me. I can hold that. . . . I mean, I can take, if you up there now I can just make a U-turn real quick." SANDERS replied, "Yeah, yeah, I'm up here now. I'm up here now waiting on you. Just bring me another one." (TT2 #4,561). At 7:04 p.m., law enforcement observed TONY arrive at and briefly enter ALLERTON COURT. At 7:09 p.m., SANDERS had brief telephone contact with TONY during which SANDERS indicated he was in #301, which is known to investigators as the apartment of UCC-8 located in 17000 block of Islip Loop, Dumfries, Virginia. SANDERS told TONY to "come up." (TT2 #4,565). ALLERTON COURT is within walking distance of UCC-8's apartment, and a short time later agents observed TONY driving over to Islip Loop and parking directly in front of UCC-8's apartment building. Agents noted that several other vehicles known by law enforcement to belong to SANDERS were present in the area of Islip Loop.

83.     On or about March 19, 2013, UC-1 bought fourteen grams of crack from SANDERS for $700.

84.     On March 24, 2013, SANDERS texted TONY: "Hit me when u get up.i might need 2 or 3 pan cakes.." (TT2 #10,164). I believe SANDERS was asking to be supplied with two or three ounces of cocaine or crack. TONY called SANDERS later that morning and asked, "301 or 201?" SANDERS replied, "301." (TT2 #10,185). I believe TONY had brought the ounces of cocaine or crack to UCC-8's apartment building and was asking the apartment number where he could meet SANDERS and give him the drugs.

85.     On or about March 27, 2013, PWCPD officers charged SANDERS with reckless handling of a firearm after he responded to Sentara Hospital suffering from a gunshot wound to his right leg. SANDERS told officers he was at 18500 Corby Street, which is next door to CORBY STREET, and was attempting to holster a pistol when it discharged and the bullet struck him in his leg. SANDERS reported to officers that he carried a gun for protection because he carries a lot of cash on his person. Police officers responded to 18500 Corby Street and attempted to recover the gun with negative results.

86.     On or about September 13, 2013, UC-1 bought approximately 26.8 grams of crack from SANDERS for $1,400.

iv.     **Naratio**

87.     On October 21, 2008, while TONY was still serving his ten-year sentence in federal prison, PWCPD officers executed a search warrant at a residence in Lake Ridge, Virginia. NARATIO was inside the residence when the officers made entry, and he tried to flee to a bathroom with a bag of crack that he was holding. The bag burst open before he made it there, the contents of which bag were later found to be approximately 11.3 grams of crack. NARATIO was arrested for possession of cocaine. He gave a post-arrest interview to an FBI Special Agent, during which he identified his supplier, who he claimed he had been obtaining

crack from for the past three years. NARATIO estimated that he typically obtained four-and-a-half ounces of crack a week from his supplier, with his largest single purchase being nine ounces. He said he accompanied the supplier on a trip to North Carolina where they picked up eight to nine kilograms of cocaine and 100 pounds of marijuana.

88.     Information provided by YOUNGBLOOD and other confidential sources established that NARATIO has been working with TONY since in and around the time TONY was released from prison. For instance, CS-2, who cooperated in the hope of receiving a reduction in his 2012 federal sentence for trafficking in crack and possession of a firearm, stated that in the summer of 2009 he began buying 1/8th to 1/4 ounce quantities of crack from NARATIO on a daily basis for two weeks. Thereafter he used NARATIO as a backup source of supply because CS-2 thought the quality of NARATIO's crack was low. CS-2 understood NARATIO to work with TONY in the distribution of crack, and knew that NARATIO possessed firearms and would conceal them, along with crack, in the trunks of various vehicles.

89.     Investigators were able to identify a bank account in NARATIO's name that he appeared to open in October 2011 and stopped actively using in April 2013. The address on the account is for CORBY STREET, except that Corby is spelled "Colby." There is no Colby Street in Triangle, Virginia. NARATIO made large cash deposits into the account in a manner consistent with what I know to be a person engaged in selling narcotics. For instance:

      a.     On or about December 2, 2011, there was a $2,300 deposit, which consisted of $600 in hundred dollar bills; $100 in fifty dollar bills; and $1,600 in twenty dollar bills.

b.     On or about May 18, 2012, there was a $5,000 deposit, which consisted of $1,400 in hundred dollar bills; $500 in fifty dollar bills; $3,040 in twenty dollar bills; and $60 in ten dollar bills.

c.     On or about August 2, 2012, there was a $6,000 deposit, which consisted of $2,300 in hundred dollar bills; $1,200 in fifty dollar bills; $2,380 in twenty dollar bills; and $120 in ten dollar bills.

d.     On or about April 1, 2013, there was a $1,000 deposit, which consisted of $200 in hundred dollar bills and $800 in fifty dollar bills.

90.     That NARATIO is dealing crack and is working with TONY, his brother, was corroborated by intercepted calls on TONY's phones. NARATIO was incarcerated for a period of time during the wiretaps, specifically from on or about January 16, 2013, to on or about February 22, 2013. He was serving a forty-day sentence in a Prince William County jail. He was released on or about February 22, 2013. He and TONY did speak by phone while he was in jail. Examples of their communications over the course of the wiretaps follow, as does a discussion of a controlled purchase of crack from NARATIO on or about July 15, 2013.

91.     On January 9, 2013, at 8:39 p.m., TONY called DARREL and told him to "send a skate" to an associate he referred to by the letter "E." TONY explained that this person "gave Roto [NARATIO's nickname] the money already for it, but he stay over there. E gave it Roto but, he got it, just give him a skate." DARREL replied, "A'ight." (TT1 #3,695). I believe that the associate of TONY and NARATIO's had prepaid NARATIO for a 3.5-gram quantity of cocaine or crack that the associate was then going to pick up from DARREL.

92.     On January 31, 2013, TONY called DARREL at 5:27 p.m., and asked, "Did [name redacted] come over there yet?" DARREL was initially confused about the person TONY

was asking about because he thought it was someone else with the same name, but then said, "Oh, you talking about, oh, other [name redacted]. Rato's peeps." TONY confirmed, "Yeah" and DARREL said, "Nah, I ain't see him." TONY explained, "Oh, yeah, he supposed to be on his way too." TONY went on, "When you get back to the house . . . call me let me know what's left on the skates." (TT2 #2,553). I believe that TONY was asking whether one of NARATIO's customers had come to FINDLEY ROAD to pick up either crack or cocaine from DARREL.

93.    On February 24, 2013, approximately two days after NARATIO got out of jail, he called TONY at 4:01 p.m. and told him, "I wanted you to bring me that thing before you had left." TONY said, "You can swing by joint and get it right now if you want." NARATIO asked," Who all there? Real?" TONY responded, "Yeah, yeah. I'll tell him to open the truck up." (TT2 #5,800). TONY then called DARREL and told him, "Use the key and go in the jack for me, the truck, and get, uh, there's a joint in there. The, the bigger one, um, give it, give it to Rato." DARREL asked, "You say what?" and TONY replied, "Go, go into the truck, man, get the, get the joint out there for Rato. . . . Listen, it's a, there's one, it's two of 'em in there, but it's one bigger than the other one. Give him the bigger one." DARREL asked, "The bigger joint?" TONY confirmed, saying "Yeah. He there. He should be ready to pull up so you better get it now before somebody . . . I don't know who he's got with him. I don't want 'em to see what's going on." (TT2 #5,804). Based on the nature of these conversations and my knowledge of the investigation, I believe NARATIO was going to pick up a firearm from FINDLEY ROAD.

94.    On March 1, 2013, at 10:40 a.m., TONY and NARATIO spoke about "ol' first of the month jokers." TONY said, "They still ain't trying to do nothing heavy." NARATIO agreed, "Oh no, they ain't going to do too much of nothing." (TT2 #6,446). I believe they were

discussing drug users who received government assistance checks at the beginning of the month and would be able to buy cocaine and/or crack, but that they would not buy in large quantities.

95.    Later that day, at 7:32 p.m., TONY called NARATIO and the two agreed to meet at an unspecified location, but which I believe to have been CORBY STREET. A few minutes later, TONY told NARATIO, "I need, um, utensils, man. I'm gonna need to get a daggone [UI] out. . . . I need the bags, the what's his name, the cup, and the goddamn twirler." NARATIO asked, "Box and everything, too?" and TONY replied, "Yeah, just put it in a grocery bag or something." NARATIO agreed: "Alright." (TT2 #6,580). Approximately half an hour earlier, TONY had meet with HILL, his source of supply for cocaine, as evidenced by a call they had at 6:56 p.m. HILL asked, "What you in man?" TONY said, "Like a little jeep." HILL replied, "I see you now." (TT2 #6,572). I therefore believe based on these calls that TONY obtained cocaine from HILL and then needed to cook it into crack so he could sell it quickly. He called NARATIO to see if he could bring the utensils for cooking to a place where TONY would meet him, which I believe to be CORBY STREET. Cell site data for TONY's phone show that he was in the general vicinity of CORBY STREET at the time he spoke with NARATIO.

96.    On March 17, 2013, at 10:40 a.m., NARATIO talked with TONY about having not worked the day prior and how he had therefore "missed all that bread," that is, money from drug sales. NARATIO said he therefore needed to "whip up a waffle," which I believe is a reference to cooking crack so that he could sell it. (TT2 #9,427).

97.    On March 18, 2013, at 2:40 p.m., NARATIO called TONY and told him that a person he was with "said he need, ah, roll of tape, the . . . some, some of the white girl." TONY asked, "Of the girl," and NARATIO said, "Yeah." TONY explained that the person would "have to meet, meet Rell [DARREL] at the house [FINDLEY ROAD] or something." TONY further

explained that DARREL would "have to go grab it off my bike." (TT2 #9,505). I believe NARATIO was ordering cocaine from TONY for a third party and that TONY was going to have DARREL supply the cocaine, which was stored on TONY's bike. TONY texted DARREL at 2:54 p.m. and said, "Yo go get some girl off my bike." (TT2 #9,509). He followed up with a call five minutes later in which he told DARREL to "just grab like an onion of the girl," which I believe was code for an ounce of cocaine. (TT2 #9,510).

98.     On or about July 15, 2013, CS-3 and UC-2 made a controlled purchase of approximately one ounce of crack from NARATIO at CORBY STREET. When CS-3 and UC-2 arrived at CORBY STREET, NARATIO told CS-3 that he had to leave to get the crack and would then come back. NARATIO left in a truck that is registered to SANDERS. The deal took place once NARATIO returned. CS-3 is cooperating with law enforcement to receive consideration for several pending grand larceny charges in Prince William County.

99.     NARATIO used two phone numbers (other than the line from the Prince William County jail) to communicate with TONY during the wiretap: (301) 385-4522 and (305) 967-3679.

a.     NARATIO told officers the former number was his when he was arrested on or about August 25, 2012, for driving while intoxicated, and the number is registered to UCC-5, who along with YOUNGBLOOD primarily oversaw drug sales at CORBY STREET while the owner was in prison. Several cooperating sources also told law enforcement that the former number was NARATIO's.

b.     NARATIO was linked to the latter number through two means. First, TONY told a female associate it was NARATIO's number on March 16, 2013. She told TONY, "I dialed it and it said that number don't work no more. . . . It's (301) 385-4552." TONY replied,

"No, no, he has a different number it's 305." (TT2 #9,404). TONY tried to look it up in his phone but got disconnected, so she called back and he told her the new number was "(305) 967-3679." (TT2 #9,406). Second, agents conducted a voice comparison between NARATIO's known voice on calls in which he used (301) 385-4522 and the voice of the user of (305) 967-3679 and determined them to be the same person.

### v.    McQueen

100.    MCQUEEN, whose nickname is "Pops," is the person who YOUNGBLOOD described as living at the end of Windsor Lane, Triangle, Virginia, and who is supplied crack by TONY. MCQUEEN uses telephone number (571) 991-0743 to communicate with TONY. He has been linked to that number through various means, to include surveillance of MCQUEEN conducted on January 31, 2013, described below, as well as several cooperating witnesses, to include YOUNGBLOOD, who have said it is MCQUEEN's number.

101.    On January 17, 2013, at 9:46 a.m., MCQUEEN called TONY and told him, "Hey, I'm on my way." TONY responded, "Alright, yeah, he waiting on you." MCQUEEN said, "Tell him I'm a get two of 'em." (TT2 #80). Right after that call ended, TONY received a call from DARREL. TONY said to him, "Pops on his way. He said two skates." (TT1 #4,472). I believe that MCQUEEN ordered from TONY two 3.5-gram quantities of crack and that he (MCQUEEN) was going to FINDLEY ROAD to get the crack from DARREL. At 10:48 a.m., TONY called DARREL and the latter said, "It was twenty, like twenty-three-and-a-half." TONY interjected, "Twenty-three, then Pops came, made it twenty-five seventy-five." DARREL said, "Yeah," but then TONY said, "No, twenty-five. Twenty-six, right? . . . You said twenty-three-and-a-half. Plus Pops that's twenty-five [OV]." DARREL added, "yeah it's like twenty-six, but it's ten short, so yeah. . . . So, like, twenty-five ninety or something." (TT1 #4,476). I believe the two

were discussing how much money DARREL had from cocaine and crack sales, and that prior to MCQUEEN's purchase DARREL had $2,350 and after he had approximately $2,590. That would indicate that MCQUEEN paid approximately $240 for the 7 grams of crack he had earlier picked up from DARREL, for a price of approximately $120 per 3.5 grams.

102.    On January 18, 2013, at 8:31 p.m., MCQUEEN called TONY and asked, "You close by? . . . Can I come to you?" TONY told him, "I'm going to be heading in that way in a minute [UI]. Give me probably, like, thirty minutes." MCQUEEN said, "I'm at Hit's [nickname for UCC-3] house," which I know to be CORBY STREET. TONY responded, "Well, shit, yeah I probably come, I probably slide right there." MCQUEEN said, "Alright, I'll wait right here." (TT2 #380). Over an hour later, TONY called MCQUEEN, who told him, "I was just gonna leave. . . . I'm waiting on you, player." TONY said, "Can you hit me up on, uh, on Mine Road?" and MCQUEEN said, "Yeah." (TT2 #427). I believe the two first arranged for MCQUEEN to obtain from TONY at CORBY STREET, but then changed the meet location to MINE ROAD.

103.    The next day, at 12:23 p.m., MCQUEEN called TONY and told him, "I'm trying to do three," and they agreed to meet at a restaurant. (TT2 #568). I believe MCQUEEN was asking for three 3.5-gram quantities of crack.

104.    On January 24, 2013, MCQUEEN called TONY at 5:38 p.m. MCQUEEN said, "You remember how we did that last time?" by which I believe he was referring to a prior crack deal. TONY said, "Yeah. . . . I ain't going to be up there for about, probably another two hours." MCQUEEN responded, "Oh shit, I might have all the money by then. . . . I'll meet you somewhere by the house." (TT2 #1,466). I believe that MCQUEEN was ordering another quantity of crack and also that he was going to be collecting money from his customers prior to meeting with TONY, either to pay for crack TONY previously supplied him with or to pay for

the new order. Two hours later, TONY called MCQUEEN and said, "I put something special together so I got to get by your house. One hundred fifty a stick, you know what I'm saying?" MCQUEEN responded, "Oh, man, woo. I better get two then. Let me get two." (TT2 #1,510). I believe TONY was saying he had cooked a high quality batch of crack for which he would charge MCQUEEN $150 per 3.5-grams. I further believe that MCQUEEN asked to get two 3.5-gram quantities.

105.    On January 31, 2013, at 10:49 a.m., MCQUEEN called TONY and told him to tell DARREL that he (MCQUEEN) was "on my way." TONY agreed: "Oh, I'm a tell him." (TT2 #2,503). TONY then called DARREL and said, "I was trying to catch you because, cause Pops wanted crack." DARREL asked TONY to repeat himself and TONY stated, "Yeah, he wanted crack." (TT2 #2,504). Law enforcement was conducting surveillance at FINDLEY ROAD during the time of this call. At 1:32 p.m., investigators observed a 2002 silver Dodge Neon bearing Virginia registration WXT-7738, pull up in front of the residence. This vehicle is registered to a woman with the last name McQueen and who is listed as living at the end of Windsor Road, Triangle, Virginia. (I believe this is MCQUEEN's wife, as evidenced by a call on March 2, 2013, in which MCQUEEN said he could not meet up with TONY until later because his (MCQUEEN's) wife needed the car. (TT2 #6,884).) Investigators observed MCQUEEN exit the driver door of the vehicle and enter FINDLEY ROAD via the front door. A short time later, MCQUEEN and DARREL were observed exiting the residence, entering MCQUEEN's vehicle, and driving away. A short time later, the vehicle returned to FINDLEY ROAD and DARREL was seen entering the house via the front door.

106.    The next day, at 2:14 p.m., MCQUEEN called TONY and said, "Lend me three of them things. Come this way." TONY said, "Alright." (TT2 #2,649). I believe TONY agreed to front MCQUEEN three 3.5-gram quantities of crack.

107.    On March 11, 2013, at 11:28 a.m., MCQUEEN called TONY and said, "Yeah, I had called you, but then I called your brother. So I went up there." TONY responded, "Ok, that's cool." (TT2 #8,456). I believe that MCQUEEN had earlier tried to reach TONY, but without success, so he called DARREL directly and then went to FINDLEY ROAD to pick up crack from DARREL.

### vi.    Juggins

108.    JUGGINS previously was convicted in 1999 in the United States District Court for the Eastern District of Virginia of trafficking in crack and using and carrying a firearm in furtherance of a drug trafficking crime. He ultimately served a sentence of eighty-six months. Agents have determined that he now obtains from TONY both cocaine and crack, typically in quantities ranging from 1/8th of an ounce up to one ounce, that he redistributes to others. Examples of intercepted communications between JUGGINS and TONY follow.

109.    On December 22, 2012, at 5:00 p.m., JUGGINS sent TONY a text message that said, "I need one." (TT1 #712). Approximately four hours later, JUGGINS called TONY and said, "I need one of them pool sticks as a soft shell." TONY told JUGGINS, "No soft shells." I believe JUGGINS was asking for a 3.5 gram quantity of cocaine. (TT1 #748).

110.    On January 3, 2013, JUGGINS called TONY at 3:12 p.m. and warned him about law enforcement by saying, "Don't go to Mine Road. They say they got police on every corner because this little youngin' running from them and shit." TONY said, "Oh shit . . . I just passed through Williamstown." JUGGINS replied, "I just saw your ass, so I said, man . . . I was just

letting you know." (TT1 #2,614). Agents confirmed that a burglary had occurred in the vicinity of MINE ROAD and that police had established a perimeter in the area.

111.    That same day, at 9:31 p.m., JUGGINS sent TONY a text message that said, "tell the white girl want to go shoot pool with her and Vicki." (TT1 #2,753). "Vick" is a common street jargon for a seven gram quantity (quarter ounce) of drugs, referencing the number Michael Vick wears on his professional football jersey. I therefore believe that JUGGINS was asking TONY for a seven gram quantity of cocaine. At 10:22 p.m., TONY texted JUGGINS, "On my way." (TT1 #2,804).

112.    On January 8, 2013, at 9:29 a.m., JUGGINS sent TONY a text message that read, "I need a Vic." (TT1 #3,435). At 1:32 p.m., JUGGINS called TONY, who asked JUGGINS, "What are you saying, some crack?" JUGGINS replied, "Yeah." (TT1 #3,465).

113.    On January 14, 2013, at 3:18 p.m., TONY called JUGGINS, who asked TONY about the "white girl." TONY said, "I got her . . . what you talking about?" JUGGINS said, "Shit, um, Vick and, uh, Vick." TONY attempted to clarify by asking, "Vick, um, soft [UI]?" JUGGINS responded, "Yeah, yeah, and, and the other." (TT1 #4,120). I believe JUGGINS was ordering from TONY a seven gram quantity of cocaine and a seven gram quantity of crack. The two arranged in that call and in further communications that day to meet for the deal.

114.    The next day, at 11:02 a.m., JUGGINS called TONY and told him that he needed "another Vick." TONY asked, "Which way?" and JUGGINS replied, "The hard way." (TT1 #4,269). I believe JUGGINS was ordering from TONY a seven gram quantity of crack.

115.    On January 17, 2013, at 5:37 p.m., JUGGINS texted TONY: "white girl." (TT1 #4,499). I believe JUGGINS was ordering cocaine from TONY.

116.    On January 23, 2013, I believe JUGGINS purchased nine grams of cocaine for $450 from TONY and DARREL. At 3:56 p.m., JUGGINS called TONY and said, "Hey, uh, can you call him for me real quick?" TONY said, "Alright." (TT1 #5,415). TONY then called DARREL and told him, "Ells is more or less trying to catch up with you." (TT2 #1,308). DARREL called TONY a few minutes later and TONY asked him, "How much is left on the, what's the name?" DARREL said, "Shit, it was like a nine." (TT2 #1,310). TONY's next call was to JUGGINS and he told him, "My brother say he only got, uh, like nine, nine something solid. Know what I'm saying?" JUGGINS explained, "Nah, I'm talking about," and TONY cut in, "The hard times?" JUGGINS said, "Yeah." TONY responded, "Shit . . . I didn't put nothing together. I ain't put nothing together before I left." (TT1 #5,418). JUGGINS nevertheless went to FINDLEY ROAD to meet DARREL, who called TONY at 4:31 p.m. and asked, "What do you want me to tell him? He's outside?" TONY replied," I'm gonna call him right now." (TT2 #1,317). TONY called JUGGINS and tried to explain to him that it would be $150 per every three gram quantity of cocaine, for a total of $450. TONY then asked, "Are you over there yet?" JUGGINS said, "Yeah, I'm right here standing with him." TONY asked to speak with DARREL, who got on the phone. TONY instructed DARREL, "Every three Gs [grams], just tell him one fifty." (TT1 #5,424).

117.    On February 2, 2013, JUGGINS called TONY at 3:20 p.m. and ordered what I believe to be an ounce quantity of crack and a 3.5 gram quantity of crack as well. JUGGINS told TONY, "I needed an onion and a motherfucking, um, I wanted to go shoot pool, too." TONY asked, "On the, which way?" JUGGINS responded, "Hard times." (TT2 #7,052).

118.    On April 10, 2013, law enforcement used CS-4 to conduct a controlled purchase of approximately fifty-three grams of crack from UCC-9 for $2,300. CS-4 was cooperating with

law enforcement in the hope of receiving consideration with drug trafficking and firearms charges in Prince William County, as well as a reduction of his restitution in an embezzlement charge in Fairfax County. Prior to conducting the transaction, CS-4 reported he had unrecorded contact with UCC-9 during which UCC-9 said his source of supply for the transaction was JUGGINS. UCC-9 told CS-4 that he would have to pick up UCC-9 at his residence and the two would then travel to meet JUGGINS at MINE ROAD. When the two arrived at MINE ROAD, CS-4 observed that a large party was taking place there. UCC-9 exited the vehicle and walked up to MINE ROAD while CS-4 waited for him to return. After waiting for a period of time, law enforcement instructed CS-4 to go up to the residence and find out what was taking so long. CS-4 reported that he then made contact with UCC-9, who explained that JUGGINS was finishing up and that it would be another five minutes before it was done. CS-4 stated that when he approached the residence, he saw UCC-9 speaking with an individual who goes by the nickname "Rato," and who law enforcement knows to be NARATIO. CS-4 explained that UCC-9 told him that NARATIO is one of JUGGINS's sources for cocaine and crack. After a short wait, CS-4 reported that UCC-9 returned to the vehicle and gave him a plastic bag that contained the crack.

119. During the course of the wiretap on TONY's phones, JUGGINS used at least two telephone numbers to communicate with TONY. The first was (571) 201-1415. JUGGINS is known to have used that number because on January 22, 2013, a PWCPD detective called JUGGINS on that number and requested that he respond to the police station in regard to an investigation of a homicide that had occurred several days prior. JUGGINS came to the police station and spoke with detectives about the homicide. During that discussion, detectives examined JUGGINS's telephone. The next day, TONY spoke with JOHNSON and told her that "Ells," a known nickname of JUGGINS, had been called by "them," which I believe to be a

48

reference to the police, and that "they" examined his phone. (TT1 #5,427). JUGGINS was frequently referred to during the course of the wiretaps on TONY's phones as "Ells" or "L."

120.    The second number JUGGINS is known to have used is (571) 201-7938. On January 23, 2013, JUGGINS sent TONY a text message from (571) 201-7938 that said, "My new # ells." (TT1 #5,409). Your affiant believes that JUGGINS changed his phone number after having met with the detectives the day before. That it was JUGGINS who sent that message and then used the new number to communicate with TONY was further confirmed by a comparison of JUGGINS's voice on calls he had with TONY over (571) 201-1415 and those he had with TONY over (571) 201-7938.

### vii.    Henderson

121.    Between September 6, 2012, and March 5, 2013, law enforcement conducted several controlled purchases of crack from HENDERSON, each time for approximately half an ounce. The approximate total weight of all the crack HENDERSON sold during these deals is 109.6 grams. The first two controlled purchases were conducted by CS-5, who was attempting, but was unable, to introduce UC-3 to HENDERSON. CS-5 was cooperating against HENDERSON in exchange for monetary payments.

122.    A successful introduction of UC-3 to HENDERSON took place during the third controlled purchase. Each of the remaining controlled purchases involved UC-3. In addition to these controlled purchases, law enforcement conducted physical surveillance of HENDERSON prior to and following each occasion. Surveillance conducted before and after the controlled purchases, as well as intercepted communications over TONY's telephones, revealed that TONY is one of HENDERSON's sources of supply for crack.

123.   On or about September 11, 2012, CS-5 made the second controlled purchase of crack from HENDERSON. Prior to the deal, HENDERSON told CS-5 that it would have to take place at a particular fast food restaurant because that was where "Drell" was located, who CS-5 understood to be the person supplying HENDERSON. CS-5, at the direction of law enforcement, told HENDERSON to pick up the crack before coming to the restaurant. Just prior to HENDERSON arriving at the deal, surveillance units observed him outside FINDLEY ROAD meeting with DARREL. HENDERSON left FINDLEY ROAD and drove directly to meet CS-5.

124.   Immediately after the third controlled purchase, which took place on or about September 18, 2012, and directly involved UC-3, agents observed HENDERSON leave the deal location and drive to CORBY STREET. HENDERSON appeared to meet outside CORBY STREET with a person inside a silver sport utility vehicle that agents know to belong to TONY. Cell site data for a phone number known to be used by TONY showed that he was in the general vicinity of CORBY STREET at that time. Additionally, toll data showed that HENDERSON and TONY had telephone contact that day consistent with HENDERSON having been supplied the crack by TONY.

125.   UC-3 made another controlled purchase in a neighborhood adjacent to CORBY STREET on or about September 24, 2012. Prior to the deal, agents observed HENDERSON arriving at and entering for a brief time CORBY STREET. Cell site data for a phone number known to be used by TONY showed that he was in the general vicinity of CORBY STREET at that time.

126.   Another controlled purchase took place on or about November 15, 2012. UC-3 spoke with HENDERSON on the phone before the deal, during which call HENDERSON said that the source of supply was coming up from Richmond, where he (the source) lives. UC-3 met

HENDERSON at a gas station in Dumfries, and the two then drove in separate vehicles to ALLERTON COURT at HENDERSON's direction. After approximately half an hour of waiting outside ALLERTON COURT, UC-3 observed TONY come out of the residence and motion towards HENDERSON and another male to come inside. All three entered the building together, and then exited together a few minutes later. HENDERSON called UC-3 and said he had the crack. HENDERSON directed UC-3 to meet him around the corner to complete the deal.

127. On January 10, 2013, UC-3 met HENDERSON for another controlled purchase at the same restaurant where the second took place. Approximately twenty minutes prior to HENDERSON arriving, surveillance units observed WILLIAMS outside FINDLEY ROAD. HENDERSON told UC-3 when he arrived that they would have to travel four blocks to pick up the crack. HENDERSON got into UC-3's vehicle and the two drove to FINDLEY ROAD. HENDERSON got out of the vehicle and approached FINDLEY ROAD. Soon thereafter, HENDERSON called UC-3 and explained that he could not supply him with a half-ounce of crack, but rather could only supply him with a quarter ounce each of crack and cocaine. UC-3 agreed to do the deal and HENDERSON supplied him with the drugs.

128. On January 30, 2013, TONY called HENDERSON at 6:38 p.m. TONY asked, "What are you talking? Hard times?" HENDERSON replied, "What you got?" TONY told him, "Just soft time right now. I mean, I mean, I'm about to put something together." I believe this meant TONY was about to cook cocaine into crack, which belief is supported by HENDERSON's follow up question, "How long [UI] three them hard times?" TONY said, "I should be around 7:00 p.m., 7:15 p.m., something like that." HENDERSON agreed to make the deal, saying, "Alright. Well, I hit you back in about an hour. Don't be making wait too long . . .

." (TT2 #2,452). The two spoke again at 8:02 p.m. and arranged to meet in ten minutes for the deal. (TT2 #2,482).

129.    On February 4, 2013, at 7:53 p.m., HENDERSON called TONY and asked, "You got some girl or you ain't got none of that?" TONY said, "Yeah, I got that." (TT2 #3,102). I believe they were talking about cocaine.

130.    On February 6, 2013, HENDERSON and TONY spoke at 6:29 p.m. about HENDERSON meeting up with DARREL to obtain crack and cocaine. HENDERSON asked, "Rell already know what the deal is, right?" TONY said, "Yeah, yeah," and HENDERSON continued, "Alright, tell him to separate them shits or whatever." TONY explained, "Rell said he had—this the thing, too—he said he had, he got like what's his name, girl, but it ain't all, it's only like five or something on the girl side. So, I mean, I don't know if you want to take the hard time. What you wanna do?" HENDERSON said, "Well shit, what you mean? 5 Gs?" TONY replied, "Yeah," and HENDERSON went on to say, "Well shit, I can talk to him when I there. It don't make no difference." (TT2 #3,376). I believe TONY was telling HENDERSON that DARREL only had five grams of cocaine, but he also had crack if HENDERSON was willing to take that as well. Right after that call ended, TONY called DARREL and told him, "Keith on his way, Rell." DARREL asked, "What he doing?" and TONY said, "The girl and the what's his name. The girl and the skate." (TT2 #3,380).

131.    March 5, 2013, was the date of another controlled purchase. Before the deal took place, HENDERSON spoke with TONY at 4:50 p.m. and asked, "What you want me to do, go to your sis?" which I believe was a reference to FINDLEY ROAD. TONY replied, "Yeah." HENDERSON said, "Alright, well that's where I'm on my way to then." (TT2 #7,404). Surveillance units outside FINDLEY ROAD observed TONY and NARATIO outside the

residence at 5:33 p.m. At 5:42 p.m., HENDERSON met UC-3 at the same restaurant where they met for the last described controlled purchase. Like that deal, HENDERSON got into UC-3's vehicle and directed him to drive in the direction of FINDLEY ROAD. HENDERSON told UC-3 not to park directly in front of FINDLEY ROAD in order not to draw attention. UC-3 gave HENDERSON $600 and HENDERSON then got out of the vehicle and was observed approaching FINDLEY ROAD. Outside the residence at that time were TONY, NARATIO, and DARREL, who HENDERSON was seen speaking with. HENDERSON then went inside the residence with DARREL for a short time. After leaving the residence, HENDERSON walked back to UC-3's vehicle and supplied him with three 1/8th-ounce quantities of crack, explaining that he was unable to provide the full half ounce at that time.

### viii.    Jones

132.    JONES obtains up to as many as four ounces of cocaine from TONY at a time. He works at an auto repair shop in Triangle, Virginia, where TONY, DARREL, and other co-conspirators have been known to take their vehicles. Law enforcement officers have made four controlled purchases of cocaine from JONES, the last three times for approximately half an ounce. The phone number JONES used in conjunction with the controlled purchases is the same one he uses to speak with TONY.

133.    On January 24, 2013, at 7:20 p.m., JONES called TONY and asked, "You coming back into town?" TONY replied, "I'll be coming in tonight and I'll be around all day tomorrow." JONES then asked, "Can you do four?" TONY said, "Yeah, that's cool," and JONES asked, "You do for the $1,350?" TONY told him, "That's a bet. . . . I'll get that tomorrow for you, check you out." JONES said, "Alright, I'll see you tomorrow." (TT2 #1,502). I believe JONES was ordering four ounces of cocaine and TONY was charging him $1,350 per ounce.

134.    Six days later, on January 30, 2013, TONY asked JONES, "Man, did you sell out of everything yet?" JONES replied, "Yeah. . . . When you think you'll be back up?" TONY said, "Friday, probably," and JONES seemed displeased, saying, "Shit." TONY followed up, "Or I can get, um, damn, shit, I'm trying. I'm like, uh, I probably get my, you know my little brother, too. He gotta come down there with his truck tomorrow to your alls' shop and I can get him to bring it right there." JONES said, "Um, yeah, if you want, that's fine." TONY asked, "I mean, just the same numbers we said?" JONES told him, "Ok, for the, uh, four." TONY said, "Yeah, that'll, that'll work." JONES asked toward the end, "So Darrel will have it?" TONY confirmed, "Yeah, yeah, yeah." (TT2 #2,453). I believe JONES ordered another four ounces of cocaine from TONY and that DARREL was going to deliver it on TONY's behalf.

135.    On January 31, 2013, law enforcement established surveillance in the area of FINDLEY ROAD in an attempt to follow DARREL to the meeting with JONES.

a.      Beginning at 10:17 a.m., and over the course of the following few minutes, law enforcement observed DARREL entering and exiting the residence several times, and speaking on a telephone. At various time throughout the morning, TONY was intercepted speaking with DARREL and encouraging DARREL to expedite the delivery to JONES. For instance, at 9:36 a.m., TONY told him, "Get your ass up," and "Chris Jones is waiting for me. Yo!" (TT2 #2,499). At approximately 10:30 a.m., DARREL was observed leaving the residence and entering a white sport utility vehicle. He drove away and surveillance units followed him to the auto repair shop where JONES works. As DARREL was arriving, he had a phone conversation with TONY and told him, "I'm pulling up right here now." (TT2 #2,504).

b.      Upon arrival at the shop, surveillance units observed DARREL meeting with JONES. At 11:03 a.m., DARREL called TONY and then put JONES on the phone. TONY

told JONES, "Yeah, so uh, he's got this thing for you. . . . I told him to be discreet about it." JONES said, "That's what's up. I appreciate it." (TT2 #2,512). At about that same time, JONES was observed walking to DARREL's vehicle. JONES got into the vehicle with DARREL, and the vehicle drove away. Surveillance did not follow. In and around this time, TONY called DARREL and told him, "Don't let nobody see." DARREL replied, "Oh yeah, yeah. It in the car now." (TT2 #2,514). Within a few minutes, the vehicle returned to the auto shop, where JONES and DARREL were observed parking and getting out. Shortly thereafter, WILLIAMS's vehicle was brought into one of the bays of the shop. At 12:47 p.m., TONY called DARREL and asked, "Did the brakes fixed?" DARREL replied, "Yeah." (TT2 #2,524).

136.    On or about February 6, 2013, law enforcement used CS-6 to purchase $200 worth of cocaine from JONES. CS-6 was working with law enforcement in exchange for consideration for pending charges in Prince William County relating to driving under the influence and drug trafficking. The purchase took place near the auto repair shop, during which CS-6 discussed with JONES the notion of conducting additional transactions in the future. This was done at the direction of law enforcement in an effort to bring an undercover on subsequent transactions.

137.    On or about February 20, 2013, CS-6 and UC-4 met with JONES and purchased from him for $600 approximately one half ounce of cocaine. This deal took place at the auto repair shop.

138.    On February 24, 2013, TONY called JONES, who said, "I'll take four." TONY said, "I'll call you like a, like a day before I head up that way." (TT2 #5,806). Four days later, on February 28th, TONY called JONES and told him, "I'm a, I'll be moving tomorrow. So early

tomorrow." which JONES replied, "That will work out good. . . . I'll have everything together." The two concluded the call agreeing to see one another early the next day. (TT2 #6,087).

139.    Also on or about February 28th, UC-4 purchased an additional half-ounce quantity of cocaine from JONES for $600. The deal occurred at the auto repair shop. In the estimation of law enforcement, the quantity of cocaine purchased on this transaction was approximately one gram short. Surveillance units noted that a vehicle known to belong to and be operated by NARATIO was the auto repair shop.

140.    On or about March 15, 2013, UC-4 purchased approximately half an ounce of cocaine for $600 from JONES at the auto repair shop.

141.    On April 5, 2013, at 11:06 a.m., JONES called TONY and told him, "I take two." TONY said, "Okay. Alright, that'll work. It'll probably be later on this evening or tomorrow." JONES replied, "Okay, well just let me know. Just give me a call or something ahead of time so I can get everything together." (TT2 #11,909). I believe JONES was ordering two ounces of cocaine. At 10:28 p.m., TONY texted JONES: "tomorrow im come by.. [sic]" (TT2 #12,004).

   ix.    **Johnson**

142.    JOHNSON obtains both cocaine and crack from TONY, and the two appear to have a close personal relationship. The phone number JOHNSON uses to communicate with TONY is (703) 595-1067, which is registered in JOHNSON's name with a listed address of a particular apartment in the 3600 block of Quantico Terrace Drive, Triangle, Virginia, where public source information indicates she last resided in and around July of 2013. That apartment is where the September 19, 2012, controlled purchase from TONY of one ounce of crack took place. Current public source information indicates that JOHNSON currently lives in a different apartment in the same building. JOHNSON goes by the nickname "Pinky," by which she is often

referred in conversations between TONY and his associates. Examples of intercepted calls about TONY supplying JOHNSON include the following:

143.    On January 13, 2013, at 10:54 p.m., JOHNSON called TONY and reminded him, "Just don't forget about me." TONY replied, "Alright. What you, uh, what you talking about?" JOHNSON said, "What, you tell me: is it like it is the other day or you [UI]." TONY told her, "I got it either way," and then asked her, "What's the number?" JOHNSON replied, "Seven." (TT1 #4,040). I believe TONY was telling JOHNSON that he had both cocaine and crack, and that JOHNSON ordered a seven-gram quantity of one of those drugs.

144.    On January 19, 2013, at 8:13 p.m., JOHNSON called TONY and asked, "You got any, whatchamacallit, soft?" TONY responded, "Ah, yeah." JOHNSON told him, "Come see me." (TT1 #4,896). I believe JOHNSON was ordering cocaine from TONY.

145.    On January 24, 2013, at 10:07 p.m., JOHNSON called TONY and said, "Where you at? I need to see you." TONY replied, "I'm just pulling up on Mine Road." JOHNSON said she was on her way but might be delayed a bit because she was in D.C. (TT1 #5,555). Approximately forty minutes later, the two spoke again and TONY said he was still on MINE ROAD but would be going to CORBY STREET. The two agreed to meet at CORBY STREET. (TT1 #5,578). I believe the purpose of this meeting was for TONY to supply JOHNSON with cocaine and/or crack.

146.    On January 27, 2013, JOHNSON called TONY at 9:01 p.m. and told him she wanted "something small, like a thirty." TONY responded, "Alright." (TT1 #6,236). I believe JOHNSON was ordered a $30-quantity of cocaine or crack from TONY.

147.    On February 1, 2013, at 12:51 p.m., JOHNSON called TONY and asked, "You got any of the other way?" TONY responded, "Ah, not too much." JOHNSON said, "Come see

me [UI], you fat motherfucker." TONY said he would. (TT1 #6,847). I believe JOHNSON was asking if TONY had either cocaine or crack, and TONY said he had a small quantity and would deliver it to her.

148.    On February 13, 2013, at 6:41 p.m., TONY received a call from JOHNSON. He asked her, "Which way? . . . What are you talking about? What are you waiting to talk about?" JOHNSON told him, "Well, can I get one of each?" TONY responded, "Yeah, he should have it. Let me make sure he do." TONY told JOHNSON during the call, "I might get what's-his-name to bring it to you. . . . Old ass Ernie Dangerfield [nickname for DANGERFIELD]." JOHNSON responded, "I know Dangerfield."

149.    The next call TONY made was to DANGERFIELD, at 6:43 p.m., who he told, "I need you to make a run for me." . . . Get the thing from my brother, then, um, take it to, um, ah, down there at Pinky's for me." DANGERFIELD asked, "Down where Pinky live?" TONY replied, "Down in Quantico Terrace, down off Fuller Heights." TONY explained, "She need something heavy; she be getting heavy." DANGERFIELD asked, "Like what?" TONY told him, "Shit, like, uh, think like quack, quarter. . . . Quarter, two of 'em." DANGERFIELD agreed to make the delivery. He asked TONY, "You want me to get the money from her?" TONY said, "Yeah, yeah. She going to give you the money. . . . She say she gonna have two fifty [UI]." TONY went on to tell DANGERFIELD that JOHNSON lived in the first building in Quantico Terrace, which is the building in which JOHNSON is known to reside. (TT2 #4,335). TONY next called DARREL, at 6:53 p.m., and told him, "Danger coming to get, uh, jank for Pinky. He take it to Pinky for me. Ah, two, um, two skates and Danger want a skate. So that's three skates." (TT2 #4,337). I believe that these two calls show that JOHNSON had ordered 3.5-gram quantities of cocaine and crack, for a total of a quarter ounce for which she was going to pay

$250, and that DANGERFIELD was going to pick up the drugs from DARREL and deliver them to JOHNSON on behalf of TONY.

150.    On March 2, 2013, at 9:00 p.m., TONY told DANGERFIELD, "I need you to make a few runs for me. . . . I'm gonna get you to, uh, catch up with these people for me right quick. . . . Cause Pinky want to catch up and, um, this other girl I know." DANGERFIELD replied, "Alright." I believe TONY was asking DANGERFIELD to deliver cocaine and/or crack for TONY to other people. During the call, TONY directed DANGERFIELD where to meet him, where I believe TONY was going to give DANGERFIELD the cocaine and/or crack. In explaining the directions, TONY said, in part, "Come off [Route] 234, like you go to Mine Road," which I believe was a reference to MINE ROAD. (TT2 #6,925). Later that night, TONY called DANGERFIELD, who said, "I'm right at Pinky's door," and the sound of him knocking a door could be heard in the background." TONY said, "I'm gonna get [female name redacted] to pull up right there. She wanted four." DANGERFIELD asked, "Over here at Pinky's?" TONY said, "Yeah. I'm gonna get her to pull up right there to you at the parking lot right there." (TT2 #6,934).

151.    On April 2, 2013, at 11:45 a.m., TONY called DANGERFIELD and told him, "Pink on the other line cussing me up. . . . Why you ain't fucking answer her? She's on the phone." DANGERFIELD replied, "Goddamn. Do you want me to stop by to get something from DARREL to take to her?" TONY replied, "Yeah, that's the plan. . . . She wants two of them junks." (TT2 #11,478). I believe JOHNSON had ordered two 3.5-gram quantities of cocaine and/or crack and that DANGERFIELD was going to deliver them to her on behalf of TONY.

152.    On April 10, 2013, DARREL called TONY at 8:38 p.m. and said, "Pinky one straight and then, uh, one soft." TONY asked, "What was the one Pinky take?" DARREL

responded, "Uh, one soft, one hard." TONY said, "Alright, one to one." (TT2 #12,602). I believe JOHNSON had picked up, or was going to pick up, from DARREL a 3.5-gram quantity of cocaine and a 3.5-gram quantity of crack.

## II.   HILL

### A.   Background

153.    In November 1997, HILL was convicted in the Circuit Court of Prince William County of five separate counts of distribution of cocaine. He continues to reside in Prince William County and is responsible for distributing large quantities of cocaine, and sometimes crack, to multiple people in his distribution network, of which TONY is a part. HILL conducts the majority of his distribution business in and around Woodbridge and Dale City, and in particular frequently uses apartments within the Dale Forest Apartment complex located in Dale City. One of the apartments he uses often and which is referenced several times below is located at 4360 Welsh Lane (hereafter referred to as "WELSH LANE").

154.    By his own estimation, HILL distributes approximately five kilograms of cocaine a week: "Shit, man, if I had it, dog, I could probably move five a day, easy. . . . Like right now I'm buying three, know what I'm saying, nigga, nigga front me two. But these five joints don't last but, shit, a week, dog. I'm good for one a day. . . . See, but see, I'm on the block though, you know what I'm saying? Like, I'm out in the street with the hot boys, you know what I'm saying? . . . But on the laid-back level, I could probably do three, three a week, something like that, you know?" HILL went on to explain in that call, which took place on March 27, 2013, and was with MARCIANO, that his suppliers were not from Virginia: "That's why I'm probably still here, dog, cause the people I fuck with, they from out of town, man. I don't fuck with the same people niggas be fucking with around here." (TT3 #2,728).

155.    In another call with MARCIANO, which was on June 21, 2013, HILL said he had at least two sources of supply for kilograms of cocaine, one from up north and another in Texas: "I be going to the bottom, man. . . . Yeah, I be going, you know, sometimes they ain't got it and I might, like, get some from like, my peoples up north. But right now they don't got nothing, so I was calling you to see if you had it." MARCIANO replied that he was expecting to get twenty kilograms soon, which he referred to as a "twenty pack of Bud Light," and that he would call HILL if that happened. MARCIANO said that he was currently paying $37,000 to $38,000 per kilogram. HILL then told MARCIANO that he was getting kilograms for $36,000 each, and that he would be willing to take MARCIANO with him. HILL said that for that price, he had to go pick them up rather than have them delivered to him. When MARCIANO asked how far he had to go, HILL said, "Yeah, yeah, I gotta go all the way down to Texas." Regarding HILL paying $36,000 per kilogram in Texas, MARCIANO told HILL, "Yeah, shit, nah, they be charging you too much, bro, know what I'm saying, to be going that far. . . . Yeah, cause, um, they, um, when I talk to my peeps, they, um, they say if I go down there they let me get it for twenty-nine." (TT6 #2,997).

156.    The following three sections to HILL. The first deals with the relationship between HILL and TONY, the second with how agents believe the two met through JOHNSON, and the third addresses the other charged members of HILL's distribution network.

## B.    Hill and Tony's relationship

157.    The communications between TONY and HILL are indicative of an ongoing and long-term relationship in that, in many of them, there are no drug quantities or dollar amounts discussed, even in coded language. Instead, the communications are extremely brief, and usually center on the time, and sometimes, the location of the meeting. However, an intercepted call

between the two on March 28, 2013, provided insight into the quantities of cocaine TONY obtains from HILL. That day, at 8:53 p.m., TONY called HILL and the two discussed a problem with a recent payment made by TONY. (TT3 #2,802). The following is a portion of their conversation:

| HILL: | You know the, the one joint you give me that always be fifty-four? It wasn't fifty-four. |
|---|---|
| TONY: | What was it? |
| HILL: | It was forty-eight, forty-nine. . . . [T]his is forty-nine hundred dollars right here. . . . The one stack is, there's three stacks in here. . . . The one that was the two rubber bands was only forty-nine. . . . I ain't trying . . . |
| TONY: | I know, I know, I know you ain't trying [UI] I know I counted four, five stacks, and then I counted the four. The twenty for the four. Twenty twenties, twenty twenties for the four. |
| HILL: | I counted three times before I called you. . . . We need to start counting this, you know what I'm saying, in front of each other. |
| TONY: | Yeah man, cause [UI] that's crazy. I swear I ran that motherfucker. I counted the jank. I counted it all out right then and there. . . . Fuck man. I mean [UI]. I was counting fast, but not that goddamn fast. But goddamn, I don't like, I don't like, I don't like this. I don't like no business going like that, you know what I'm saying? |
| HILL: | Right |
| TONY: | But I mean, if it's my fault then it's my fault. But man, goddamn. Look I got to figure it out. I know I counted every one of those stacks out right. Put this jank there, put that to the side, and then counted the three. Good god almighty. [UI], it's got to be on me. If it's on me then it's on me. But goddamn. |
| HILL: | I mean, like I said in the beginning, they was always straight [UI]. |
| TONY: | Yeah, I mean, I know [UI]. I know I counted this out. What you say it was? Forty-nine? That's fucking, that's off by, goddamn, that's off by five. |
| HILL: | Yeah, that's five-hundred short homie. |

| TONY: | Yeah. That's crazy. . . . I move fast [UI] but I don't move that goddamn fast. I counted those bills so fast my hands was cramping. But goddamn! |
|---|---|
| HILL: | Yeah, I was like [UI] to count this shit again. I counted again. It was the same thing. I ain't even take [UI] rubber bands till just now so it couldn't of been confused with nobody else money. |
| TONY: | Yeah, man, I had the little black ones on there, right? |
| HILL: | Yeah, you had two little black joints. |
| TONY: | Two little black janks on there. |
| HILL: | Yep. |
| TONY: | Goddamn, bro! Alright, [UI] it's on me. |
| HILL: | Alright man. |
| TONY: | We'll get it straight. |

158.    I believe this call demonstrates that TONY frequently purchases multiple ounces of cocaine from HILL because TONY provided HILL with at least two separately packaged quantities of money, one which I believe was $3,000 (which HILL refers to as "The one stack is, there's three stacks in here"), while the other was $4,900 but was supposed to be $5,400. This was not the first time TONY had miscounted what was supposed to be a $5,400 payment. On March 2, 2013, HILL texted TONY twice about a payment. The first was: "Bro u was 440 short." (TT3 #935). The second: "4960." (TT3 #941).

159.    Given that TONY paid HILL at least $7,900, and was supposed to have paid at least $8,400, I believe he obtained approximately nine ounces of cocaine, equivalent to approximately one quarter of a kilogram. Also corroborating this belief is a text message exchange between the two men on April 14, 2013. HILL wrote: "What u need cuz?" (TT3 #4,033). TONY replied, "9" (TT3 #4,038), which I believe was a request for nine ounces.

160. Despite the typically vague communications between the two about their meeting locations, law enforcement has been able to conduct surveillance of some of their meetings. For instance, on February 27, 2013, over several text messages and a call, TONY and HILL arranged to meet. With no previous discussion as to the location, TONY's text message to HILL, "Im here in the back" indicates that "the back" is a known meeting location where the two have met and conducted previous drug transactions. (TT3 #779). Shortly after receiving the previous text message, HILL called TONY, who said he was arriving on his motorcycle. HILL told TONY, "You gotta come to me, homey." HILL then gave TONY directions to WELSH LANE. (TT3 #781). Shortly after that call, law enforcement observed TONY arrive in the area of WELSH LANE on a green motorcycle that is registered in his name. TONY entered the building, and within one or two minutes, exited with HILL. Surveillance units followed TONY to the area of Dale Boulevard and Forestdale Avenue in Dale City. Shortly thereafter, surveillance observed a green motorcycle, believed to be TONY's, parked in front of FINDLEY ROAD.

161. On March 7, 2013, TONY and HILL arranged to meet the following day at a Bob Evans restaurant. While attempting to agree on a meeting time, TONY texted, "What time good for u ..earlier the better for me I dead and stinking. .lol." (TT3 #1,241). I believe TONY was saying that he wanted to meet as early as possible because he did not have any cocaine for his customers. Eventually the two agreed to meet the following morning at 10:30, which meeting was surveilled by law enforcement:

a. On March 8, 2013, at 10:00 a.m., surveillance was established in the vicinity of a Bob Evans restaurant in Woodbridge, Virginia. HILL texted TONY at 10:20 a.m. to say he was at the restaurant (TT3 #1,274), and agents observed HILL inside the restaurant at 10:37 a.m. TONY joined him at 11:08 a.m. after arriving in a GMC Yukon registered in his

name. Agents were able to positively identify HILL by comparing photographs of him obtained during the surveillance against his photo from his prior case in Prince William County, as well as through other information obtained that day related to him being seen picking up a young child at an elementary school after he met with TONY.

      b.    Just prior to noon that same day, TONY was observed returning to CRESSIDA PLACE with a large bag after he met with HILL. At 12:01 p.m., TONY called DARREL and said he was "putting everything together. I'm up the street right now. So I'll meet you in a little bit. Do all this, all this shit up right quick." (TT2 #7,761). I believe TONY was telling DARREL that he was cooking the cocaine he obtained from HILL into crack and that he would meet DARREL later to give him all or a portion of the crack to be distributed to others.

      c.    In a series of text messages shortly thereafter, TONY arranged to sell a half ounce of crack to a customer. After exchanging several text messages in which the customer tried to negotiate a better price for the half ounce, TONY sent the following message, "Nigga I got work to di in this kitchen. .lol." (TT2 #7,783). I know crack dealers often refer to working in kitchens when they are "cooking" their crack. Not long after the previous messages, TONY received a text message from an unidentified female which read, "U got it wit u". (TT2 #7,790). He replied, "Yea." (TT2 #7,791). The woman called him at that point, and TONY gave her directions to meet him in the area of CRESSIDA PLACE. (TT2 #7,792). Surveillance units then observed TONY meeting with an unidentified female near CRESSIDA PLACE.

      162.    Law enforcement observed a second meeting between TONY and HILL on March 8, 2013. I believe that TONY sold all of the cocaine he bought from HILL earlier in the day, so he met HILL again to be resupplied. In the evening, TONY called HILL and asked, "Did you figure out about that thing?" to which HILL replied, "Shit everything about to be gone. What

you want me to hold?" TONY answered, "Yeah yeah. I'm saying I'm ready for the junk. I told you to have the junks." (TT3 #1,302). I believe that TONY called HILL for more cocaine, and that HILL told TONY that he was almost out. Later, after TONY informed HILL that it would take him about twenty minutes to get to where HILL was (TT3 #1,334), HILL texted TONY, "Take your time im going to hold it 4u." (TT3 #1,336). Approximately one hour later, surveillance units observed HILL leave WELSH LANE, at about which time he called TONY and said that he was walking to TONY. TONY replied that he was "around the back." (TT3 #1,354). Several minutes later, surveillance observed TONY's GMC Yukon parked on Worchester Drive, which is a short distance from WELSH LANE. Surveillance then saw HILL approaching TONY's Yukon from about thirty yards away. HILL appeared to be on his phone as he approached. At approximately the same time, HILL called TONY and said, "Yeah, I'm coming right now. . . . I see you." (TT2 #1,357).

163.    On June 3, 2013, which was a Monday, TONY called HILL at 5:53 p.m. and told him, "[S]o I ain't going to be back till like fucking Friday cause I gotta, I gotta see the damn PO [parole/probation officer] and shit. . . . I'll just get it Friday, that'll, that'll work." HILL replied, "I don't know if I can hold it that long, dog, but I'll try. . . . I mean, you know, what, what you trying to do? One?" TONY replied, "Shit, probably two." HILL told him, "See, I, I could probably, cause I promised you I would, hold you one. . . . But you wanted two, if you wanted two, you probably have to come tomorrow. Couldn't hold both of them for you, dog." TONY agreed to come see HILL the next day. (TT3 #6,737). I believe TONY was ordering a quantity of cocaine from HILL, who could only guarantee him half as much if he waited until the end of the week to come up from Richmond to pick up the cocaine. The next day TONY texted HILL at 12:33 p.m. and asked, "u got 3?" (TT3 #6,849). HILL replied, "Yeah." (TT3 #6,851). I believe

that TONY, who was travelling from Richmond, decided to order additional cocaine since he would not be coming back to Northern Virginia for several days.

164.    On July 2, 2013, HILL called TONY at 12:38 p.m. and said, "I got no babysitter, so I have to bring all the kids with me. So it's gonna have to be like bam, bam, you know what I'm saying?" TONY replied, "Okay." HILL said he would call right back. (TT3 #8,670). He texted TONY instead at 1:15 p.m., asking, "What u need cuz? R u ready? Maybe we can meet somewhere." (TT3 #8,672). TONY replied, "2..yea im ready." (TT3 #8,675).

###    C.    Tony meets Hill through Johnson and Dixon

165.    Intercepted communications, along with telephone record analysis, establish that JOHNSON, through DIXON, arranged several transactions between TONY and HILL in or around the beginning of 2013. I believe this is when TONY and HILL's relationship first began.

166.    On December 29, 2012, TONY and JOHNSON exchanged several telephone calls in which they appeared to arrange to meet a source of supply together. For example, at approximately 7:32 p.m., JOHNSON called TONY and said, "He said he was going to call me back in thirty minutes. And he'll be there, but he'll call me back in thirty minutes." TONY replied, "Thirty minutes? A'ight. Damn, so I'm gonna have to give you a ride?" The call concluded with JOHNSON saying, "I call you back when he call me." (TT1 #1,744). Approximately one hour later, JOHNSON received a call from telephone number (646) 271-5619, which, based on confidential source information, is another number used by DIXON. Shortly thereafter, JOHNSON called TONY and asked if he was ready. (TT1 #1,793).

167.    An intercepted call between TONY and JOHNSON the next day demonstrates that they both had obtained cocaine from the same source the night prior, whether from HILL directly or through DIXON, and tried to cook it into crack. JOHNSON was successful, TONY

was not. At 4:50 p.m., TONY called JOHNSON and asked, "Hey how'd that thing act for you last night?" JOHNSON replied, "It was alright. . . . Why, yours didn't do right?" TONY said, "Nah, man, shit was trash. Gummy, gummy, gummy, man." To which JOHNSON stated "Ah, you should of put some more [UI] on it." TONY indicated, "Shit, I tried that, too." JOHNSON went on to say, "Mine didn't do that, and it was all in the same what-ya-call-em." TONY replied, "Yeah I don't know what the fuck. [UI] That shit was gummy. I had to take, end up taking everything off the motherfucker. Man, I'm telling you, I didn't know what a straight [UI] or straight oil [UI]. Man, just, man like a like one outta the two that I got." JOHNSON then made another statement which would indicate she had obtained her cocaine from the same person, "Mine didn't do that and I saw him, and it all came off the same." TONY continued, "Yeah, I fucked with this fucker like till, man, I want to say a good, shit, about three this morning from the one I came and got from your house." JOHNSON proceeded to give TONY advice about how to manufacture crack, saying, "Maybe your, um, your soda wasn't good, right." TONY told her, "That motherfucker didn't do nothing. I tell you I took everything off that motherfucker. What I did, I made some janks for, um, you know, like . . ." JOHNSON responded, "Uh huh." TONY continued, "You gave me one thing, I think I put another three off, so that was seven altogether. Yeah, I did the thing right. Yeah I was thinking I fucked around. I thought I should of, I thought I had three, but no that was right. Shit, it was just motherfucking I don't know." Throughout the rest of the conversation, JOHNSON gave several more tips of advice to include, "I think you could go back and put some, and put some what-ya-call-um on it, because it shouldn't be like that;" "Sounds like not enough. . . . Man, you better go ahead and put it back on there;" "Yeah, um, but yeah, they wasn't no problem at all. Even though, you know, I'm smaller than you. But, shit, I made it no problem;" "I don't know what the fuck you did. You got mad,

that's what you did. First of all, you was trying to be fast. You was trying to be fast, huh?;" and "Uh huh, and trying to be fast, and then you done fucked up. Then you tried to go back and fix the fuck up, and then you done got frustrated and that's it. There's a wrap." (TT1 #2,085).

168.    In a series of calls on December 31, 2012, it appears that JOHNSON attempted to set up a meeting with her, HILL, and TONY. At approximately 5:19 p.m., call records indicate that JOHNSON called HILL on Target Telephone #3. Immediately thereafter, JOHNSON called TONY and asked where he was. TONY answered, "Shit man, I'm a ways away. What's up? What did he say?" JOHNSON said, "Oh because [UI] he said that he's there for thirty minutes. He's leaving in thirty minutes and we ain't gonna make it if you a ways away." TONY responded, "Yeah, ah, a'ight. What he gonna do about tomorrow?" JOHNSON told him, "I don't know. I'll call him back and see." (TT1 #2,261). Call records show another call between HILL and JOHNSON approximately twenty minutes later. Again, immediately after speaking with HILL, JOHNSON called TONY and said, "Yeah he's, he's gone till tomorrow." (TT1 #2,262).

169.    The following day, January 1, 2013, TONY called JOHNSON and asked, "What'd ya figure out, nigga?" JOHNSON answered, "I call him now, see if he there, call you back." (TT1 #2,387). Immediately after speaking with TONY, call records show that JOHNSON placed three outgoing calls in a row to HILL on Target Telephone #3. Then, approximately two hours later, JOHNSON called TONY and said, "He didn't call me back here, fats, so I'll let you know." (TT1 #2393).

170.    On January 3, 2013, JOHNSON appeared to arrange another cocaine transaction for herself and TONY with DIXON. In a call early in the afternoon TONY asked JOHNSON, "Hey, is you going that way today?" JOHNSON answered, "I don't know. I need to. I gotta see. He didn't answer. . . . Dude should be back tonight." TONY replied, "A'ight, well shit. Then let

me know something." (TT1 #2,612). Later that evening, TONY called JOHNSON and asked, "Haven't heard nothing, yet?" JOHNSON answered, "No, he ain't called me. I'll call and see if he forgot or something cause he ain't called and said he got here." (TT1 #2,720). Shortly thereafter, call records show that JOHNSON placed an outgoing call to DIXON, and then immediately called back to TONY. During the conversation, JOHNSON asked TONY, "You coming to get me?" TONY said that he would. (TT1 #2723). Approximately two hours later, TONY sent the following text message to JOHNSON, "grab some extar [sic] bags." (TT1 #2,819).

171. On January 5, 2013, JOHNSON arranged another cocaine transaction for herself, TONY, and DIXON. Early in the afternoon, JOHNSON called TONY and told him that she was waiting for him, and that she was going to "call and make sure the other dude still there." (TT1 #3,038). Immediately thereafter, JOHNSON called DIXON. Approximately three minutes later, JOHNSON called TONY and said, "He might bring it to me. I don't know. He said he gonna call me back in twenty minutes. He said he ain't sitting there like no motherfucking sitting duck. . . . I'll let you know. I might need you to just bring me change, you know what I'm saying." (TT1 #3,040). Call records show a call between JOHNSON and DIXON approximately eighteen minutes later. Shortly thereafter, JOHNSON called TONY and said, "You better come on here, we gotta go to 234 to Target. Hurry up because he is on his way now." TONY said he was on his way. (TT1 #3,075). A little later, JOHNSON appeared to have grown impatient waiting for TONY to pick her up. She told him, "Well you better come on before his ass leaves." TONY replied, "I thought you said he was coming down there." JOHNSON responded, "Motherfucker he's not coming down here. I told you you had to meet him at Target." The conversation ended with TONY saying, "A'ight. I can't drive too fast. Shit, I'm filthy, motherfucker," by which I

believe he meant he had to be careful driving because he had a weapon and/or drugs in his vehicle and did not want to be caught by law enforcement. (TT1 #3,095).

172.    That JOHNSON connected with HILL through DIXON was confirmed once interception of Target Telephone #3 began. On three occasions, DIXON told HILL that JOHNSON wanted to speak with him. On February 20, 2013, DIXON texted HILL: "Pinky wants u to call her ill b there same time u knw when." (TT3 #309). On March 29, 2013, DIXON texted HILL: "Pinky said to call her." (TT3 #2,868). Then, on May 19, 2013, DIXON texted HILL: "Yo call Pinky 7035951067," which is JOHNSON's phone number. (TT3 #5,786). There were no known interceptions between JOHNSON and HILL, but I believe that is because HILL used another phone to communicate with her. He has told other co-conspirators that he has many different phones.

173.    That TONY met HILL through JOHNSON was also confirmed, I believe, through intercepted communications on Target Telephone #3. For instance, on April 25, 2013, TONY called HILL at 10:05 p.m. and asked where they should meet. HILL replied, "Meet me at my spot. You know, where you was coming with old girl," which I believe was a reference to JOHNSON. (TT3 #4,716). Then, on May 30, 2013, TONY again called HILL to find out where they should meet for a deal. HILL told him, "You going to meet me at my building, the joint you and home girl first start coming to." (TT3 #6,482).

**D.    Hill's distribution network**

174.    There are many people to whom HILL distributes cocaine and crack, including the five charged defendants below. As HILL explained to UCC-10 on April 30, 2013, at 1:29 p.m.: "I'll be in the street, but I be, I be in and out. . . . Yeah, I don't, I don't be out there all day, night no more. . . . I've got people out there doing things for me so I don't have to be out there

71

like that no more." HILL went on to explain, "I only be having it soft. I don't be having it hard no more." UCC-10 asked, "Oh, you quit doing that?" HILL replied, "Yeah, I don't be having it like that no more. . . . I can, um, make you some. You know what I'm saying? . . . And just put it to the side, so when you come up, I'll have it." (TT3 #4,852).

175.    During the course of intercepting Target Telephone #3, HILL explained to other people, like he did to UCC-10, that he was no longer selling crack, just cocaine. For instance, he told another customer, "I'll just be having this soft now. I don't be having it the way you, you normally come and get it from me." (TT3 #4,865).

176.    With another customer, HILL told him, "I don't got it your way." The customer replied, "Okay, well, I'm saying the other way, then." HILL asked, "Soft?" and the customer said, "Yeah." HILL asked, "Who you gonna get to do it?" by which I believe he was referring to cooking the cocaine into crack. The customer responded, "Her. She said you taught her how to do it." HILL cautioned the customer, "She don't know what the fuck she doing. Why you think she don't spend her own money? Cause she don't want to fuck it up." The customer said, "You can whip it up for me right quick, dog." But HILL explained, "Nah, it ain't no whip it up. . . . Dog, I'll tell you what to do. . . . Go to the cigar store, right? The cigarette outlet behind the Giant. . . . Go over there, it's a over there. It's a cigar in there come with a glass tube, but it's like $10 or something like that. You buy that little tube, I'll do it for you. Other than that I'm not doing nothing. . . . I would cook it for you." (TT3 #5,240). I know that there is a cigarette store a very short walk from the complex where WELSH LANE is located.

### i.    Dixon

177.    DIXON is a close distribution associate of HILL. He splits his time between New York and Woodbridge, Virginia, traveling to the Woodbridge area nearly every weekend. There

are occasions when it appears that DIXON is a source of supply to HILL, or at least a courier for HILL's source of supply. As described above, HILL told MARCIANO that he has a source of supply "up north," which I believe could refer to DIXON in New York. There are other times when it appears that DIXON is working with or for HILL.

178.    Based on the appearance that DIXON may have been a source of supply to HILL, a wiretap was obtained for DIXON's telephone, (646) 527-2099, which was Target Telephone #9. On May 22, 2013, agents used location-based information on Target Telephone #9 as a basis to establish surveillance at a VRE train station in Woodbridge because they expected the user of the telephone to be arriving there. At approximately 6:05 p.m., a VRE train pulled into the station and DIXON was seen exiting one of the passenger cars. DIXON then walked across the grassy area separating the train platform from the pickup area and walked directly to a Nissan Altima occupied by a black female driver. The Altima is registered in the name of a woman who also is the registered subscriber of Target Telephone #9.

179.    On February 23, 2013, DIXON texted HILL to say, "Shit is slow motion 4 me bro." (TT3 #552). He continued, "Should b finish today." (TT3 #556). And a few minutes later, "Im need to c u im finish." (TT3 #558). HILL called DIXON and asked, "Can you meet me over there at Donna's?" DIXON replied, "Yeah." (TT3 #562). I believe that the text messages DIXON sent were meant to explain that he was selling his supply of cocaine and/or crack slowly but that he should be finished with it later that day and would need to see HILL to be resupplied. I further believe that HILL told DIXON to meet him at PORTER's residence.

180.    One instance in which DIXON appeared to have supplied crack to HILL was intercepted in the following series of text messages between the two on March 11, 2013. I believe that HILL said that the crack DIXON had provided him was not good quality and that it

caused HILL to waste two ounces of cocaine trying to improve it. I also believe that DIXON said he would pay HILL $2,000 ("two stacks") for the two ounces of cocaine that HILL lost.

| HILL: | Bro what did u put in that food?? (TT3 #1,595). |
|---|---|
| DIXON: | Nothing unless the dude who house I had it n dipped n it (TT3 #1,597). |
| DIXON: | Y what's wrong? (TT3 #1,599). |
| DIXON: | If its fucked up ill give u the paper don't want u to take anymore loses on my account (TT3 #1,601). |
| HILL: | I fucked up 2oz i put that with it! (TT3 #1,603). |
| DIXON: | Ill bring 2 stacks back when I come (TT3 #1,605). |
| DIXON: | But I didn't do anything to it & I hope this dude didn't (TT3 #1,607). |
| HILL: | Dont trip bro. It ant going to kill me. Just wanted to know what was in it. (TT3 #1,609). |
| DIXON: | I don't want u to keep losin bcause of me trusting others I have to pay 4 my mistakes the only thing I can think of was I left the food in that cat house when (TT3 #1,611). |

181.    On March 15, 2013, at 2:00 p.m., DIXON texted HILL what I believe to be a warning about law enforcement: "B super careful they out!" (TT3 #1,823).

182.    The next day, HILL texted DIXON and told him, "Imma need to c u soon bro." (TT3 #1,904). DIXON wrote back, "Imma hit u after I c my man bout 30." (TT3 #1,919). Later that night they met, with DIXON calling HILL and telling him, "Over here." HILL said, "Alright, I'm coming." (TT3 #1,952). I believe that HILL fronts DIXON cocaine and/or crack and that he wanted DIXON to pay him for drugs he previously supplied. DIXON said he first needed to meet with a customer to get money that he could then give to HILL.

183.   On March 21, 2013, at 6:37 p.m., DIXON texted HILL to ask, "Did u say its ok to give uncle tickets to the show 4 half price?" (TT3 #2,333). DIXON then called HILL and said, "He want, um, one of them things. He got half the money he said he'd pay you, he straighten it out. He told me that he talked to you about it." HILL replied, "Nah, he can't do that. He gotta have money for everything he buy man. I'm fucked up. I ain't got no money right now in my pocket. Gotta have everything he get." (TT3 #2,336). I believe that a customer of HILL's was going to DIXON to pick up cocaine or crack and said he had gotten HILL's permission to only pay half the price up front. I believe DIXON was skeptical of the claim and got in touch with HILL to verify the customer's claim.

184.   On April 8, 2013, at 12:47 p.m., HILL texted DIXON and asked, "Did u finish that food bro?" (TT3 #3,580). DIXON replied, "Yeah but I have the paper." TT3 #3,586). HILL wrote back, "We out till monday bro." (TT3 #3,657). DIXON said, "Ok I'm still comin to bring that paper." (TT3 #3,659). I believe HILL was asking if DIXON sold the cocaine or crack that HILL had supplied him with, and that DIXON confirmed he had and would bring the money to pay HILL for it.

185.   On April 25, 2013, at 9:31 p.m., DIXON texted HILL: "Homie don't want to rush u but they callin so I'm need a 9 piece from Popeyes." (TT3 #4,704). DIXON called HILL a half hour later and the two agreed to meet that night. (TT3 #4,707). I believe DIXON was ordering nine ounces (a quarter of a kilogram) of cocaine from HILL.

186.   On April 27, 2013, at 8:52 p.m., HILL described to DIXON that he had followed a car that day riding in which he believed to be a man who owed him money. HILL said, "Yeah,

man. Just, shit, I wasn't even strapped, but I was following that nigger, though." (TT3 #4,772). I believe HILL was saying he did not have a gun on him but that he followed the car regardless.[5]

187.   On May 23, 2013, at 7:28 p.m., DIXON sent HILL a text that read, in part, "I have one left shit slow 4 me." (TT3 #5,966). DIXON sent another text right afterward: "U want me to bring u what I have?" (TT3 #5,969). HILL replied, "Yeah, won't b around this weekend." (TT3 #5,970). I believe DIXON was explaining that his sale of cocaine and/or crack was moving slowly but that he could bring HILL the money he had earned so far.

188.   On May 29, 2013, HILL called DIXON. During the conversation, DIXON, who is on parole, told HILL that he had a dirty urine test and that one of the things he tested positive for was Xanax. HILL said, "Yeah that's impossible dog. I could see if they said the stuff you be . . . You be wearing gloves though, right?" DIXON responded, "Yeah, yeah." Later DIXON said, "I know I, that's shit that ain't, I, if it was the other thing, I would've been like, yeah, okay. You know I would've been, I would've kept the story to some bullshit story." I know from my training and experience that people who distribute cocaine and/or cook cocaine into crack often wear rubber gloves when handling the drug to avoid it seeping into their skin. I therefore believe

---

[5] As discussed below, BATES told law enforcement that HILL often carries a semiautomatic firearm. Corroborating this claim was a call on April 13, 2013, in which HILL, a convicted felon, spoke with a man who he had sent to buy ammunition and possibly other firearm-related items. HILL asked him, "Where'd you go?" and the man replied, "I went ever-, everywhere could think of is where I went." HILL replied, "And they don't have no, but didn't have no ammunition to sell?" The man said, "Most of 'em didn't, but some of 'em who did had you, limits. You can buy like three or four or five." HILL followed up, "Did you get everything on the list?" and the man said, "No. I got everything what they had." HILL asked, "Ok, wh-, what, what did you get? Two two three?" The man said, "Yeah. . . . Not a lot. I only got sixty." (TT3 #3,938). I believe HILL had asked for, among other items, .223-caliber ammunition, of which the man said he bought sixty rounds. The next day the two men spoke again, and HILL asked if the man had "got any further." He said, "Nah, I didn't go nowhere today." HILL explained, "I done sent like three people to do what you doing and they got the same problems you got." The man advised HILL, "You better hold them firearms and ammo, J [HILL's first name is Johnnie]." HILL replied, "Yep, yep." (TT3 #4,031).

that HILL was implying that he would understand if DIXON tested positive for cocaine because of his exposure to it, but then he asked if DIXON had been wearing gloves when handling the cocaine. I believe that DIXON confirmed he does wear gloves when handling cocaine and that he would have understood if he had tested positive for that drug but did not understand why he had tested positive for Xanax. At the end of the call, DIXON told HILL, "I'll see you tomorrow. I'll be, dudes, they gonna meet me early. I'm trying, I'm trying, see I'm trying to get rid of it now, but they not. I'll see you in the morning." HILL replied, "Okay, man, be careful, man." (TT3 #6,423). I believe DIXON was explaining that he was trying to distribute the cocaine and/or crack that he had and would see HILL to pay him and/or pick up more drugs the next day.

189.     During a conversation between DIXON and HILL on June 27, 2013, at 11:15 a.m., HILL said, "Getting ready, getting ready to roll out, man. So I'mma, I'mma need to see you, um [UI] an hour." DIXON replied, "Alright, but I still got homework." Later in the conversation, HILL said, "You think you gonna need me before, cause I ain't gonna be back till Sunday?" DIXON answered, "Well, you could leave, you could leave me some more." (TT3 #8,548). I believe that HILL was preparing to travel to be resupplied, and he called DIXON to see if DIXON had money for him. I also believe that DIXON told HILL that he had not sold all of his drugs yet, and that HILL should leave more for DIXON to sell while HILL was gone.

190.     On July 5, 2013, at 4:05 p.m., DIXON texted HILL: "I'm need to cu n a min." (TT3 #8,923). Through additional text messages they coordinated a meeting time for later that evening, during which exchange DIXON asked, "Donna?" (TT3 #8,973). When HILL did not respond, DIXON called and asked, "Donna's?" HILL told him, "Yeah," and DIXON said, "Alright, I'm here." (TT3 #8,975). I believe the two were meeting at PORTER's for a drug deal.

### ii.     Bates

191.   CS-6, through an unwitting witness, conducted two controlled purchases of crack from BATES between January 23, 2013, and February 10, 2013. The total weight of the two purchases was approximately five grams. Then on February 27, 2013, investigators were conducting surveillance at BATES's residence in Woodbridge when they observed short-term foot traffic consistent with drug dealing occurring at the residence. They obtained a search warrant for the residence and when they executed it they recovered approximately twelve grams of crack, seven grams of cocaine, $3,600 dollars of U.S. currency, a digital scale, plastic baggies, and an iPhone with telephone number (202) 492-2081. BATES was arrested.

192.   Prior to this arrest, BATES had been using phone number (202) 492-2081 to communicate with HILL. For instance, on February 14, 2013, BATES and HILL had a series of short intercepted phone calls during which they established a transaction to take place and a location to meet. (TT3 #s 9, 34, and 41). Subsequent to meeting one another, HILL called BATES and told him, "It's 850, dog." BATES replied, "Alright, I'm gonna have to come right back then." HILL then offered to BATES, "Nah, nah, nah, don't trip. . . . Don't trip off of it. Next time." BATES said, "I just miscounted." As the phone call concluded, BATES told HILL, "Alright, I got you. . . . I'll pay you in a couple days." (TT3 #47). I believe that HILL and BATES met to conduct a one ounce crack transaction and that BATES only paid HILL $850, which was less than the agreed upon price. The next day, BATES called HILL and asked, "Yo, where you want me to come to?" HILL replied, "Um, I can't, refresh my memory: where we was at last time? Cause I been meeting people everywhere. I can't remember where I meet you, man." BATES told him, "By the light." (TT3 #174).

193. Following his arrest on February 27th, BATES waived his *Miranda* rights and provided a statement to officers. He said that a subject he knew as "Snoop" and "Bush" (known by law enforcement to be aliases used by HILL) supplied him with cocaine. BATES physically described "Snoop" identically to HILL's actual physical description. BATES's cell phone, recovered at the time of arrest, had an entry labeled "Snoop" with telephone number (215) 983-4866. That is Target Telephone #3, HILL's phone. BATES said that "Snoop" would supply him with an ounce of powder cocaine at a time, for $1,300 dollars per ounce. BATES stated that he had been buying cocaine from "Snoop" for over one year and that the most cocaine he had purchased was four ounces at one time. BATES also stated that HILL sold drugs to him in two main locations, the description of one of which was consistent with WELSH LANE.

194. On March 12, 2013, BATES was interviewed again by law enforcement in an effort on his part to seek consideration for what was at the time, state narcotics distribution charges, after he had been released on bond. BATES again identified his current source of supply as "Snoop" or "Bush." BATES stated he was originally introduced to "Snoop" through a friend while he (BATES) was employed as a maintenance worker for the Dale Forest Apartments. BATES indicated that he had bought one to two ounces of crack a week from "Snoop" for approximately one year. BATES stated he would buy the crack from "Snoop" in one-ounce quantities for $1,200 an ounce. BATES added that he had been buying cocaine from HILL for the last one-and-a-half years. BATES estimated that he had purchased three to four ounces of cocaine a week from "Snoop" in one- to two-ounce quantities at a time, paying $1,300 an ounce. BATES told law enforcement that he currently owed "Snoop" $2,600 in drug debts. BATES stated that he knew "Snoop" always to be armed with a semi-automatic pistol, which he carried in a black plastic holster on his waist when he ("Snoop") sold drugs to BATES. BATES recalled

an occasion, approximately one-and-a-half years ago, when "Snoop" used a pistol to break two ounces off of a brick of cocaine that "Snoop" had on his person, and then sold the two ounces to BATES. Following the interview, BATES accompanied law enforcement to the Dale Forest Apartments and physically pointed out WELSH LANE and WESTMINSTER LANE as locations where "Snoop" is known stay and distribute drugs.

195.     Sometime after the second interview with law enforcement, BATES decided not to cooperate with law enforcement. After his arrest, BATES contacted law enforcement and asked for his seized iPhone to be returned. When his request was denied, BATES provided the telephone number (540) 316-1584 as one where he could be contacted. In subsequent intercepted communications with HILL, BATES used this telephone number. At times, however, this number was also used by BATES's wife.

196.     During several intercepted communications, BATES explained his recent arrest and asked HILL to loan him money to pay for an attorney. For instance, on March 19, 2013, at 2:01 p.m., BATES texted HILL: "Yo, this worm I need help with a lawyer if u can two weeks Ago I got a possession with intent and they took all the money out my house." (TT3 #2,139). HILL replied, "Come talk to me Tomorrow bro." (TT3 #2,195).

197.     On April 5, 2013, at 9:13 p.m., BATES called HILL, who told him, "It's probably gonna have to be tomorrow. Can you, I probably get you about $500 tomorrow." I believe HILL was saying he would contribute that money towards BATES's legal fees.

198.     On April 23, 2013, BATES called HILL. During their conversation, HILL said, "I was just checking in on you. You alright?" BATES responded, "Yeah I'm good. I don't go to court till, uh, June 7th. They postponed my shit for some reason, I have no idea." HILL then requested of BATES, "Okay, man, keep in touch with me, man." BATES replied, "A'ight, I got

you. I'll let you know everything and what, whatever happens." The phone call concluded shortly thereafter, with HILL saying, "Okay, you need anything, man, let me know." (TT3 #4,515). I believe that HILL felt it was in his best interests to assist BATES because HILL did not want BATES to expose him as his source of supply.

### iii. Thurman

199. THURMAN often obtains one ounce or more quantities of cocaine from HILL. Law enforcement have made three controlled purchases of cocaine from THURMAN. The phone number THURMAN used in conjunction with the controlled purchases is the same one he uses to speak with HILL. He also told PWCPD officers that it was his number when he was arrested on or about July 12, 2013, for possession with intent to distribute cocaine and possession of cocaine.

200. CS-7 was working with law enforcement to receive consideration in Prince William County for traffic-related charges and an obstruction of justice charge. On January 28, 2013, and again on February 5, 2013, UC-5 drove CS-7 to meet with THURMAN and purchase approximately a quarter-ounce of cocaine for $400. On February 12, 2013, UC-5 again drove CS-7 to meet with THURMAN. This time, THURMAN entered UC-5's vehicle and sold them approximately half an ounce of cocaine for $800.

201. On February 23, 2013, at 9:41 p.m., THURMAN and HILL agreed to meet later that night for what I believe to be a cocaine deal. At 10:40 p.m., THURMAN texted HILL, "im headed that way...people [sic] wait n me." (TT3 #609). THURMAN followed up with a call a few minutes later, and HILL told him, "I'll be there in twenty minutes. Fifteen, I'll be there in fifteen minutes." (TT3 #611). I believe THURMAN was picking up cocaine to sell to his customers, who were waiting on him to be supplied by HILL.

202.    Three days later, THURMAN called HILL and said, "Hey, what's up, man. I was wondering if I could come by there. I got some short money, like 620 and shit. I'll make up the difference." HILL reminded him, "You owe me, man. . . . Man, you owe me from the last package, man. I'm on a totally different package." THURMAN replied, "I hear you. I'm trying to take care of something to get straight. I gotta collect some money, too. Nobody wanna fucking pay me." (TT3 #725). I believe this shows HILL fronts cocaine to THURMAN and wanted to be paid for a previous deal before he allowed THURMAN to take more cocaine on credit.

203.    On March 11, 2013, at 7:43 p.m., THURMAN texted HILL: "wanted to come by now..for the whole...one..aint gonna have time later." (TT3 #1,549). I believe THURMAN was ordering one ounce of cocaine.

204.    On March 14, 2013, at 8:04 p.m., HILL texted THURMAN, "What u want?" (TT3 #1,771). THURMAN replied, "a whole... 1280," by which I believe he meant one ounce of cocaine for $1,280. (TT3 #1,773).

205.    On March 16, 2013, at 9:57 p.m., THURMAN called HILL, who asked him, "What you want, man?" THURMAN replied, "Like, the whole one and the half, like before." HILL told him, "Nah, that ain't gonna work. . . . You gotta have everything man." THURMAN said, "Yeah, I know." (TT3 #1,934). I believe THURMAN was ordering one-and-a-half ounces of cocaine, but HILL explained that THURMAN would have to pay for it all up front.

206.    In the evening hours of March 20, 2013, investigators established surveillance in the area of WELSH LANE in response to intercepted calls between HILL and THURMAN that indicated they had agreed to meet (TT3 #s 2,235, 2,269, and 2,272). Upon the establishment of surveillance, law enforcement observed a green Buick known to belong to THURMAN arrive and park in the area of WELSH LANE. A short time later, THURMAN'S vehicle left the area.

An investigator was able to follow this vehicle and determine, while parked directly next to it at a red light, that the driver matched a known photograph of THURMAN.

207.    On March 29, 2013, THURMAN texted HILL: "just hit me when u ready for me..the whole one..1400." (TT3 #2,885). I believe THURMAN was ordering one ounce of cocaine for $1,400.

208.    On April 14, 2013, HILL called THURMAN to ask where he had been. THURMAN explained he was out of town for a family matter, and would be leaving for another week to spend time with family again. (TT3 #4,406). On April 21, 2013, THURMAN sent HILL a text that read: "Come n back that way...niggas was starving while i was gone...need to get back to work...may need some help..ill let u know how bread i got when i get home..ok." (TT3 #4,339). I believe THURMAN was explaining that his cocaine customers had gone without the drug while he was away and that he would be getting back to selling once he returned and obtained cocaine from HILL. I believe THURMAN was suggesting that he might not have enough money to pay up front for all the cocaine he would need, and was therefore asking HILL to front him a quantity that he could sell and then pay HILL back later.

209.    Throughout the investigation, the two had frequent disagreements over THURMAN owing HILL money. One call, in particular, on July 4, 2013, encapsulates this tension. (TT3 #8,887). The following is a portion of the conversation:

HILL:       Yeah, I ain't even tripping off of you. You know that right?

THURMAN:  Well you acting like you is, like I ain't your nigger no more, or something. I don't know.

HILL:       You got my money?

THURMAN:  Yeah, we switching out like the weather, nigger.

HILL:       You got my money you owe me?

THURMAN:   No I don't. I ain't even sell none of mine yet. I'm trying to help somebody out. I ain't even open mine yet.

HILL:   Man, fuck somebody else, man.

THURMAN:   It's my little brother. I gotta help my little brother man or he gonna eat off of me.

HILL:   Did you tell your little brother that you owe me money?

THURMAN:   Nah, cause that ain't his business.

HILL:   Oh, oh.

THURMAN:   And we gonna work that out, too. You don't have to keep saying that like I'm some nigger that's not gonna take care of mine, like you been saying a lot of offensive stuff lately. Like, I don't know if it be your moods or whatever you feeling like at the time but, you been going in on me lately man.

HILL:   Man, you owe me money man.

THURMAN:   I know that, and you know.

HILL:   I'm from the old school man, I shouldn't even be picking up your phone call if it ain't about my money.

THURMAN:   No, you supposed to keep the money coming in by dealing with people. You rocking them to sleep, and you get through situations and problems. You don't cut people off that owe you money. You keep them around so the money can come in, and more money can come in later. That's what I do.

HILL:   Man, that don't make no damn sense, man.

THURMAN:   It does make sense.

HILL:   Who told you that?

THURMAN:   Man, that's how shit goes. That's how you properly run a business, you know what I'm saying? This ain't no strong-arm business like it gets to be.

HILL:   It's not how you, listen to me: That is not how you properly own a business. If you got a credit card, and your credit card is maxed out, you can't even get a fucking another credit card.

THURMAN:   This is not a corporate business. This isn't the corporate world. This is, uh, a illegitimate business. You gotta run your business the best way you know how, the best way to keep your clients happy, and the best way to keep money coming in. That's how I was taught, you know what I'm saying?

HILL:   Man . . .

THURMAN:   Like if your nigger, like I thought, I thought the nigger beat me, but he got in touch with me today, and now I'm waiting on him, so I [UI] you know what I'm saying? Then I wouldn't, I'd be [UI]. Know what I mean?

HILL:   My, my, my father ain't teach me that shit. My father taught me that if a motherfucker owe you money . . .

THURMAN:   You cut him off and say forget the money?

HILL:   No, you cut him off until they pay you. Once they pay you, then they back on track again . . . That's how it goes. That's how it's supposed to be. You think my people gonna keep dealing with me if I owe them some money? Fuck no. They not gonna keep dealing with me. They might a fucking bullet . . .

210.   Later that day, HILL complained that THURMAN had only given him $347 instead of the $350 that was owed. THURMAN explained, "Three dollars? I ate a hotdog. You made me waiting out here, okay?" HILL was upset and said, "That's like the tenth time you been shorted me." THURMAN replied, "Oh, I'll see you later. And I ain't fucking with you no more after that. You gonna miss me too." HILL disagreed, "I hope not man. I ain't gonna miss your little boy money, man. . . . Many, you got, you got on-the-corner money. I don't mess with niggers that be on the corner. . . . I mess with niggers that be in a house, kicking their feet up, getting their head sucked." (TT3 #8,905). I believe HILL was saying that he typically does not sell cocaine to people who stand on street corners and sell small quantities of the drug for relatively low amounts of money. Rather, he sells to people who stay out of the streets, the

implication being that they get larger quantities and have other people beneath them selling at the street level. TONY fits that description.

     **iv.**     **Porter**

211.    PORTER aides HILL in the day to day operations of his drug trafficking by, among other efforts, allowing her home at WELSH LANE to be a meeting spot for HILL and other co-conspirators for drug deals. In exchange, HILL supplies PORTER with cocaine and/or crack at what I believe to be discount prices.

212.    With respect to PORTER's residence, surveillance units observed several meetings between HILL and customers at WELSH LANE. On many of those occasions, HILL would wait outside the building to greet the customer, they would go inside the building for a short period of time, and then the customer would exit and leave the area. That these were for drug deals was confirmed by intercepted calls because many times HILL advised co-conspirators to meet him at "Donna's" or "D's." For instance, on February 14, 2013, HILL told DIXON he was at "Donna's" and the two agreed to meet there. (TT3 #s 26 and 30). And on March 10, 2013, HILL told STARNER he was at "Donna's" and STARNER said he would there in "five minutes." (TT3 #1,523).

213.    Other times, PORTER would call HILL and tell him that people were waiting to meet him at her residence. On March 27, 2013, for example, she called HILL and asked, "You waiting on somebody?" HILL said, "Yeah," and she told him, "Somebody out here." (TT3 #2,770). On April 9, 2013, she called HILL and told him, "[Name redacted] still here, waiting on you." (TT3 #3,687). And on May 10, 2013, PORTER told HILL that, "[Name redacted] want to see you. Is it possible?" HILL replied, "In a little while." PORTER explained to him, "She's here," by which I believe she was referring to her residence.

214. PORTER also has collected money for HILL from his customers. On May 28, 2013, PORTER asked, HILL "You, you, you come around yesterday?" HILL said, "Yeah." PORTER then told HILL, "Oh, ok. Um, I seen your boy, right? and "He gave you half of what he, of what's what. You know that, right? So, I got half." (TT3 #6,274). I believe that HILL completed a drug transaction at WELSH LANE the previous day with a customer who only paid HILL half of what was owed at that time. I believe that the next day the customer gave PORTER the remainder of the money so that she could give it to HILL.

215. It appears from some intercepted calls that HILL sometimes uses PORTER's residence to stash his drugs. On February 22, 2013, for instance, HILL told PORTER, "I'm at the door," and that "I gotta get my stuff out of there, baby." (TT3 #511). That HILL spends time inside PORTER's residence was confirmed by two calls on March 3, 2013. In the first call, HILL asked her, "I leave a phone over there?" PORTER said, "I haven't seen one." She said she would look and call him back. (TT3 #1,018). She did call back and said she did not find a phone. She asked him, "Which phone did you lose?" HILL told her, "That's my phone everybody call me on. So if I could around, I ain't gonna make no money anyway." PORTER replied, "Oh, yeah, you gotta find that phone." (TT3 #1,021).

216. It also appears that HILL has at least another stash location to which PORTER has access, as evidenced by these calls:

a. On February 20, 2013, STARNER called HILL and said, "I'm working' with about thirty. Can you work with me?" I believe he was saying he had $30 to purchase cocaine or crack. HILL responded, "Not right now, man. Nah, I can't." STARNER pleaded with him to do the deal, and HILL finally told him, "I would tell you to come, but I don't know if there's something over there or not." He explained, "My peoples, you know, she might of went

over there and took some." STARNER said, "She wouldn't do that to you." HILL replied, "I mean to sell it." (TT3 #332). I believe HILL was talking about PORTER having possibly gone to HILL's stash location and taken cocaine or crack to sell to other people on behalf of HILL, and that STARNER should not waste his time going to the stash location because there might not be anything there.

      b.    On June 4, 2013, PORTER asked HILL, "Um, can you come by here? Um, [name redacted] want to see you." HILL directed PORTER by stating, "No, you go over there and get it for him." PORTER stated "Oh, okay." (TT3 #6871).

      c.    On June 26, 2013, PORTER asked HILL, "Can I go over there? I got it." HILL said, "Hell no. Hell no. Leave my shit alone." PORTER protested, "I got the money. I got the money." HILL asked, "You got the money you owe me?" PORTER said, "Yes," and HILL relented, telling her, "Alright, alright. Go ahead." (TT3 #8,526).

    217.    With respect to HILL supplying PORTER with drugs, it became clear that they had a previously established relationship that did not require much need for discussion as to the type of controlled substance (cocaine or crack), the amount, or the price. There were a large number of calls and texts when PORTER simply inquired whether HILL was "around" or asked him to come see her. The following is a sampling of calls indicative of this aspect of their relationship.

      a.    On February 15, 2013, during text communications to HILL, PORTER stated, "I got 3hundred for u" (TT3 #83) and "I got ur money!!! Smile" (TT3 #87).

      b.    On April 1, 2013, PORTER asked HILL "You coming?" HILL then began to question PORTER as to why she did not call him on Sunday. PORTER offered reasons relating to Easter and HILL ultimately stated, "You said you was going to call me Sunday to pay

my money. I ain't hear from you yesterday." PORTER offered "Right, and I got you. That's why I need you to come over here sweetheart." HILL responded "No, no, you need me to come over there cause you trying to get high." PORTER denied this and the two began to yell at one another. PORTER stated "I got your money and I want . . ." when HILL interrupted, "I know you do." PORTER continued "And I got a joint." HILL continued to ask about the money: "And you, and you will have it whenever I get there, right? Even if I get there tomorrow, you'll have it right?" PORTER answered "Yep, I sure will. But I'm saying . . ." HILL interrupted again, "Alright then, so you're calling me back, you're calling me back because you want to get high again." PORTER stated "No, not necessarily." HILL eventually stated, "The reason you doing that, is it to pay my money? Fuck no, it's not. The reason you trying to get me over there is so you and [name redacted] can do what you all been trying to do." (TT3 #3,061).

      c.     On May 3, 2013, PORTER requested that HILL "come inside for a second." PORTER told him, "I need to holler at you. That's all. Okay?" HILL asked, "You got money?" To which PORTER replied "Yes, baby." HILL told her, "Alright, well that was the first thing that should of come out your mouth is that 'I got money.'" (TT3 #5,119).

      d.     On May 28, 2013, PORTER asked HILL, "Um, you around?" HILL indicated that he had waited on PORTER but she took too long. PORTER requested that HILL come over. HILL asked, "Why?" and PORTER responded, "Cause I want to give you that and I owe you and I want one." HILL stated "Alright." (TT3 #6,312).

    218.    PORTER used at least three phones to speak with HILL. One of those numbers, (571) 285-1262, was one she used several times, and as recently as on or about January 7, 2013, to call the Prince William County Public Safety Communications Center to report a medical emergency at WELSH LANE, all of which are believed to have involved her elderly mother. In

all these calls, PORTER provided her full name. Then on February 8, 2013, PWCPD officers did a canvas in PORTER's apartment building regarding a robbery, during which they spoke with PORTER inside WELSH LANE. She told the officers her number was (571) 285-1262. Agents linked the other numbers to PORTER through voice comparison and the context of the calls.

### v.    Starner

219.    STARNER first came to the attention of law enforcement as a frequent customer of HILL's for smaller quantities of cocaine and crack. As the investigation proceeded, and as evidenced by two lengthy calls discussed below, STARNER eventually came to work for HILL in the delivery of cocaine and crack to various customers.

220.    On March 1, 2013, at 6:44 p.m., HILL called STARNER and asked, "What you want?" STARNER replied, "One." STARNER asked HILL is he was "around," HILL said he was. (TT3 #903). Agents believed this was a reference to the two men conducting a drug deal at WELSH LANE, where the agents had established surveillance. Shortly after 7:00 p.m., agents observed a white Chrysler sedan registered in STARNER's name arrive. The vehicle was observed in the vicinity of WELSH LANE for a brief amount of time, after which it returned to the residence in Woodbridge listed on the Chrysler's registration.

221.    On March 18, 2013, at 8:26 p.m., STARNER asked HILL, "You around tonight?" to which HILL simply responded "Yeah, come on." (TT#3 2,075). At 8:45 p.m., agents observed the known vehicle for STARNER arrive on WELSH LANE. A few minutes later, STARNER was observed walking back from 4360 WELSH LANE to his vehicle. Agents was followed STARNER directly back to his residence in Woodbridge.

222.    On March 24, 2013, STARNER contacted HILL, who told him, "You got to do it yourself man. I ain't fucking around." HILL explained, "I don't got hard," to which STARNER

replied "Ok, do it myself, you mean . . . Okay." HILL went on to say, "I don't have it hard but you'll keep calling me every day," to which STARNER replied "Yeah, alright, yeah, I'll do it." HILL then asked, "What do you want." STARNER told him, "Um, dollar." I believe that STARNER was asking for $100 worth of cocaine, but that previously he had primarily been obtaining crack from HILL. (TT#3 2,477). Shortly after that call ended, the two spoke again and STARNER said, "Yo, I'm over at Donna's," which I believe was a reference to WELSH LANE. (TT3 #2,479).

223.    On April 13, 2013, HILL and STARNER discussed what I believe to be HILL's stash location and the fact that STARNER had taken a quantity of cocaine from it the night prior. HILL asked, "Hey did you go over to my spot? Okay, um, you know that was $200 worth of shit right?" STARNER replied, "I kind of figured it was that. It kinda looked big." HILL replied, "Yeah, why would you touch that? It wasn't even for you, it was for someone else." STARNER responded, "Man, I was trying to get a hold of you, trying to get a hold of you and I was in a situation. I said, man, I apologize, Bush [one of HILL's nicknames]. I got $100 right now, but I'll have the rest of it tomorrow or the next day." (TT3 #3,944).

224.    By May 1, 2013, STARNER appeared to begin to work for HILL directly in the distribution of cocaine and crack. During an intercepted call that day, HILL responded to STARNER's questioning if he (HILL) were around with, "Oh no, man, you, you want some work?" STARNER replied "Some work, what do you mean work?" HILL then stated "I need help moving some stuff, man," to which STARNER replied "Oh really?" (TT3 #4,923).

225.    On May 10, 2013, STARNER told HILL, "Yeah, I had Stafford call me up. Are you around?" to which HILL replied "No I'm not. I mean what's up?" STARNER told him, "Well he's talking a dollar but, um, I gotta take it down to him, you know." HILL then replied

"Alright. I'll call you back." (TT3 5,583). They spoke soon thereafter, and HILL told STARNER, "I just, um, I just put it in the spot man," to which STARNER replied. "Okay, alright. So you want me, you want me to bring it back and leave it?" HILL responded "No, it's too much. Just hold it for me. A dollar though, I need a dollar." (TT3 #5,594). I believe these calls concerned a customer in Stafford, Virginia, to whom STARNER was going to deliver a quantity of cocaine or crack, which HILL was going to supply. I further believe that HILL left the drugs in the stash location for STARNER to pick up, and that when STARNER offered to leave the money from the deal at the stash location, HILL told him to hold onto it instead and give it to him later.

226. The two spoke at length twice the next day about the deal, during which STARNER explained that the customer in Stafford did not like the drugs and would not pay. STARNER said that instead of returning the drugs to HILL, he kept them in the hopes of being able to pay HILL later. HILL expressed his extreme displeasure with STARNER. A large portion of those calls is detailed below because of the insight they provide into HILL's distribution activities. The first call took place at 10:02 p.m. (TT3 #5,644).

> STARNER: Man, I got down there and dude took one shot of that stuff and he said "Man, I don't want it."
>
> HILL: Okay, well where's the stuff?
>
> STARNER: Well, I brought it back and then said, "Well I go ahead and pay for it. Well I'm not going to be able to get anything until Monday."
>
> HILL: Oh man, that'll be the last time you'll ever do that to me. I came up, I got my girlfriend to take me all the way over here to get my money. I come over here to get my money and my money ain't even there, or my stuff cause I got people right now that wanna buy it and I ain't got the stuff or my money. Like how does that work?
>
> STARNER: I'm sorry man.

HILL:        Sorry, what's sorry gonna do for me buddy?

STARNER:     I know, I was thinking that I was going to score something today and be able to get.

HILL:        I mean wha-, come on man. We been through this ten times man.

STARNER:     I know, you know.

HILL:        So what you gonna get me? You gonna get me some extra because I'm upset?

STARNER:     [Laughing] That what you want man?

HILL:        I mean wha-, wha-, what would you want? I come over here to get my money, my money not there or my product. What would you want?

. . .

STARNER:     You know how much money I got to my name right now?

HILL:        And that's probably cause money don't mean nothing to you. I don't know why you would do that. What you did you know I wouldn't had done. I'd of rather leave it where it was at cause I don't play games like that. Got too many people out here.

STARNER:     After I run all the way down there I was upset.

HILL:        How, how, how was you upset?

STARNER:     What was I supposed to do? The product was already tested and it, it's, you know. And I told him, I said, "Well you got to do this and do that to it," and he, he wouldn't, he wouldn't go for it. So I lost all my gas and lost all my time going all the way down there and come back with nothing.

. . .

HILL:        I know, man. You should of, you should of left it there or should of called me and let me know what the situation was and I would have told you to leave it there.

STARNER:     Leave it down there with them?

HILL:        Nah, leave it where, where you got it from.

STARNER:     It, uh, what was left of it, you mean?

93

HILL:        Yeah, what was left of it. I mean, I'm, I'm pretty sure it was . . . more than what is over there right now.

STARNER:     Well, yeah that's true. You got that right [laughing].

HILL:        You laughing and shit. This shit ain't funny man.

STARNER:     No it's not. I, I, I'm very sorry. But, you know, I've had a hard day too, you know what I'm saying?

HILL:        I know. But I, I don't care about your hard day because this ain't the first or second or third time you did this to me. It's like I should have never, I should've never let you know about that spot.

STARNER:     Well.

HILL:        I don't know why you did that Paul [STARNER's first name].

STARNER:     I was trying to make you money man.

HILL:        Nah, well you didn't make me no money. You ain't make me no money man.

STARNER:     Well you going to get your money.

HILL:        I know I am, but not when I want it.

STARNER:     Right

HILL:        Like right now, I need it right now.

. . .

STARNER:     That's why I, that's why I'm saying I apologize about that, but I was expecting some . . .

HILL:        I don't want no apologies. I mean you was talking like these is your folks, like obviously these are new people or something. I don't know what's going on with you, man.

STARNER:     No they're the same ones I go down there for. They're the only ones I go down there for.

HILL:        Alright, well you ain't gotta worry about taking my shit nowhere else. I don't care who it is. It could be Santa Claus or your brother-in-law. I don't

give a fuck who it is. You ain't taking my stuff nowhere else and doing that to me. Obviously he knew people cause people that's friends of ours don't do shit like that, especially if they have you come all the way to Stafford to bring it to them. Friends don't do that.

STARNER:  I know it. But you know what happens when people get on alcohol and everything else.

HILL:  Yeah, but they're not our problems and you call me and, and assure me like, "Hey B, man, do you mind if I take it to them because this and because that and because this and because that," and then all of a sudden it's some, it's, it's some bullshit. You know I'm saying, it's the same shit I sell everyone else and ain't nobody said nothing. I've got not one complaint. I got people beg me, "Yo, can you please come out, man. Please." I'm like, "Can you wait till tomorrow?" They're like, "No man, I can't wait till tomorrow." . . . So you telling me they can't wait till tomorrow because of some bullshit? That don't even make no fucking sense. So I'm pissed the fuck off. I done begged my girl to take me over there to get some money that ain't even there. All you had to do was call me and tell it won't there.

STARNER:  I should have called you earlier. Yeah, you right.

HILL:  Yeah, you shoulda called me and said, "Yo, what you told me to do, Bush, I didn't do it. So don't go over there and expect for that money to be there cause it's not there."

STARNER:  You told me to hold on to that money.

HILL:  No I didn't. I told you to put it there. I said you go over there and get it, I said go put my money back over there.

STARNER:  No you said . . .

HILL:  That's what I told you.

STARNER:  You, you told me to hold on to it man.

HILL:  Well even if you was holding on to it, you ain't got it right now. So you, you didn't listen to either me or you didn't listen to yourself. . . . So yeah, I'm, I'm fucking pissed off. I could see if it was money that you needed cause everybody need money. Everybody don't need, you didn't need that. It wouldn't have hurt you to left it over there. You wouldn't a, all you had to do was call me and say, "B, I got it. I'm a take care of that." But you didn't do that. You doing the same shit Donna and everybody else be doing. You just don't think that what you did. That's exactly what you did.

STARNER:    I just thought that you would, you would say, "Okay, no problem."

HILL:       I would, I would have! You right! You are absolutely right, Paul, I would have! . . . Yeah I would have, but you just didn't let me in on your little secrets. So I feel like I'm your runner.

. . .

STARNER:    I just don't know how to put it in words to make you understand.

HILL:       Nah, it's no, there is no words that make me understand. . . . You was trying, you was trying to say something like, "Sorry. I apologize." Stuff like that. But there is no words that make me understand. It just like you said, shit happens.

STARNER:    And you know how this goes.

HILL:       Yeah I do. I be in the same boat with my peoples. You know I got people over top of me too, and they don't wanna hear that shit. And I always gotta give them, not always, but when I fuck up I gotta give them extra. If I don't, if I don't do what I say I'm gonna do, I gotta do, I gotta make it up to them so they will be able to leave me stuff again. So you going have to make it right.

STARNER:    I'm going have to make it right.

HILL:       Yep, that's all.

227.    HILL called STARNER a few minutes after the last call ended. (TT3 #5,645).

HILL:       I, I got a question for you.

STARNER:    Okay.

HILL:       You said they didn't like it, right? What do you mean they didn't like it?

STARNER:    They didn't like it, like it was cause it burnt all black.

HILL:       Okay, but I mean how, how, I mean, basically if, if you saying that these are people that's been on our team, they should be used to that. So what happened? They was playing with you?

STARNER:    Basically, yeah. I mean, I get all the way down there and it's like, you know, they are already messed up. And I mean, you know, there's more

stuff there but hey, we already got it and we don't have it and so we go to try it and then say we don't like it.

HILL:          Okay, alright. I gotcha.

STARNER:    You know what I'm saying? . . . And, and what I went through for them is not going to happen again cause I ain't going through that crap, taking that kind of risk, going all the way the f down there. You know what I'm saying?

HILL:          Yeah, I know what you saying. Yeah, they fucked you.

## III.  MARCIANO

### A.  Background

228.    MARCIANO is a kilogram-level cocaine distributor operating primarily in North Carolina. He works closely with several associates to distribute the cocaine, and his main partners appear to include VENANCIO (who I believe is his brother), FRANCISCO (who I believe to be his cousin), and JAIMES (who I believe to be his brother-in-law). MARCIANO obtains large quantities of cocaine from numerous sources of supply, to include CHRISTIAN and UCC-1. During the investigation, UCC-1 employed UCC-11, who owns a long-haul trucking company, and UCC-12, who drives a truck for UCC-11's company, to deliver what I believe to be fourteen kilograms of cocaine to MARCIANO.

229.    Two of MARCIANO's phones were wiretapped during the investigation. He was identified as the user of those phones through various means, to include: the identities of the people with and about whom MARCIANO spoke, many of whom are known by investigators to be his family members; a call on May 24, 2013, in which he told UCC-1 that his father's name is "Marciano Reza" (TT6 #505); and a call on July 2, 2013, in which JAIMES told MARCIANO that he sent a wire transfer on behalf of MARCIANO, and when MARCIANO asked specifically, "Under whose name? My name?" JAIMES responded, "Yeah, under Marciano, Jr."

(TT6 #4,318). Additionally, agents were able to identify through intercepted calls and other investigative techniques the identity of who agents believe to be MARCIANO's wife and mother of his recently born child. They then were able to find her Facebook account, which is referenced in intercepted calls, which has a picture of MARCIANO with his wife.

230.    What follows are three parts. The first deals with MARCIANO's relationship with HILL; the second with MARCIANO's distribution network; and the third with a specific deal for fourteen kilograms that took place on April 13, 2013, and involved UCC-11 and UCC-12.

**B.     Marciano and Hill**

231.    During the wiretaps on their respective phones, agents intercepted several phone calls between MARCIANO and HILL in which they discussed that they sell kilograms of cocaine. Portions of two of those calls are discussed above in Section II.A. The two maintained contact with one another because MARCIANO offered himself as a source of supply to HILL. HILL expressed interest in doing business with MARCIANO, but the two did not appear to conduct any transactions because they could not come to an agreement on a mutually acceptable price per kilogram.

232.    Public source information lists HILL as previously connected with an address in North Carolina that is within relatively close proximity to the areas of North Carolina where MARCIANO and his co-conspirators operate. And on February 15, 2013, HILL told MARCIANO that he still has family in the Greensboro, North Carolina area, which is also close to where MARCIANO operates. (TT3 #128). While agents do not know exactly how HILL and MARCIANO first met and established a business relationship, it appears from their conversations that there are at least three possible connections.

233.     The first and oldest connection, I believe, is that HILL used to obtain cocaine from MARCIANO's brother, Antonio Reza, and MARCIANO was present for some of their deals.

a.      In the same call on February 15th in which HILL discussed his family, HILL talked about coming down to North Carolina to pick up cocaine from MARCIANO and suggested, "[W]hen I used to deal with Tony back in the day, he used to meet me in Greensboro." MARCIANO responded, "Yeah, we could do it in the Boro." Earlier in the call, HILL asked, "What's the number man. What are we talking?" MARCIANO told him, "Probably like thirty-eight-and-a-half." HILL balked: "Oh, that's high. Even if I'm trying to do like four or five?" MARCIANO told him, "I could probably do a little better than that. Depends on how many." HILL asked, "It ain't messed with or nothing, right?" MARCIANO told him, "No, it's plain. Nothing but fish." HILL explained, "Yeah, you know I'm gonna have to mess with them before I grab 'em, right?" MARCIANO responded, "Yeah, I know how you do cause I done roll with my brother a couple times." (TT3 #128).

b.      I believe in this call the two were talking about doing a multi-kilogram deal and MARCIANO quoted a price of $38,500 per kilogram. HILL was unhappy with that price and asked if he could get a discount if he bought four to five kilograms, and MARCIANO said it was possible. I believe that HILL then asked if the cocaine was of a high quality, and that MARCIANO assured him it was, as I know that cocaine dealers often describe high quality cocaine as appearing to be scaly like a fish. HILL explained, I believe, that he would have to test the cocaine in some form or fashion to make sure it was as good as MARCIANO claimed, and MARCIANO said he understood that's how HILL operated because he had been present for deals between HILL and MARCIANO's brother in the past. I therefore believe that the "Tony"

HILL referenced later in the call was MARCIANO's brother, and I have learned that MARCIANO does in fact have a brother named Antonio Reza. Antonio was convicted in 2008 in the United States District Court for the Middle District of North Carolina of possession with the intent to distribute almost two kilograms of cocaine. He was sentenced to 152 months.

234. The second connection, I believe, is an associate of HILL's that lives in North Carolina and knows MARCIANO. Again in the February 15th call, HILL said to MARCIANO, "I've been trying to get through to you through my homeboy, but he's talking about he go to school or something now." MARCIANO asked, "Who that?" HILL said, "J." (TT3 #128)

235. Finally, the third connection appears to be a cousin of HILL's who, I believe, lives in North Carolina.

a.      On March 27, 2013, MARCIANO called HILL from a new phone number (Target Telephone #5) and explained, "I been trying to call you, but your phone was off, cause I was trying to give you my new number." HILL said, "I'm a call you from another number too cause I got like seven or eight phones, so I'm gonna get you another number to get in touch with me just in case you can't, you can't get in touch with me on this." The two discussed MARCIANO and his brother, who I believe to be VENANCIO, driving to the Washington, D.C., metropolitan area, to include Virginia, to meet HILL. HILL said if they came up, then HILL and his "people" would probably buy "seven," which I believe to mean seven kilograms of cocaine. In relation to this plan, MARCIANO discussed two of his cousins having been convicted for dealing cocaine in and around 2008 or 2009 and receiving sentences of over ten years. I believe he was referring to Moses Reza and Emiterio Reza, who were convicted in 2009 in the United States District Court for the Middle District of North Carolina of conspiracy to distribute five kilograms of cocaine and fifty grams of crack, for which they each received sentences of greater

than 200 months. HILL warned MARCIANO, "Just be careful down there, man. Good gracious almighty." MARCIANO responded, "Yeah, cause that's why I'm trying to get that out-of-town money, man, so nobody know what the fuck going on. Know what I mean?" He continued, "Hell, I'm trying to get that out-of-town bread, man, cause shit, know what I'm saying, it's more safer and it's more money, really. Know what I mean?"

      b.    I believe MARCIANO was ensuring HILL had his new phone number, and vice versa, so that he could expand his cocaine distribution outside North Carolina to Virginia in order to reduce his exposure to law enforcement in an attempt to avoid being charged and convicted like his two cousins.

      c.    Also during the call, MARCIANO referenced knowing a cousin of HILL's. Specifically, he said, "I ain't talked to your cuzo [slang for cousin] since that incident and shit." He went on to explain what I believe to be a situation in which HILL's cousin had stolen or robbed MARCIANO's nephew of nine ounces of cocaine, equivalent to approximately one quarter of a kilogram, and that MARCIANO ended up paying $13,000 to cover the cost of the stolen drugs. MARCIANO told HILL, "I ain't trying to go through the same situation and shit with you []." HILL told MARCIANO, "Yeah, you gotta be careful down with with, um, my family down there cause they, they don't play by the same rules that we play by up here. Cause basically, you know, when a nigga get their shit tooken down there, there ain't no repercussions." (TT3 #2,728).

236.    In a call with UCC-1 on June 12, 2013, MARCIANO referenced HILL. UCC-1 asked MARCIANO how long it would take him to sell fifteen kilograms, and if MARCIANO would want them at $36,000 apiece. MARCIANO said yes, and then referenced HILL when he told UCC-1 that "the guy from Virginia wants to come here. He buys about four cars."

MARCIANO then described to UCC-1 the back and forth he had with HILL concerning the price of the cocaine. (TT6 #2,387). I believe this call shows that MARCIANO counted on HILL as a customer who could purchase multiple kilograms at a time, if MARCIANO had to sell them quickly.

237.    A call on July 8, 2013, is another example of when MARCIANO and HILL talked business. HILL called MARCIANO and asked if he had any cocaine for him. MARCIANO told him he was expecting some soon. HILL asked if he would have four or five kilograms, and MARCIANO said he would have more than that. MARCIANO also said, "'I'm saying, as many as they bringing I should be able to, you know what I'm saying, do that number. Cause, you know what I'm saying, I'mma have to get out from it quick." (TT6 #5,014).

238.    When all of the above-described calls took place between MARCIANO and HILL, cell-site records for HILL's phone show that it was in and around the area of Woodbridge, Virginia, which is within the Eastern District of Virginia.

    C.    **Marciano's distribution network**

239.    MARCIANO works very closely with VENANCIO, FRANCISCO, JAIMES, and CHRISTIAN to purchase and redistribute cocaine. They each have their own customers, but they all work together and help one another out, to include loaning money and drugs within the group. MARCIANO and CHRISTIAN have their own sources of supply for cocaine, and they will often supply each other if the other person does have any themselves or if they come across what they believe to be a good deal. MARCIANO appears to be responsible for obtaining cocaine not only for himself, but also for VENANCIO, FRANCISCO, and JAIMES. Once the cocaine is sold, VENANCIO, FRANCISCO, and JAIMES collect the money from their customers, and give that to MARCIANO to pay his sources of supply.

240. Controlled purchases have been made from MARCIANO, VENANCIO, and FRANCISCO.

a. CS-8, who is not a U.S. citizen and has been assisting law enforcement in the hope of obtaining lawful immigration status in the United States, arranged to purchase two ounces of powder cocaine from VENANCIO on or about November 14, 2012. At the time of the transaction, MARCIANO arrived instead of VENANCIO. FRANCISCO and JAIMES were also present in the vehicle with MARCIANO. CS-8 approached MARCIANO's vehicle, and MARCIANO provided CS-8 with the two ounces of cocaine in exchange for $2,000. MARCIANO told CS-8 to call him from then on to purchase cocaine.

b. On or about November 28, 2012, and December 20, 2012, CS-8 participated in two additional controlled purchases of cocaine from MARCIANO. During each transaction, MARCIANO provided approximately two ounces of cocaine to the CS-8 in exchange for $2,000. During the transaction on or about November 28th, MARCIANO arrived in a truck driven by JAIMES.

c. On or about May 23, 2013, CS-9, who was working with law enforcement in North Carolina for monetary consideration, participated in a controlled purchase of approximately one ounce of crack from VENANCIO.

d. On or about June 6, 2013, CS-9 participated in a controlled purchase of approximately three ounces of crack cocaine involving VENANCIO and FRANCISCO. CS-9 arranged the deal over the phone with VENANCIO, who used phone number (910) 975-3144, and FRANCISCO was the person who actually did the deal with CS-9.

241.    What follows is the description of two incidents, one on June 7, 2013, and the other on June 29, 2013, that capture clearly the relationship between MARCIANO, CHRISTIAN, JAIMES, FRANCISCO, VENANCIO, and UCC-1.

242.    The incident on June 7, 2013, centered on MARCIANO obtaining nine kilograms of cocaine from UCC-1 that he divided between himself, VENANCIO, FRANCISCO, JAIMES, and CHRISTIAN.

a.    On June 6, 2013, at 3:45 p.m., UCC-1 called MARCIANO and brokered a deal with him for ten kilograms of cocaine at a price between $35,000 and $36,000 per kilogram. (TT6 #1,554).

b.    CHRISTIAN called MARCIANO at 6:20 p.m. from a new telephone number and told MARCIANO, "What's up brother, this is my new number and shit." MARCIANO then told him about the deal he brokered with UCC-1. "He was gonna let me get it for thirty-six. . . . But he still gonna front 'em to me. I'm just waiting on him to call me. . . . Yeah, so I might just put like five on you, something like that. He give me, he give me, he give me a week on it." CHRISTIAN replied, "Okay, alright. I gotcha." (TT6 #1,591). I believe MARCIANO was explaining that he would get the kilograms at $36,000 a piece, but that all or a portion of the cocaine would be fronted and he would have a week to pay off the entire cost of the deal. I further believe that he was going to give CHRISTIAN five of the kilograms.

c.    At 6:51 p.m., MARCIANO spoke again with UCC-1 and asked if the deal would take place that day or the next. UCC-1 said he was told the person with the cocaine would be ready that day to do the deal. (TT6 #1,604).

d.    MARCIANO called VENANCIO at 6:52 p.m. and asked, "How much change you got on you, bro?" VENANCIO said, "Probably like fifty, sixty, somewhere."

MARCIANO explained, "[T]hey want me to put a down payment on a car. . . . Yeah cause they trying to throw me, um, ten. . . ." Later in the call, VENANCIO asked, "What they need? What they want?" MARCIANO explained, "They want at least one hundred." VENANCIO was taken aback, saying, "Damn, boy." MARCIANO replied, "Yeah, but they giving us ten, though." (TT6 #1,606). I believe that MARCIANO was saying he had to pay $100,000 up front for the ten kilograms of cocaine, and that he was arranging to get a portion of that money from VENANCIO, who said he had between $50,000 and $60,000.

e.      At 8:06 p.m. MARCIANO called UCC-1 and told him that the deal would have to wait till the next day. (TT6 #1,628).

f.      At 9:10 p.m., MARCIANO told CHRISTIAN, "I was suppose to see them in the a.m., early in the morning." He added, "Hell, yeah. So soon as I get them in my hands, I'll call ya." (TT6 #1,631).

g.      At 9:16 p.m., MARCIANO told UCC-1 that he had only been able to gather up "eighty-nine bucks," which I believe meant $89,000. UCC-1 said the person with the cocaine was expecting "one hundred bucks," which I believe meant $100,000. MARCIANO said he would see what he could do to get the remaining balance. (TT6 #1,633).

h.      At 11:17 p.m., JAIMES texted MARCIANO, "They come through?" (TT6 #1,636). MARCIANO responded, "In the morning." (TT6 #1,637).

i.      On June 7, 2013, at 7:29 a.m., MARCIANO texted VENANCIO, "Right here about to get right." (TT6 #1,677). VENANCIO wrote back, "Ok lil bro safe let me kno wen u on yo way back." (TT6 #1,678). I believe MARCIANO was saying that he was at or near the deal location and about to pick up the cocaine.

j.    At 9:15 a.m., MARCIANO told VENANCIO he was on his way back. He explained, "He gave me nine. I thought he was gonna have ten. He ain't have nothing but nine." VENANCIO asked, "Well we got it for thirty-six though, right?" MARCIANO replied, "Nah, thirty-six-and-a-half." Later MARCIANO described the appearance of the cocaine, saying, "But it look like flake [slang for high quality cocaine]. You can, it just look like, um, it just look like the, they look fat. They kinda fat looking." (TT6 #1,700).

k.    MARCIANO called UCC-1 at 9:27 a.m. and told him, "I already got that." He further explained, "Everything is fine. Some look a bit beaten up. I'll check them out and see how it looks." (TT6 #1,704).

l.    At 11:51 a.m., MARCIANO and VENANCIO discussed that they and FRANCISCO would meet later that day so MARCIANO could supply them with cocaine. (TT6 #1,715).

m.    In a text message at 12:01 p.m., VENANCIO wrote MARCIANO, "Send two," by which I believe he meant two kilograms. (TT6 #1,717). At 12:03 p.m., MARCIANO told VENANCIO in a call that he was "going to send you a pretty one in there, and two halves." (TT6 #1,720). I believe he was saying that it would be one whole kilogram and two half kilograms, for a total of two kilograms.

n.    At 12:26 p.m., MARCIANO told JAIMES, "Shit, I got my hands on that, man," and "They charging thirty-six-and-a-half." JAIMES said, "Okay then, that's cool. I'm gonna call old boy and see what he wants." MARCIANO asked, "Yeah, he always bought one, right?" JAIMES said, "Yeah, hell yeah." MARCIANO surmised, "If the number right, he'll probably buy two." MARCIANO added, "Okay, just let me know, bro. I'll put some up for you, though." (TT6 #1,728).

o.   At 12:42 p.m., MARCIANO and FRANCISCO discussed the location where they were going to meet in a few moments to pass off the cocaine. (TT6 #1,732).

p.   At 12:51 p.m., MARCIANO and VENANCIO spoke and it appeared that the transfer had already taken place because MARCIANO told him, "I meant to tell you, uh, that nigger, he only gave us a week on it, too." I believe he was saying that they had to pay the full price of the nine kilograms within one week. MARCIANO went on to explain that the person he picked up the cocaine from said that they could supply MARCIANO "every two weeks." VENANCIO replied, "Yeah, every two weeks. Yeah [UI] we'll be alright." (TT6 #1,740).

q.   FRANCISCO called MARCIANO at 2:45 p.m. and asked, "Can you get me something bro? Some good, something good?" MARCIANO asked, "Yeah, what?" FRANCISCO replied, "I need a whole one," but said, "Don't bring the little, the half, the what's it half or whatever because they're not, they ugly bro." I believe FRANCISCO was describing the two half kilograms MARCIANO had provided him and VENANCIO earlier that day, as FRANCISCO went on to say, "Yeah, yeah, the, the little, the other one is beautiful, but . . . the other little pieces, they ugly." MARCIANO responded, "They said it was flame, supposedly. That's what they said." FRANCISCO told him, "I don't know what that mean; they don't look like it." (TT6 #1,761).

r.   FRANCISCO called back two minutes later and said, "Bro, never mind, never mind. They both, they all ugly, bro. . . . We just like broke it and its ugly. . . . They ain't even scale." (TT6 #1,763).

s.   At 3:23 p.m., MARCIANO called CHRISTIAN and told him, "They came through, man." He continued, "I was gonna give you two of them in the morning, too." CHRISTIAN responded, "Oh, okay." In reference to the person from whom MARCIANO got

the cocaine, MARCIANO explained, "He said as soon as I finish this, I'll go get some more." (TT6 #1,770).

t.     At 3:54 p.m., MARCIANO called VENANCIO, who asked, "You still got the other one for me, don't you?" MARCIANO replied, "That, that how many you wanted?" VENANCIO said, "Three." MARCIANO responded, "Okay, yeah. Cause, um, you're getting three; Lazo [shortened first name of JAIMES] want two; I'm giving Twin [CHRISTIAN's nickname] two, Pancho [FRANCISCO's nickname] getting one, and I'm getting one." (TT6 #1,780). This accounted for the nine kilograms MARCIANO had obtained earlier that day.

243.     On June 29, 2013, MARCIANO obtained three kilograms of cocaine from CHRISTIAN that were intended to be divided between him, VENANCIO, FRANCISCO, and JAIMES.

a.     On June 28, 2013, at 5:36 p.m., CHRISTIAN texted MARCIANO: "He ready." (TT6 #3,651). I believe CHRISTIAN was telling MARCIANO that his (CHRISTIAN's) source of supply had cocaine.

b.     MARCIANO immediately called VENANCIO, telling him, "Nah, um, Twin just hit me back. Say old boy got something." VENANCIO asked, "What you going to do?" MARCIANO said, "Shit, I might just grab me a goddamn half-time or one. That's it. I ain't going all in, fuck that." MARCIANO asked VENANCIO, "You going to grab you one, too?" VENANCIO replied, "Yeah." MARCIANO said, "I'mma see when they going to see him. It'll probably be today or tomorrow. Ain't no telling." VENANCIO said, "Yeah, find out let me know." (TT6 #3,652). I believe that MARCIANO and VENANCIO were going to get cocaine from CHRISTIAN's source, specifically a half kilogram to one kilogram for MARCIANO and one kilogram for VENANCIO.

c.      MARCIANO then called CHRISTIAN right back at 5:38 p.m. and said, "I know I'm gonna do one. Then my bro might do one. Probably like, probably do like two-and-a-half or three. Some shit like that." (TT6 #3,653).

d.      MARCIANO's next call was to FRANCISCO at 5:39 p.m., who asked "They got some?" MARCIANO told him, "They said he can. . . . I told him I'm just gonna grab one, man. Make, make sure it's good. I don't want to grab a lot." FRANCISCO said, I got fifteen for you, another fifteen." (TT6 #3,654). I believe MARCIANO was telling FRANCISCO that CHRISTIAN could get them cocaine, but that MARCIANO was only going to get one kilogram in order to first make sure it was high quality. I further believe that FRANCISCO said he had $15,000 in cocaine proceeds to give to MARCIANO.

e.      MARCIANO's next call was to JAIMES at 5:42 p.m. and he asked, "Did you want anything?" JAIMES replied, "Hell yeah." MARCIANO told him, "Yeah, it's Twin and them." JAIMES appeared to say he wanted "a little nine or something," by which I believe he meant a quarter kilogram. MARCIANO asked if one of JAIMES's customers wanted anything. So MARCIANO told JAIMES, "Just call and make sure he still wants some, though, before you grab it. Then you can grab him [the customer] some." (TT6 #3,656).

f.      At 5:59 p.m., MARCIANO called CHRISTIAN and said, "I'mma let you know in a little bit what, um, to place the order. I might need more than, uh, more than three." MARCIANO went on, "Yeah, cause a bunch of people want some C.O.D. [cash on delivery]. I'mma just fuck with that C.O.D. right now. That fronting shit fucked me up on that bullshit." CHRISTIAN replied, "A'ight. Ain't, ain't no rush. He just called me to, he just told me he ain't going to be good to do nothing until in the morning. So just take your time and hit me up before the day over." (TT6 #3,660).

g.    JAIMES called MARCIANO at 6:07 p.m. and told him, "He said, he'll two or three." (TT6 #3,661). I believe JAIMES was referring to his customer, who MARCIANO had told him to call.

h.    MARCIANO called CHRISTIAN a few minutes later and asked, "Old boy won't throw you nothing?" by which I believe he was asking if CHRISTIAN's source of supply would front any of the cocaine. MARCIANO went on to explain, "Yeah, cause I was saying, I'll bring the bread right back. . . . I'll get it at the end. One of them Indian cats [which is how MARCIANO and JAIMES refer to JAIMES's customer] want two of 'em." MARCIANO continued, "[J]ust tell him I'd like one, though, and bring the bread right back. . . . Yeah, cause I got, I, we got, I think I got, we got change for like three. Some shit like that." CHRISTIAN said, "Okay, okay. Let me holler at him and see." MARCIANO followed up, "Okay. And just let me know. If not, I'mma try to go and cash out before though." (TT6 #3,663). I believe MARCIANO was saying that he could pay for three kilograms up front, but wanted to know if CHRISTIAN's source would front the two kilograms intended for JAIMES's customer.

i.    At 11:14 a.m. on June 29, 2013, MARCIANO called CHRISTIAN and asked, "You ain't holler at old boy about, um, seeing if he could throw you one, too?" CHRISTIAN replied, "[H]e act like he can't do it." MARCIANO tried to explain that they would not steal from the source and would be able to pay him quickly: "Cause ain't want nobody be ripping or running. Cause I got dude, dude want two, another cat want one, and all of them be gone soon as I get down the road." CHRISTIAN did not say it was possible, so MARCIANO said later, "Okay, then, yeah. Cause, um, I was going to say, um, yeah I might, I'mma, I might have be able to do three for right now." (TT6 #3,746). I believe that CHRISTIAN's source was not going to front MARCIANO any cocaine, so MARCIANO had to limit his order to three

kilograms, which is what he, VENANCIO, FRANCISCO, and JAIMES had between them to pay for the cocaine up front.

j.      It appeared from calls and text messages between MARCIANO and CHRISTIAN that they met at around 3:45 p.m. to travel together to the deal with CHRISTIAN's source. (TT6 #s 3,771 and 3,772).

k.      At 4:45 p.m., MARCIANO called VENANCIO and said, "Shit, I'm about ready, about to pull out now." I believe he was saying that he had the cocaine and was leaving from where he met CHRISTIAN's source. (TT6 #3,780).

l.      MARCIANO called CHRISTIAN at 5:41 p.m. and told him, "Yeah, it look good, though. She look, this 'bout the best I seen it look, though." He continued, "It had the number. It got the numbers on it again." CHRISTIAN replied, "Yeah, I could see the numbers. It got, like, '88' on it, right?" MARCIANO said, "Yeah, I think it's '5 8,' some shit like that." (TT6 #3,794). I know that kilograms of cocaine often come from Mexico with images or numbers stamped, or pressed, into the cocaine. This is sought after by drug traffickers because they feel that cocaine kilograms with stamps are less likely to have been "stepped on," or mixed with a cutting agent, and therefore will be of a higher quality.

244.     VENANCIO was identified in several ways, including the following. First, he was frequently referred to in communications as MARCIANO's brother, which he is, and by his nickname "Vinny," which is a shortened form of his first name, Venancio. Second, the phone he used to speak with MARCIANO is the same one he used with CS-9 in conjunction with the controlled purchase on June 6, 2013, described above. Third, on October 7, 2013, pursuant to a court order, the phone he used to speak with MARCIANO was tracked to a residence in the 1100

block of Quinlan Drive, Greensboro, North Carolina. Surveillance units then saw VENANCIO leaving the residence and driving away in a black Cadillac.

245.     Agents identified JAIMES in several ways. First, JAIMES was frequently referred to in communications as "Lazaro," which is his first name, and "Lazo." Second, one of the telephones that JAIMES used to talk to MARCIANO was tracked pursuant to a court order. On October 7, 2013, JAIMES's telephone was located in a restaurant in Candor, North Carolina. Surveillance units observed an Hispanic male exit the restaurant and leave alone in a gray Nissan truck. On October 8, 2013, the telephone was located at a residence in the 1000 block of Burkhead Lane, Biscoe, North Carolina. The same gray Nissan truck from the restaurant was present at the residence. On October 9, 2013, the telephone was again located at the Burkhead Lane residence, at which time surveillance units observed JAIMES, who they identified based on comparison with a North Carolina driver's license photo of JAIMES, drive away from the residence in the gray Nissan truck.

246.     FRANCISCO was identified in several ways. He is often referred to as "Frankie" or "Pancho," which is a common Spanish nickname for Francisco. He is often also described in the calls as a cousin of MARCIANO's, which he is. Finally, according to FRANCISCO's North Carolina driver's license, his birthday is July 9, 1988. On July 9, 2013, MARCIANO sent a text message to FRANCISCO that read, "Happy birthday bro i love you." (TT6 #5,043). That same day, MARCIANO told an associate that it was Frankie's birthday and that they were going to go out to get something to eat. (TT6 #5,128).

247.     CHRISTIAN was identified in the following manner.

        a.     On August 6, 2013, at 5:45 p.m., MARCIANO called the man then known to investigators as "Twin" and "Trey." During the call "Twin" said, "I just hit your wife up on

Facebook, but tell her never mind." (TT10 #187). Agents obtained a search warrant for the Facebook account used by MARCIANO's wife, and located a posting on August 6, 2013, at 5:42 p.m. that said, "Hey cuzn have yall lef 4 beach yet? Tell j I said give me a call." MARCIANO's full name is Marciano Reza, Jr., and he is referred to often in his wife's Facebook account as "Jr.," for which "J" is a shortened form. The August 6th posting was made by the user of Facebook account BrennanChristian, which is CHRISTIAN's name. A photograph of the user of Facebook account BrennanChristian matches a prior booking photo of CHRISTIAN, who is currently on probation for charges related to dealing cocaine.

b.     Agents conducted a records search and determined that CHRISTIAN's birthday is in September, and he lives in High Point, North Carolina. "Twin" said he had a birthday in September in an intercepted call with MARCIANO (TT6 #5,375), and cell site location data from his phone showed it had a definitive link to the area of High Point, North Carolina.

c.     Agents also determined that CHRISTIAN has a twin brother named Brent. Brent has been incarcerated since in and around June 2012 in connection with a federal case in which he was ultimately convicted of possession with intent to distribute 500 grams of cocaine and possession of a firearm in connection with a drug trafficking crime. He is not scheduled to be released from prison until 2025.

**D.     Fourteen kilogram deal on April 13, 2013**

248.    The second day of interception of Target Telephone #5, the first of MARCIANO's phones to be wiretapped, was April 13, 2013. There were several calls that day concerning MARCIANO meeting at a Walmart in Greensboro, North Carolina, to pick up what I believe to be fourteen kilograms of cocaine. Further investigation uncovered that UCC-1 was the

source of the cocaine and that it was delivered to MARCIANO via a tractor trailer owned by UCC-11 and driven by UCC-12. Before describing the deal, what follows is a discussion of how UCC-11 and UCC-12 were identified.

i.    **Identification of UCC-11 and UCC-12**

249.    UCC-11 is the owner of a long-haul trucking company based in New Jersey. Target Telephone #8 is the listed business phone for UCC-11's company and is subscribed to in UCC-11's name. In intercepted communications over Target Telephone #8, UCC-11 self-identified himself numerous times, to include his full name, date of birth, and the last four digits of his Social Security number. Additionally, location-based information on the phone showed it consistently in the immediate vicinity of the address for UCC-11's company.

250.    Also relevant to the April 13th deal is a telephone number ending in the last four digits 1089, which I believe, based on the following evidence collected after the deal, was used by UCC-11 to communicate with MARCIANO that day.

a.    Investigators obtained passenger records for United Airlines Flight 4209 from Nashville to Newark for April 26, 2013, showing UCC-11 as a passenger on that flight. The flight departed Nashville at 11:31 p.m., and arrived in Newark at 1:24 a.m.

b.    On April 26, 2013, location based information for the telephone number ending in the last four digits 1089 showed that the telephone was located in Nashville, Tennessee, in the immediate vicinity of Nashville International Airport at 8:00 p.m. At 1:24 a.m. on April 27, 2013, the telephone was located at Newark International Airport. The telephone arrived in the vicinity of 21 Chestnut Street, Clifton, New Jersey, at 2:15 a.m. on April 27, 2013, and remained there until 1:00 p.m. that afternoon.

c.      On April 30, 2013, at 2:35 a.m. CST (Central Standard Time), according to records from the Federal Motor Carrier Safety Administration, UCC-11, who was driving a truck, was stopped by the Arkansas State Police and inspected at a highway inspection station at mile marker 282 on Interstate Highway 40 westbound in Arkansas. Records show the driver was UCC-11 and the carrier name for the truck he was driving was C K Hauling, Inc. Location-based information for the telephone number ending in the last four digits 1089 showed that at 2:50 a.m. CST, the telephone was located in the vicinity of Interstate Highway 40, mile marker 282, in Arkansas.

d.      A comparison between the voice of UCC-11 on intercepted calls over Target Telephone #8 and the man who called MARCIANO on April 13, 2013, using the telephone number ending in the last four digits 1089 show that it is the same person.

251.    UCC-12 is a truck driver who works for UCC-11. On May 18, 2013, he was stopped by a Texas Department of Public Safety (DPS) Trooper near Amarillo, Texas, for several equipment violations and for a Federal Motor Carrier Safety inspection. During the inspection, the Trooper found two suspicious boxes, which were subsequently searched. One box was found to contain twenty-five packages of suspected methamphetamine, weighing approximately 14.7 kilograms, and the other contained nine packages of suspected cocaine, weighing approximately 9.8 kilograms. UCC-12 was arrested and held in the Potter County Correctional Center until May 22, 2013. At the time of his arrest, UCC-12 was in possession of Target Telephone #7, which is subscribed to in his name. UCC-12 said he worked for UCC-11 and the truck UCC-12 was driving was registered in UCC-11's name. Below is a photograph of the truck:



### ii.    Description of deal on April 13, 2013

252.    At 10:53 a.m.[6] on April 13, 2013, UCC-11 used the telephone number ending in the last four digits 1089 to call MARCIANO. (TT5 #19). The following is a portion of their conversation:

UCC-11:     In two hours exactly, Greensboro. I will call you for the exit, okay? I told you that. . . .

MARCIANO: Okay, in two hours?

UCC-11:     Yes, and what time you will get out? Eh, do me a favor, do me a favor . . .

MARCIANO: Uh huh.

UCC-11:     The, the, the, how do I tell you? The papers that you have, wrap it up good. I want you to wrap it up real good.

MARCIANO: Uh huh. How much do you have then?

UCC-11:     How many tamales are they? Fourteen, right?

MARCIANO: Yes, fourteen, ah, yes.

UCC-11:     Ok, wrap it up good please. Put tape, all really good wrap up, if you can please.

253.    At 10:55 a.m., MARCIANO called VENANCIO and asked, "A'ight, you got any change laying around?" He went on, "Can you, um, get four Benz for me and, um, um, like clean, uh, like, um, tape it up and everything for me?" and then explained, "Vacuum it real good and, um, do it real quick." VENANCIO said, "Okay, then." (TT5 #23). I believe MARCIANO was telling VENANCIO he needed $40,000 to pay for a portion of the fourteen kilograms (which MARCIANO and UCC-11 referred to as "tamales") he was going to pick up in Greensboro.

---

[6] There is a difference of approximately three minutes between the times listed on the toll records for Target Telephone #5 provided by Verizon Wireless and the time stamp recorded by the program used by the FBI to intercept the telephone calls. In order to avoid confusion, the call times for all calls related to the deal are derived from the toll records.

254.    MARCIANO called VENANCIO back at 11:17 a.m., who asked, "Who you gotta meet at that road?" MARCIANO replied, "Them, them boys with that, um, that load." He continued later, "He got to wait on his last load so he can go back home. That's why he waited." I believe MARCIANO was explaining that the person with the cocaine had delivered other items, whether drugs or other goods, and that his last load was the cocaine for MARCIANO. MARCIANO asked later in the call about the money, "Did you tape it up . . .?" VENANCIO responded, "I Saran wrapped it real good." (TT5 #29).

255.    At 11:50 a.m., MARCIANO called UCC-1, who said, "That one called you and said he would meet you in forty-five minutes," which I believe is a reference to the call MARCIANO received from UCC-11 in which the latter said the meeting would take place at approximately 1:00 p.m. UCC-1 explained, "There's a guy who wants to drive the car. He wants to drive." I know this to be a reference to an associate of UCC-1 that was going to drive MARCIANO to the deal. MARCIANO said, "That's fine," and then said, "I have a house near [Interstate] 40. The guy driving and I can go there so that we don't have to drive too far with everything. . . . I was getting ready because I have to pick up some money nearby where the guy is going. And I'll go near there with the guy who is driving." (TT5 #54).

256.    MARCIANO then called UCC-1's associate at 11:53 a.m. and they agreed to meet at a mall in and around Greensboro. (TT5 #55).

257.    At 1:08 p.m., UCC-11 called MARCIANO and asked, "Are you around there? You're in Greensboro?" MARCIANO said, "Yes, I'm here." UCC-11 replied, "Okay. Greensboro, 40 'boches' [PH], exit 214. Walmart. . . . It's at the back of the Walmart." MARCIANO asked, "You're behind Walmart?" and UCC-11 responded, "Uh huh. On the side, it's a yellow one, the trailer says L-C-T-D [PH]. It's a big one, blue." MARCIANO clarified,

"Okay, uh, it's a big trailer?" UCC-11 told him, "It's a trailer with blue letters 'L-C-T.'" Later UCC-11 said, "Okay, I'll, my, um, my driver call you. He speaks English very well." (TT5 #62). I believe UCC-11 was providing directions to a Walmart located off Exit 214 on Interstate 40 where a driver with a truck and tractor trailer would be waiting with the cocaine for MARCIANO.

258.    Agents confirmed that there is a Walmart in Greensboro, North Carolina, that is in close proximity to Exit 214 on Interstate 40. The physical address is 4424 West Wendover Avenue, Greensboro, North Carolina. Agents obtained the Walmart's surveillance video footage from April 13, 2013, at around the time of the deal. At 1:02 p.m., the footage showed a truck that matched UCC-11's description arrive at the rear of the Walmart and finish parking at 1:04 p.m. A still shot of the truck from the surveillance footage is below, and it appears to be UCC-11's truck that UCC-12 was driving when he was arrested in Amarillo on May 18, 2013.



259.    Toll records show that at 1:05 p.m., UCC-12 used Target Telephone #7 to call UCC-11 on Target Telephone #8. The call lasted approximately two minutes and fifty-five seconds. I believe UCC-12 was telling UCC-11 that he had arrived, which is reflected by the above-described call UCC-11 made to MARCIANO at 1:08 p.m. to say his driver was in a truck behind the Walmart.

260.    At approximately 1:20 p.m., tolls records show that UCC-12 used Target Telephone #7 to again call UCC-11 on Target Telephone #8. The call lasted approximately two minutes and twenty seconds. While they were on the phone, MARCIANO called UCC-11 on the telephone number ending in the last four digits 1089. (TT5 #66). The following is a portion of their conversation, the italicized portions of which were in Spanish:

MARCIANO: *What's up, bro?*

UCC-11:    *Did you see it already?*

MARCIANO: *Yeah, you said it's in back?*

[OV]

UCC-11:    *It's a yellow one.*

MARCIANO: *I don't know. Is it in the back or front of Walmart?*

UCC-11:    *In back.*

MARCIANO: *In back?*

UCC-11:    *Yes.* Yeah.

MARCIANO: *Okay, okay. Right now we're here. We'll find it.*

UCC-11:    Okay. 910 -- hold on -- *He's going to call you.* 910 . . .

MARCIANO: Uh huh.

[Can hear voice of person on other phone in background]

UCC-11:    Eh  975-5311.

MARCIANO: *That's my number, right?* [laughs]. Bro?! *Is the number* . . .

[OV]

UCC-11:    5311.

MARCIANO: *That is my number.*

[Can hear voice of person on other phone in background]

UCC-11:      910-975-5311. Call [OV] very close to you.

MARCIANO: [OV] *that's my number.*

UCC-11:      Eh, [UI] he close to you, he call you, okay? [UI] working each other's.

261.    At 1:23 p.m., UCC-12 used Target Telephone #7 to call MARCIANO on Target Telephone #5, which was telephone number (910) 975-5311. The two had a brief exchange that was mostly inaudible, but during which MARCIANO said, "I'm here." (TT5 #67).

262.    At approximately 1:23 p.m., the surveillance video shows a white sedan pull into the Walmart parking lot and park near the front of the truck pictured above. The front passenger then exits the white sedan and approaches the driver of the truck, who is outside of the truck but then immediately returns to the cab of the truck.

263.    At approximately 1:24 p.m., surveillance shows the white sedan drive to the area near the rear of the container of the truck. The truck driver opens the container, removes a large item from the container, and places it in the trunk of the white sedan, which was opened by the passenger of the sedan.

264.    At approximately 1:25 p.m., surveillance shows the two occupants of the white sedan return to the vehicle and drive away. The truck driver closes the container and returns to the cab.

265.    Toll records show that UCC-12 used Target Telephone #7 to call UCC-11 on Target Telephone #8 at 1:26 p.m. At that same time, surveillance shows the white sedan drive past the truck again, which behavior, I believe, is consistent with surveillance detection routines commonly utilized by drug traffickers.

266.     At 1:34 p.m., UCC-11 used the telephone number ending in the last four digits 1089 to call MARCIANO. MARCIANO said, "[T]hey said it's fourteen guys. . . . [W]e're going to check it out. Didn't get a chance to check it out because the [UI] cameras." (TT5 #71). I believe MARCIANO was confirming that he received fourteen kilograms of cocaine but that he did not get to physically inspect the cocaine in the Walmart parking lot because of the presence of surveillance cameras that he observed there, but intended to check the contents later at a better location.

267.     The surveillance footage shows the truck pulling away at 1:37 p.m. and exiting the Walmart parking lot a minute later.

268.     Historical cell site information collected on Target Telephone #7 shows that the phone moved through the following locations, among others, on the following days:

a.     April 6, 2013: the area of Los Angeles, California (UCC-12 is from California);

b.     April 7, 2013: Nevada;

c.     April 8, 2013: Texas;

d.     April 9, 2013: Oklahoma;

e.     April 10, 2013: Tennessee;

f.     April 11 and 12, 2013: New York;

g.     Morning of April 13, 2013: Richmond, Virginia, within the Eastern District of Virginia;

h.     April 13, 2013, between 1:05 p.m. and 1:26 p.m.: the phone hit off a cell tower directly across the street from the Walmart in Greensboro, North Carolina, described above; and

i.      April 13, 2013, through April 17, 2013: in order, went from North Carolina through Tennessee, Arkansas, Oklahoma, Texas, Arizona, and, finally, California.

269.    Based on my training and experience, and knowledge of the investigation, this pattern of movement is consistent with a cross-country truck driver, and corroborates that the UCC-12, the user of Target Telephone #7, was the person who drove the truck into the Walmart on April 13, 2013, and delivered what I believe to be fourteen kilograms of cocaine to MARCIANO. I further believe that UCC-12 drove with the cocaine through the Eastern District of Virginia on his way to the deal with MARCIANO in Greensboro, North Carolina.

270.    On April 13, 2013, at 1:53 p.m., MARCIANO called VENANCIO and told him he was on his way home and then said, "It's the one four," by which I believe he was saying he had fourteen kilograms. VENANCIO asked, "What about, say, what's the time frame, though?" MARCIANO told him, "Uh, now, fifteen days." (TT5 #76). I believe they were discussing how long they had to sell all the cocaine to pay off the remaining balance they owed the source of supply.

271.    At 2:04 p.m., CHRISTIAN called MARCIANO, who told him, "I got something. I got that food in already." CHRISTIAN asked, "It look like originals?" and MARCIANO responded, "Yeah, original CDs. They don't look like no bootleg CDs." He later asked, "You want like two or three of 'em?" CHRISTIAN replied, "Yeah, yeah. That's all I'm trying to do." (TT5 #83). I believe MARCIANO was telling CHRISTIAN that the cocaine he picked up appeared to be high quality and that he would give him two to three kilograms.

272.    At 2:34 p.m., MARCIANO received a call from FRANCISCO. MARCIANO told him, "I got some girl," by which I believe he meant cocaine. Then MARCIANO asked, "Did you

any, did you need any?" FRANCISCO said, "Yeah, yeah, yeah, yeah." MARCIANO told him, "Okay, then. Yeah I got some for you." (TT5 #100).

273. MARCIANO called UCC-1 at 5:13 p.m. and said, "Yeah, I'll finish them in fifteen days," confirming that he only had that length of time to sell the fourteen kilograms and pay off what he (MARCIANO) owed. (TT5 #161).

274. At 6:07 p.m., MARCIANO called FRANCISCO and said, "I'm only bringing three, though." FRANCISCO said, "Okay then." (TT5 #196). I believe they were talking about three kilograms of cocaine that FRANCISCO was going to receive.

275. At 8:36 p.m., HILL called MARCIANO and told him, "I'm thinking like maybe three or four." MARCIANO asked, "Three or four of them?" HILL confirmed and MARCIANO said, "Just call me. I got it man. I got whatever, so just call me." I believe they were speaking about three or four kilograms of cocaine. Later in the call, HILL said, "Okay, I'll call you, dog. It's, it's not a definite. I was just calling to make sure you okay." (TT5 #267).

276. On April 15, 2013, at 4:10 p.m., MARCIANO called JAIMES, who asked, "What's left?" MARCIANO went on to tell him that at "the spot" there were "two down there; like two-and-a-half [UI] split." JAIMES replied, "Oh, okay. I'm gonna have to get me one. . . . I'm gonna leave it the way it is. I'm just gonna move this one time." MARCIANO asked, "What are you gonna charge them, forty?" JAIMES said, "Ah, forty-one." MARCIANO said, "Yeah, okay. That's cool, then. You charge forty-one. That's cool." JAIMES asked, "Thirty-five, then, right?" MARCIANO told him, "Shit, hell no [laughter]. No I'll just charge you, ah, I was charging everybody thirty-six-and-a-half." JAIMES replied, "Oh, okay. Yeah, that's cool." (TT5 #507). I believe that MARCIANO had two-and-a-half kilograms of cocaine left over from the April 13th deal that he was offering up to JAIMES, who said he only needed one. I further

believe that MARCIANO said the kilograms were split into half-kilogram quantities, and that JAIMES said he was going to leave two halves the way they were and charge his customer(s) $41,000 total. Finally, I believe that MARCIANO said he would charge JAIMES $36,500 for the kilogram, meaning JAIMES would make a $4,500 profit.

## CONCLUSION

277.   Based on the foregoing, your affiant submits there is probable cause to believe that between in and around 2012 and the present date, within the Eastern District of Virginia and elsewhere, defendants TONY, HILL, BATES, NARATIO, DANGERFIELD, DIXON, HENDERSON, JOHNSON, JONES, JUGGINS, MCQUEEN, PORTER, SANDERS, STARNER, THURMAN, DARREL, and YOUNGBLOOD did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute 500 grams or more of a substance containing a detectable amount of cocaine, a Schedule II controlled substance, and twenty-eight grams or more of a mixture and substance containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

278.   Based on the foregoing, your affiant further submits there is probable cause to believe that between in and around 2012 and the present date, within the Eastern District of Virginia and elsewhere, defendants MARCIANO, CHRISTIAN, JAIMES, FRANCISCO, and VENANCIO did unlawfully, knowingly, and intentionally combine, conspire, confederate, and agree with other persons, both known and unknown, to unlawfully, knowingly, and intentionally distribute five kilograms or more of a mixture and substance containing a detectable amount of

cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 846.

279.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Kenneth M. Smith
Special Agent
Federal Bureau of Investigation


Sworn and subscribed to me this 15th day of October, 2013.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

Theresa Carroll Buchanan
United States Magistrate Judge

126